UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DOUGLAS COMPANY, LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>MMA KINGS CROSSING, LLC, MMA SHELL POINTE, LLC, MMA DOUGLAS MONTAGUE, LLC, and BFIM SPECIAL LIMITED PARTNER, INC.,<br><br>       Defendants. | Case No. 1:20-cv-10875 |

## COMPLAINT

COMES NOW Plaintiff Douglas Company, LLC, by and through its undersigned attorneys, for its Complaint against Defendants MMA Kings Crossing, LLC, MMA Shell Pointe, LLC, MMA Douglas Montague, LLC, and BFIM Special Limited Partner, Inc., formerly known as MMA Special Limited Partner, Inc. (collectively, "Limited Partners" or "Defendants"), states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.      This action seeks, among other things, a declaration of the rights and obligations of the parties under the limited partnership agreements (the "LPAs" or "Partnership Agreements") governing each of the Kings Crossing, L.P., Shell Pointe, L.P., and Douglas Montague, L.P. (collectively, the "Partnerships"), which are the owners of separate affordable housing developments located in Charleston County, South Carolina (collectively, the "Projects").

2.      Plaintiff Douglas Company, LLC ("Douglas" or the "General Partner") is a general partner in each of the Partnerships and the holder of identical buyout options under each of the LPAs with respect to Defendants' limited partner interests in each of the Partnerships.

3.      The General Partner is a limited liability company formed and existing under the laws of the State of South Carolina with its principal place of business located in Aynor, South Carolina.  Plaintiff's sole member is a citizen of South Carolina.

4.      Defendant MMA Kings Crossing, LLC ("MMA Kings") is the investor limited partner of the Kings Crossing, L.P.  MMA Kings is a limited liability company formed and existing under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.  Pursuant to the LPA for Kings Crossing, L.P., MMA Kings became the investor limited partner in Kings Crossing, L.P. upon transfer of the investor limited partner interest from, upon information and belief, an affiliate of MMA Kings—MMA Financial Warehousing— pursuant to an Initial Transfer Agreement.  Upon information and belief, none of the members of MMA Kings are citizens of the State of South Carolina.

5.      Defendant MMA Shell Pointe, LLC ("MMA Shell") is the investor limited partner of the Shell Pointe, L.P.  MMA Shell is a limited liability company formed and existing under the laws of the State of Delaware with its principal place of business in Boston, Massachusetts.  Upon information and belief, none of the members of MMA Shell are citizens of the State of South Carolina.

6.      Defendant MMA Douglas Montague, LLC ("MMA Douglas") is the investor limited partner of the Douglas Montague, L.P.  MMA Douglas is a limited liability company formed and existing under the laws of the State of Delaware with its principal place of business in

2

Boston, Massachusetts.  Upon information and belief, none of the members of MMA Douglas are citizens of the State of South Carolina.

7.      MMA Kings, MMA Shell, and MMA Douglas are collectively referred to herein as the "Investor Limited Partners."

8.      Defendant BFIM Special Limited Partner, Inc., formerly known as MMA Special Limited Partner, Inc. ("BFIM" or the "Special Limited Partner") is the special limited partner of each of the Partnerships.  BFIM is a corporation formed and existing under the laws of the State of Florida with its principal place of business in Boston, Massachusetts.

9.      Upon information and belief, BFIM is affiliated with Boston Financial Investment Management ("Boston Financial"), a company owned by ORIX Corporation USA, and located in Boston, Massachusetts, from where it manages approximately $7.3 billion in financial investments comprising over 1,150 apartment complexes and 114,000 apartment units.

10.     Upon information and belief, Boston Financial currently manages Defendants' assets in the Partnerships and claims entitlement to collect a percentage of any financial interest that Defendants may have in the Partnerships.

11.     The matter in controversy exceeds the sum of $75,000 exclusive of interests and costs, and is between citizens of different States; thus, there is complete diversity in this action.

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 2201(a).

13.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1).

14.     The parties have all consented to the jurisdiction of this Court pursuant to Section 13.7D of the LPAs.

## FACTUAL ALLEGATIONS

**I.      The Low-Income Housing Tax Credit Program**

15.      The low-income housing tax credit ("Tax Credit") is a federal tax credit that is generated from certain multi-unit housing projects that satisfy a number of requirements, including, without limitation, an agreement by the property owner to only rent certain units to households with incomes below certain qualified limits at rents that do not exceed federally-mandated maximums for a period of at least 15 years after the property is placed in service (the "Compliance Period").

16.      The Low Income Housing Tax Credit Program (the "LIHTC Program") is governed by Section 42 of the Internal Revenue Code (26 U.S.C. § 42), certain Treasury Regulations, guidance from the United States Department of Treasury and the Internal Revenue Service, and state-specific procedures contained in various documents adopted by designated housing agencies in each state (collectively, the "Tax Credit Rules").

17.      In a typical low-income housing project, the project owner is organized as a limited partnership or limited liability company (here, the Partnerships), in which a developer (which may be a for-profit or non-profit organization, here Douglas) acts as a general partner or managing member of the owner entity, controlling the day-to-day operations of the project.

18.      A third-party tax credit investor is admitted as a limited partner or an investor member (here, the Investor Limited Partners), agreeing to contribute capital to the owner entity (the Partnerships) in exchange for an allocation of substantially all of the Tax Credits available to the project owner (the Partnerships) along with certain other expected tax benefits (such as writing off on-paper losses).

4

19.     The Tax credits provide the investor limited partner with a dollar-for-dollar reduction on income taxes, allowing investors with large, predictable annual tax liability to reduce their income taxes.

20.     The Tax Credit Rules provide that only the project owner of a qualified low-income housing project can qualify for Tax Credits, and can only receive the Tax Credits if the project owner meets certain terms and conditions, and also guarantees the continuation of these requirements for the duration of the Compliance Period, or as extended.

21.     The project owner collects the Tax Credits over a ten-year period, but remains obligated to maintain the low-income rent restrictions during the fifteen-year Compliance Period. By the end of the Compliance Period, the project owner has collected all Tax Credits available to the project and other tax benefits.  As a result, by the end of the Compliance Period, the investor limited partner has realized the economic benefits it bargained for and expected from the project and thus expects to exit the partnership near or following the expiration of the Compliance Period.

22.     To effectuate its desire to exit the partnership near or following the end of the Compliance Period, the investor limited partner often agrees to a buyout option with the general partner.

23.     A buyout option is often one of the primary economic incentives for the general partner in a typical low-income housing project.

24.     While the investor limited partner receives a substantial yearly return on its investment during the Compliance Period in the form of Tax Credits and other economic benefits, the general partner or an affiliate of it provides development and management services to the project during the Compliance Period for modest fees, which are traditionally required to be deferred and paid out from project cash flows.

5

25.     The general partner or an affiliate of it is also the guarantor of the flow of Tax Credits, any negative adjustors, and operating losses, so the general partner or its affiliate assumes significant risk in the project.

26.     The general partner undertakes its investment of time, resources and money, as well as its duties and obligations, with the expectation that it will have the option and right to acquire either the investor limited partner's interest in the operation of the business as a going-concern, or the real estate itself at the end of the Compliance Period at a formulaic price.

27.     Traditionally, the investor limited partner does not expect, nor project, any cash payment upon the exercise of the buyout option that takes into account the return of the investor limited partner's capital contribution to the partnership or related capital account balance.

28.     In this case, the General Partner invested in and took on considerable risk from the Partnerships and dutifully served as the general partner with these aforementioned understandings and expectations.

29.     Without the rights afforded to it through the buyout options and the parties' agreements that the buyout option prices would not include, or even consider, the return of capital contributions to the Partnerships or related capital account balances, Douglas would have much less incentive to participate in, and otherwise would not have participated in, the development of the low-income housing projects at the center of this dispute, and would otherwise be deprived of an economic right to which the parties had originally negotiated and agreed upon at the inception of the Partnerships.

## II.     Boston Financial is an Aggregator

30.     Boston Financial is what is known throughout the LIHTC industry as an "aggregator":

> Recently, however, a number of private firms have been challenging

> LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end [*i.e.*, after the 15-year compliance period closes]. These firms appear to be aggregating investor interests in LIHTC partnerships; asserting myriad claims and arguments against project transfers, including transfers to nonprofits; and extracting value from the project or nonprofit in the shadow of protracted litigation. As noted, some in the LIHTC industry have dubbed these firms "aggregators."

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission, p. 5 (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (last visited May 4, 2020) (observing that firms like Boston Financial often use burdensome tactics, like litigation, to take advantage of resource disparities in order to leverage economies of scale in hopes of overwhelming their counterparts and preventing rights like the buyout options here). A true and correct copy of the report detailing such activities is attached here as **Exhibit A**.

31.     Boston Financial claims to be a national leader in the LIHTC industry, with investments of over $13.1 billion in LIHTC properties since 1986. It manages real estate investments for over 100 institutional clients from across the United States, yielding a portfolio of approximately $7.3 billion, comprising over 1,150 properties and 114,00 units. Its geographic reach extends to 48 states, the District of Columbia, Guam, Puerto Rico and the U.S. Virgin Islands.

32.     As its website touts, "Boston Financial sponsors investment funds to raise capital ***to acquire low-income housing tax credits*** from developers and distribute the credits ***and other tax benefits*** to investors." Yet, in situations such as those underlying the dispute here, near or after the close of the Compliance Period, when all Tax Credits and other tax benefits have been received, Boston Financial uses aggressive tactics to extract additional, improper profits out of the LIHTC project.

33.     Boston Financial's ultimate objective is to offer "investment opportunities at attractive yields," not further the underlying objectives of the LIHTC program or corresponding affordable housing projects (such as the Projects here).

34.     Boston Financial's role as an aggregator, known for conduct such as that giving rise to the dispute here, highlights a concerning trend in the affordable housing industry, where ownership and/or management of the investor limited partner interests changes hands late into the Compliance Period, with the new limited partner or manager seeking to undermine the purchase options agreed to by the original parties at or near the start of the fifteen-year Compliance Period. The new limited partner or manager typically (as is the case here) seeks to extract additional profits out of the partnership and/or project to the detriment of the general partner and residents in the affordable housing communities.

## III.     The Partnership and the Project

35.     The Kings Crossing, L.P. was formed on or around May 8, 2002, for the purpose of acquiring, constructing, developing, maintaining, operating, managing, leasing, and otherwise dealing with a 48-unit affordable housing project.

36.     The Shell Pointe, L.P. was formed on or around April 24, 2003, for the purpose of acquiring, constructing, developing, maintaining, operating, managing, leasing, and otherwise dealing with a nine building, 72-unit affordable housing project.

37.     The Douglas Montague, L.P was formed on or around April 24, 2003, for the purpose of acquiring, constructing, developing, maintaining, operating, managing, leasing, and otherwise dealing with a 64-unit affordable housing project.

38.     The Partnerships are governed by the LPAs, all of which are substantially similar. A true and correct copy of the Kings Crossing, L.P. Partnership Agreement, inclusive of

attachments, is attached hereto as **Exhibit B**.  The Partnership Agreements for Shell Pointe, L.P. and Douglas Montage, L.P. are substantially similar.

39.     The Projects were to be acquired, developed, and operated in such a manner as to qualify for (and receive) Tax Credits.

40.     Pursuant to the LPAs, in 2003 and 2004, the Limited Partners were admitted to the Partnerships as the investor limited partners and special limited partner.  The terms of the LPAs set forth the various obligations and duties of the general partners and limited partners in each of the Partnerships.

41.     Section 6.13 of the LPAs provides the General Partner with a right to buyout the Limited Partners' interests in the Partnerships (the "Buyout Options").

42.     Section 6.13A of each of the LPAs provides:

> The Investor Limited Partner grants to the General Partner, for so long as it is the General Partner of the Partnership, an option to purchase Investor Limited Partner's and the Special Limited Partner's entire interest in the Partnership on the terms and conditions as set forth in this Section 6.13 (the "Option").

43.     Under Section 6.13B, the period during which the Buyout Options may be exercised (the "Option Periods") runs for 1 year beginning after the expiration of the Compliance Periods.

44.     Under Section 6.13C, the Buyout Options may only be exercised if the General Partner agrees "to continue to use the Projects for low-income housing purposes subject to restricted rents."

45.     Section 6.13C also establishes the price of the Buyout Options (the "Buyout Prices"), providing that the Buyout Price as to each Partnership:

> shall be the greater of (i) all federal, state and local taxes imposed on the Limited Partner attributable to the Buyout; or (ii) the fair market value (as of the date of the closing of the Buyout) of the

9

Investor Limited Partner's Interests as determined in accordance with this Section 6.13.

46.    Section 6.13C of the LPAs also provides that the notice of exercise (the "Buyout Notice") must be in writing, must include a proposed closing date and be sent to the Investor Limited Partners at least 60 days, but not more than 120 days, prior to the proposed closing date, and must include the following:

> (1) an appraisal of the assets of the Partnership by an appraiser selected in accordance with this Section 6.13;
>
> (2) an appraisal of the fair market value of the Investor Limited Partner's Interest in the Partnership by an appraiser selected in accordance with this Section 6.13;
>
> (3) a calculation by the General Partner of the principal amount and accrued interest of all outstanding indebtedness secured by the Project,
>
> (4) a calculation by the General Partner of the federal, state and local taxes to be borne by the Investor Limited Partner attributable to a sale of the Investor Limited Partner's Interest; and
>
> (5) a calculation by the General Partner in accordance with the requirements of this Section 6.13 of the proposed Buyout Price.
>
> Any Buyout Notice which fails to include the items required in this Section 6.13 shall not constitute an effective Buyout Notice.  If a Buyout Notice includes appraisals or calculations which, in the reasonable opinion of the Investor Limited Partner, contain *material* errors, the notice shall not constitute an effective Buyout Notice.
>
> [Emphasis added.]

47.    Section 6.13D of the LPAs provides the requirements for an acceptable appraiser:

> Appraisals performed of the value of the Investor Limited Partner's and the Special Limited Partner's Interest shall be performed by an Accredited Senior Appraiser as certified by the American Society of Appraisers and acceptable to the Limited Partner (an "ASA Appraiser") or an MAI certified real estate appraiser acceptable to the Limited Partner (an "MAI Appraiser").

48.    Section 6.13E of the LPAs identifies the specific factors an appraiser must consider:

For the purposes of determining the value of the assets of the Partnership[s], the appraiser shall be specifically directed to assume that limitations on tenant income and permitted rents, as set forth in the Extended Use Agreement, shall remain in effect throughout the Extended Use Period. For the purposes of determining the fair market value of the Investor Limited Partner's and the Special Limited Partner's Interest, the appraiser shall consider the value of the assets of the Partnership and give due consideration to all other relevant factors relating to the value of the Investor Limited Partner's and the Special Limited Partner's Interest including without limitation:

(i)      provisions relating to restrictions on the amount of rent and the level of tenant incomes;

(ii)     limitations on the market for the Interest including limitations resulting from the lack of marketability, transferability, and liquidity;

(iii)    limitations on Investor Limited Partner's management control and management selection;

(iv)     limitations on Investor Limited Partner's ability to require liquidation; and

(v)      any other reasonably applicable limitations on marketability and control.

49.     Additionally, Section 6.4J of the LPAs provides the Investor Limited Partners with the right to request the General Partners either refinance or market the Projects for sale (the "Forced Sale Rights"). Section 6.5J provides, in relevant part:

If requested to do so by the Investor Limited Partner at any time after the Compliance Period, the General Partners shall use their best efforts to sell or refinance the Project on terms acceptable to the Investor Limited Partner. . . Any proposal either from the Credit Agency or from another buyer of the Project which is acceptable to the Investor Limited Partner shall be accepted by the Partnership.

50.     The Buyout Options can be exercised within the Option Periods irrespective of the Forced Sale Rights.

51.     Upon exercise of the Buyout Options, a binding contract to transfer the Limited Partners' interests in the Partnerships to the General Partner is created.  As a result, the Forced Sales Rights are extinguished.

52.     Moreover, to exercise the Buyout Options, the General Partner must agree "to continue to use the Project[s] for low-income housing purposes subject to restricted rents." Therefore, upon exercise of the Buyout Options and the creation of binding contracts requiring the Limited Partners sell their interests in the Partnerships to the General Partner, the Projects can no longer be sold without undermining the General Partners right to continue to use the Projects for low-income housing.

53.     Forcing the General Partner to market the Projects for sale after the Buyout Options have been exercised would breach the LPAs and/or the LPAs' implied covenants of good faith and fair dealing owed by the Limited Partners to the General Partner.

54.     The existence of the Buyout Options do not nullify the Forced Sale Rights because, among other things, (a) the Option Periods are limited—lasting only one year following the Compliance Period—while the Forced Sale Rights continue thereafter and (b) the Buyout Options can be waived during the Option Periods, allowing for the Forced Sales Rights to be exercised and a sale consummated during the Option Periods.

## IV.     The Current Dispute

55.     The Compliance Periods for the Projects ended on December 31, 2019.

56.     The Option Periods during which the General Partner could exercise the Buyout Options ends on December 31, 2020.

### A.     The Exercise of the Buyout Options

57.     By letter dated January 1, 2020, the General Partner exercised the Buyout Options by sending Buyout Notices to each of the Limited Partners as required under the Partnership

Agreements and via email.  True and correct copies of the Buyout Notices exclusive of attachments are attached hereto as **Exhibits C, D, and E**.

58.     The General Partner and Limited Partners' regular course of conduct included communicating via email.  The delivery of the Buyout Notices via email on January 1, 2020, and through formal delivery under the Partnership Agreements, provided actual notice of the General Partner's exercise of the Buyout Options, as received by the Limited Partners.  The January 1, 2020 email therefore substantially complies with the notice requirements under the LPAs.

59.     On January 2, 2020, the General Partner also arranged for hardcopies of the Buyout Notices to be delivered to the Limited Partners via FedEx.  The Limited Partners have acknowledged receipt of the Buyout Notices on January 2, 2020.

60.     The General Partner agreed via the Buyout Notices to continue to use the Projects for low-income housing purposes subject to restricted rents pursuant to Section 6.13 of the LPAs.

61.     The Buyout Notices included a proposed closing date of March 11, 2020, which was more than 60 days, but less than 120 days, from the date of the Buyout Notices.

62.     The Buyout Notices also included exhibits A through E, which provide the appraisals and calculations as required under Section 6.13C(ii) of the LPAs.

63.     The appraisals of the Partnerships' assets were completed by an MAI Appraiser from Cushman & Wakefield in accordance with Section 6.13 of the LPAs.

64.     The appraisals of the Partnerships' assets have no material errors and were performed using industry standard methods by an MAI Appraiser approved by Defendants under the Partnership Agreement.

65.     The appraisals of the fair market values of the Limited Partners' interests in the Partnerships were completed by Phil Jones, from Cushman & Wakefield, who the Limited Partners

approved in accordance with Section 6.13 of the LPAs and whom Boston Financial (including its affiliates) had approved in other instances.

66.     The appraisals of the fair market values of the Limited Partners' interests in the Partnerships have no material errors and were performed using industry standard methods.

67.     The Buyout Notices provided for the following Buyout Prices:

      a.     $33,400 for the Limited Partners' Interests in Kings Crossing, L.P.,

      b.     $170,171 for the Limited Partners' Interests in Shell Pointe, L.P., and

      c.     $145,602 for the Limited Partners' Interests in Douglas Montague, L.P.

68.     The Buyout Notices were unequivocally delivered to the Limited Partners during the Option Periods, thereby causing the Buyout Options to be exercised and created binding contracts requiring the Limited Partners transfer their interests in the Partnerships to the General Partner at the Buyout Prices.

**B.     The Forced Sale Rights are Purportedly Exercised to Undermine the Buyout Prices and Extinguish the Buyout Options**

69.     As a result of the General Partner's valid and effective exercise of the Buyout Options, the Forced Sale Rights have been extinguished.

70.     Nevertheless, by letters dated January 2, 2020 and with knowledge of the Buyout Options have been exercised and/or being pursued, the Investor Limited Partners sent the General Partner a notice purporting to exercise the Forced Sale Rights under Section 6.4J of the LPAs (the "Forced Sale Letters").  True and correct copies of the Forced Sale Letters are attached hereto as **Exhibits F, G, and H**.

71.     Pursuant to the Forced Sale Letters, and notwithstanding that the Limited Partners were already contracted to transfer their interests in the Partnerships to the General Partner at the Buyout Prices, the Investor Limited Partners directed the General Partner to "engage within thirty

(30) days of the date hereof a nationally or regionally recognized brokerage firm acceptable to the Investor Limited Partner to conduct the marketing and sale of the Project[s] for a purchase price acceptable to the Investor Limited Partner[s]."

72.     The Investor Limited Partners represented they would not find the Buyout Prices "acceptable" by offering, instead, "to sell their Interests in the Partnership to the General Partners or an affiliate for a price that would be equal to the net proceeds that would be received by the Limited Partners based upon a sale of the Project[s] and liquidation of the Partnership[s]."

73.     In particular, the Limited Partners proposed sale prices are based upon hypothetical liquidations of the Partnerships that include the sales of the Projects, which is contrary to the LPAs and express language of the Buyout Options.

74.     Thereafter, by letters dated January 9, 2020, the Investor Limited Partners provided a separate response to the Buyout Notices (the "January 9 Letters").  True and correct copies of the January 9 Letters are attached hereto as **Exhibits I, J, and K.**

75.     In the January 9 Letters, the Investor Limited Partners provided unreasonable criticisms of the Buyout Notices and attempted to manufacture material errors for the purpose of rendering the Buyout Notices ineffective and extinguishing the Buyout Options.

76.     The Investor Limited Partners first claimed the Buyout Notices were ineffective because they were postmarked December 31, 2019 (the day preceding a federal holiday), and therefore Notice was given prior to the start of the Option Periods.  The Investor Limited Partners nevertheless concede they received the Buyout Notices during the Option Periods on January 2, 2020.

77.     The Buyout Notices were also sent to the Limited Partners via email on January 1, 2020.

78.     The Buyout Notices provided the Investor Limited Partners with actual notice during the Option Periods and therefore substantially complied with the LPAs' notice requirements.  Upon information and belief, the Investor Limited Partners' technical challenges to the Buyout Notices were made in bad faith only to enable them to make an irrelevant argument that they exercised their Forced Sale Rights before the General Partner exercised their Buyout Options.  Such is clearly not inaccurate nor germane to the outcome of the dispute here.

79.     The Investor Limited Partners next claim material errors in the fair market value appraisals of the Limited Partners' interests in the Partnerships and attempt to reform the contractually mandated Buyout Prices.

80.     Specifically, the Investor Limited Partners claim that because the Forced Sale Rights were exercised, and because a sale of the Projects would cause a dissolution of the Partnerships, which would then cause a liquidation of the Partnerships, the Buyout Prices must ignore what the Partnership Agreements require for the distribution of sale proceeds and, instead, take into account and apply what the Limited Partners would receive in a hypothetical liquidation of the Partnerships.  The underlying contention is that the Forced Sale Rights grant the Investor Limited Partners access to their capital account balances out of the sales proceeds from the Projects because such proceeds must be treated as liquidation proceeds instead of sale proceeds.  Under this analysis, the Investor Limited Partners would be entitled to nearly 100% of the hypothetical residual proceeds from a sale of the Partnerships' principal asset, after paying the Partnerships' outstanding debts, thus inflating the Buyout Prices.

81.     The Investor Limited Partners' assertions are objectively incorrect and in violation of their duties of good faith and fair dealing.

82.     As an initial matter, the Buyout Options have been exercised and the Forced Sales Rights have therefore been extinguished.

83.     Upon the valid and effective exercise of the Buyout Options, the General Partner has contractual rights to the Limited Partners' interests in the Partnerships.

84.     A sale of the Projects would, ultimately, cause dissolution of the Partnerships, but only upon the happening, consummation or completion of such sale, not prior to it.

85.     A dissolution of the Partnerships would, ultimately, then cause a liquidation of the Partnerships' remaining assets but only following the happening, consummation or completion of the sale that causes the subsequent dissolution.

86.     As a result, a sale of the Projects would ultimately result in the termination of the Partnerships, thereby extinguishing the Buyout Options.  The Limited Partners attempts to force sales therefore flagrantly breaches the LPAs, the LPAs' implied covenants of good faith and fair dealing, and the binding contract formed upon the valid and effective exercise of the Buyout Options.

87.     As a matter of law, the valid and effective exercise of the Buyout Options necessarily extinguishes the Forced Sale Rights.  Therefore, as the agreed-upon Appraiser concluded, the Forced Sale Rights have no economic impact on the fair market value of the Limited Partners' interests in the Partnerships.

88.     The Limited Partners' have not raised any legitimate material error in the fair market value appraisal based upon their Forced Sale Rights.

89.     In the alternative, even if the Buyout Prices were to be calculated based upon a hypothetical sale of the respective Projects, any proceeds from a hypothetical sale of the Projects would be distributed as sale proceeds under the LPAs, not liquidation proceeds.

17

90.     In particular, pursuant to Article III, Section A of the LPAs, "upon the happening of" an enumerated event, including "the sale or other disposition of all or substantially all the assets of the Partnership," the Partnership "shall be dissolved."

91.     Under Article III, Section B of the LPAs, "[u]pon the dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VII), the General Partners . . . shall . . . liquidate the partnership assets and apply and distribute the proceeds thereof in accordance with Section 10.2."

92.     Section 10.2 applies only to "the remaining assets" following a dissolution of the Partnerships.

93.     Section 10.2 ***does not*** apply to distributions of capital transaction proceeds, such as pre-dissolution sale or refinancing proceeds.

94.     Section 10.1B, on the other hand, ***does*** apply to distributions of capital transaction proceeds, including pre-dissolution sale or refinancing proceeds.

95.     Under Section 10.1B, "***[p]rior to dissolution, if the General Partners shall determine***" proceeds from a capital transaction, such as a sale or refinance of the Projects, are available, the proceeds are distributed through a prioritized waterfall that includes any outstanding debt, a $10,000 payment to the Special Limited Partner, and all residual proceeds being distributed 10.5% to the Investor Limited Partners and 89.5% to the General Partner.

96.     Because the sale of the Projects must occur before the Partnerships can be dissolved, and because a dissolution of the Partnerships must occur before the Partnerships can be liquidated, a hypothetical sale of the Projects would necessarily constitute a pre-dissolution event, and thus would not be part any hypothetical liquidation of the Partnerships.  As such, sale proceeds

18

are not distributed as liquidation proceeds under Section 10.2, but as sale proceeds under Section 10.1B.

97.     Even if the Limited Partners' interest in the Partnerships were valued based upon hypothetical sales of the Projects due to the Forced Sale Rights, the hypothetical sales proceeds would not be distributed as post-dissolution liquidation proceeds under Section 10.2, but pre-dissolution capital transaction proceeds under section 10.1B.

98.     The Limited Partners' position is contrary to the plain language of the LPAs and is a knowingly false premise intended only to extinguish the exercise of the Buyout Options and inflate the Buyout Prices.

99.     In the January 9 Letters, the Investor Limited Partners also raised a host of other immaterial objections, technical errors, and subjective disagreements with the decisions of the approved ASA Appraiser in an attempt to manufacture material errors to render the Buyout Notices ineffective and thereby extinguish the Buyout Options.  The Investor Limited Partners, however, fail to identify a single material error in any of the appraisals.

### C.     The Amended Buyout Notices

100.     In response to the January 9 Letters, the General Partner sent Amended Buyout Notices, dated January 29, 2020 (the "Amended Buyout Notices") to the Investor Limited Partners via FedEx.  True and correct copies of the Amended Buyout Notices, inclusive of appraisals of the fair market value of the Limited Partners' interests and the Projects, are attached hereto as **Exhibits L, M, and N**.

101.     In the Amended Buyout Notices, the General Partner objected to the assertion that the Buyout Notices were ineffective due to the postmarked date being December 31, 2019, but nonetheless submitted the Amended Buyout Notices with postmarked dates within the Option Periods.

102.    The Amended Buyout Notices provided proposed closing dates of March 31, 2020, which is more than 60 days, but less than 120 days, from the dates of the Amended Buyout Notices.

103.    The Amended Buyout Notices reminded the Investor Limited Partners of the fact that "the previous five Buyout Notices we have exchanged with you used the same appraisers, same dates, and same method to update the Appraisals such that the value is consistent with the date of closings, all without any objection or accusation of error (material or otherwise)."

104.    Additionally, the Amended Buyout Notices corrected the Investor Limited Partners incorrect assertion that the ASA Appraiser did not take into account the Forced Sale Rights or the Investor Limited Partners' capital account balances.  In fact, "the Appraiser did consider these factors and, in the Appraiser's professional opinion, found them to be economically irrelevant to his conclusions of value."

105.    The Amended Buyout Notices also identified the amount of economic benefits already obtained by each of the Investor Limited Partners as bargained for in exchange for their capital contributions:

> a.      MMA Kings received $3,841,361 in Tax Credits and $2,242,642 in tax losses through 2018 for its $2,996,000 capital contribution;
>
> b.      MMA Shell received $4,770,129 in Tax Credits and $2,955,225 in tax losses through 2018 for its $3,769,000 capital contribution; and
>
> c.      MMA Douglas received $4,999,000 in Tax Credits and $2,252,330 in tax losses through 2018 for its $3,949,000 capital contribution.

106.    The basic business deal underlying the Partnerships was that the Tax Credits and losses go 99.98% to the Investor Limited Partners, and cash and residual value go 90% to the General Partner.

107.    The Investor Limited Partners received their end of the bargain.  As the above demonstrates, the Investor Limited Partners received substantial returns on their capital contributions.

108.    The Amended Buyout Notices further identified the following accrued partnership management fees still owed to the General Partner:

        a.     $402,188 from Kings Crossing, L.P.,

        b.     $420,842 from Shell Pointe, L.P., and

        c.     $224,272 from Douglas Montague, L.P.

109.    Considering, among other things, the accrued partnership management fees owed to the General Partner, the Amended Buyout Notices provided for the following Buyout Prices:

        a.     $0 for the Limited Partners' Interests in Kings Crossing, L.P.,

        b.     $140,000 for the Limited Partners' Interests in Shell Pointe, L.P., and

        c.     $122,00 for the Limited Partners' Interests in Douglas Montague, L.P.

110.    By letters dated February 7, 2020, the Investor Limited Partners responded to the Amended Buyout Notices (the "February 7 Letters"), again raising subjective, immaterial objections to the fair market value appraisal of the Limited Partners' interests in the Partnerships to render the Buyout Notices ineffective and thereby extinguish the Buyout Options.  The Investor Limited Partners, however, fail to identify a single material error in any of the appraisals.  True and correct copies of the February 7 Letters are attached hereto as **Exhibits O, P, and Q**.

111.    The February 7 Letters primarily regurgitate the Investor Limited Partners' prior objections in the January 9 Letters, demanding the Buyout Prices be calculated based upon a hypothetical liquidation so as to "reflect the value of [the Investor Limited Partners'] positive Capital Account[s]."

112.    However, as described above, and as the Investor Limited Partners are readily aware, the Buyout Prices under Section 6.13 of the LPAs are not based upon what the Investor Limited Partners would receive in a liquidation of the Partnerships that includes a sale of the Projects, nor do they take into account capital account balances.

**D.      The Limited Partners' Breach of Contract**

113.    At no point when the original parties to these transactions negotiated and entered into the LPAs was there any intention capital accounts would be returned after the close of the Compliance Period, at which point the Investor Limited Partners were expected to have received (and did, in fact, receive) all of the substantial benefits it had bargained for.

114.    Upon information and belief, the investment assumptions or considerations associated with the Limited Partners' investment in the Partnerships did not, in any respect, ascribe any residual, or other, value assumptions to their Limited Partner interests upon a sale of the Projects at or following the end of the Compliance Period.

115.    The General Partner's Amended Buyout Notices are proper, valid, effective and enforceable, and there are no material errors in the appraisals or calculations included or contained within the Amended Buyout Notices; yet, the Limited Partners have indicated and stated that they will not comply with the Amended Buyout Notices and transfer their interests as required by the Amended Buyout Notices and under the LPAs.

116.    Neither the LPAs nor the Buyout Options entitle the Limited Partners to subjectively disagree with the appraised fair market value of their interests in the Partnerships and then hold out for what they believe to be a more accurate price.

117.    The General Partner is entitled to close pursuant to the Amended Buyout Notices and acquire the Limited Partners' interests in the Partnerships as provided by Section 6.13 of the

LPAs, but the Limited Partners have refused to transfer their interests to the General Partner as required.

## COUNT I—DECLARATORY JUDGMENT

118.   The General Partner fully incorporates the above paragraphs by reference as if fully stated herein.

119.   The LPAs are valid and binding contracts.

120.   The LPAs include the Buyout Options, for which the General Partner provided sufficient consideration.

121.   The General Partner has complied with the LPAs, specifically Section 6.13 thereof, and has exercised its Buyout Options, thereby creating binding contracts for the sale of the Limited Partners' interests in the Partnerships to the General Partner for the Buyout Prices.

122.   An actual controversy exists as to the Amended Buyout Notices, specifically concerning whether there are any material errors in the appraisals or calculations contained therein, and, as a result, the General Partner's right to acquire the Limited Partners' interests in the Partnerships pursuant to the Amended Buyout Notices.

123.   There are no material errors in the appraisals or calculations contained within the Amended Buyout Notices, but the Limited Partners have stated that they do not agree with the fair market valuation of their interests, as determined by an approved ASA Appraiser, and has indicated that they will not sell their interests to the General Partner pursuant to the Amended Buyout Notices.

124.   The General Partner maintains that Section 6.13 of the LPAs require the jointly-selected appraiser to consider certain specified factors in conducting the appraisal and otherwise grants discretion to the appraiser to determine: (i) the appropriate appraisal methodology; (ii) the impact on value of each factor required to be considered under Section 6.13; and (iii) the

appropriate additional considerations that impact the appraiser's ultimate conclusion of value. Accordingly, a party's disagreement with the appraiser's subjective, professional determinations cannot constitute a "material error" under the LPAs.

125.    The Limited Partners have expressed subjective disagreements with the jointly-approved appraiser's professional determinations and conclusions made within the scope of the discretion otherwise granted to the appraiser under Section 6.13 of the LPAs, and contend that their disagreements constitute "material errors" rendering the General Partner's Amended Buyout Notices ineffective.

126.    The interpretation of the LPAs articulated by the Limited Partners would allow them to prevent the General Partner from exercising its Buyout Options and deprive the General Partner of the benefit of its bargain, including its ability to acquire the Limited Partners' interests in the Partnerships at the Buyout Prices and continue to use the Projects for low-income housing purposes, all in contravention of LPAs, Section 42 of the Internal Revenue Code (26 U.S.C. § 42), and the LIHTC Program.  Such a result was never contemplated by the parties when entering into the LPAs, and is contrary to the plain language of the LPAs.

127.    A declaratory judgment would resolve the uncertainty or controversy giving rise to these conflicting contentions.

128.    The General Partner is entitled to an order pursuant to 28 U.S.C. § 2201(a), declaring that:

     a.    The appraisals and calculations attached to the Amended Buyout Notices do not contain any material errors;

     b.    The General Partner's Amended Buyout Notices are valid, effective, and enforceable; and

     c.    The Limited Partners must sell and transfer their interests in the Partnerships to the General Partner pursuant to the Amended Buyout Notices.

129.     In the alternative, if it is determined that the Buyout Prices are to be calculated based upon the hypothetical sale of the Projects pursuant to the Forced Sale Rights, the General Partner is entitled to an order pursuant to 28 U.S.C. § 2201(a), declaring that the hypothetical sale proceeds are distributed as capital transaction proceeds under Section 10.1B of the LPAs, not liquidation proceeds under Section 10.2.

**COUNT II—BREACH OF CONTRACT AND THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

130.     The General Partner fully incorporates the above paragraphs by reference as if fully stated herein.

131.     The LPAs are valid and binding contracts.

132.     The LPAs include the Buyout Options, for which the General Partner provided sufficient consideration.

133.     The General Partner has complied with the LPAs, specifically Section 6.13 thereof, and has exercised its Buyout Options, thereby creating binding contracts for the sale of the Limited Partners' interests in the Partnerships to the General Partner in exchange for the Buyout Prices.

134.     The Limited Partners have refused to sell their interests in the Partnerships to the General Partner and have therefore breached their contractual obligations under the LPAs as owed to the General Partner.

135.     Additionally, the LPAs include implied covenants of good faith and fair dealing, requiring that neither party do anything to impair the other's rights to receive benefits under the contracts.

136.     The Limited Partners have breached the implied covenants of good faith and fair dealing by seeking to deprive the General Partner of its rights under the Buyout Options by, among other things, refusing to sell their interests in the Partnerships to the General Partner at the Buyout

Prices because (i) the exercise of their Forced Sale Rights purportedly entitles the Limited Partners to access their positive capital account balances, although the LPAs do not provide for such, and (ii) the Limited Partners have raised unreasonable, immaterial objections to the fair market value appraisal, claiming such objections rise to the level of "material errors" and render the Buyout Notices ineffective, although the appraisal was performed by a mutually agreed upon ASA Appraiser in accordance with Section 6.13 of the LPAs and industry standards.

137.    The General Partner is entitled to, among other things, an order for specific performance requiring the Limited Partners sell and transfer their interests in the Partnerships to the General Partner pursuant to Section 6.13 of the LPAs, as set forth in the Amended Buyout Notices.

138.    The General Partner is entitled to recover any damages it incurs due to the Limited Partners' breaches of contract.

## PRAYER FOR RELIEF

WHEREFORE, the General Partner respectfully prays for the following relief:

1.    That the Court issue a declaration that:

    a.    The appraisals and calculations attached to the Amended Buyout Notices do not contain any material errors;

    b.    The General Partner's Amended Buyout Notices are valid, effective, and enforceable; and

    c.    The Limited Partners must sell and transfer their interests in the Partnerships to the General Partner pursuant to the Amended Buyout Notices.

2.    That, if it is determined that the Buyout Prices are to be calculated based upon the hypothetical sale of the Projects pursuant to the Forced Sale Rights, in the alternative to the preceding paragraph, the Court issue a declaration that:   the hypothetical sale proceeds are

distributed as capital transaction proceeds under Section 10.1B of the LPAs, not liquidation proceeds under Section 10.2.

3.      That the Court order specific performance requiring the Limited Partners sell and transfer their interests in the Partnerships to the General Partner pursuant to Section 6.13 of the LPAs, as set forth in the Amended Buyout Notices;

4.      That the Court order such other and further relief, including, without limitation, monetary relief and attorneys' fees and costs, which the Court may deem just, equitable and appropriate under the circumstances presented.

Dated:  May 7, 2020                            Respectfully submitted,

DOUGLAS COMPANY, LLC,

By Its Attorneys,

*s/Andrea L. Martin*
Andrea L. Martin (BBO 666117)
BURNS & LEVINSON LLP
125 High Street
Boston, MA 02110-1624
(617) 345-3000

OF COUNSEL

David A. Davenport (*pro hac vice* to be filed)
WINTHROP & WEINSTINE, P.A.
225 S. Sixth Street, Suite 3500
Minneapolis, MN 55402
(612) 604-6400