## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>DOUGLAS COMPANY, LLC )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>MMA KINGS CROSSING LLC, MMA )<br>SHELL POINTE, LLC, MMA DOUGLAS )<br>MONTAGUE, LLC AND BFIM SPECIAL )<br>LIMITED PARTNER, INC., )<br> )<br> )<br>Defendants. )<br>_____ ) | Case No.  1:20-cv-10875-DJC |

## ANSWER AND COUNTERCLAIM OF DEFENDANTS MMA KINGS CROSSING LLC; MMA SHELL POINTE, LLC; MMA DOUGLAS MONTAGUE, LLC; AND BFIM SPECIAL LIMITED PARTNER, INC.

Defendants MMA Kings Crossing LLC; MMA Shell Pointe, LLC; MMA Douglas Montague, LLC (the "Investor Limited Partners") and BFIM Special Limited Partner, Inc. (the "Special Limited Partner") (together the "Limited Partners") hereby answer the numbered paragraphs of the Complaint filed by plaintiff Douglas Company, LLC (the "General Partner") as follows:

## PARTIES, JURISDICTION AND VENUE

1.      The Limited Partners admit that the identified limited partnerships (the "Partnerships") are the owners of separate affordable housing developments in Charleston County, South Carolina (the "Projects").  The remaining allegations of paragraph 1 contain a summary of the relief sought by the General Partner to which no response is required.

2.      The Limited Partners admit that plaintiff is the General Partner of the Partnerships.  To the extent the General Partner attempts to characterize the contents of the limited partnership agreements ("the LPAs") in the remaining allegations of paragraph 2, the Limited Partners state that each LPA speaks for itself.

3.      The Limited Partners admit the allegations of paragraph 3.

4.      The Limited Partners admit the allegations of paragraph 4.

5.      The Limited Partners admit the allegations of paragraph 5.

6.      The Limited Partners admit the allegations of paragraph 6.

7.      No response is required to paragraph 7.

8.      The Limited Partners admit the allegations of paragraph 8.

9.      The Limited Partners admit the allegations of paragraph 9 that plaintiff BFIM Special Limited Partner, Inc. is affiliated with Boston Financial Investment Management ("Boston Financial") which is owned by ORIX Corporation USA and located in Boston.  The figures cited in paragraph 9 for Boston Financial's financial and real estate investments are reflected on its website.  However, as of June 30, 2020, Boston Financial held 1,125 properties and 98,000 apartment units.

10.      The Limited Partners deny the allegations of paragraph 10.

11.      The Limited Partners admit the allegations of paragraph 11.

12.      Paragraph 12 states a legal conclusion to which no response is required.

13.      Paragraph 13 states a legal conclusion to which no response is required.

14.      The Limited Partners admit the allegations of paragraph 14.

## **FACTUAL ALLEGATIONS**

15.      The Limited Partners admit the allegations of paragraph 15.

16.     The Limited Partners admit that the LIHTC program is governed by Section 42 of the Internal Revenue Code.  The Limited Partners lack sufficient information regarding the General Partner's definition of the "Tax Credit Rules" to admit or deny the remaining allegations of paragraph 16.  Further answering, the Limited Partners state that any LIHTC project is also governed by the terms of any partnership or operating agreement.

17.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 17.  Further answering, the Limited Partners state that the General Partner is a for-profit company.

18.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 18.  The Limited Partners deny that tax credits and tax benefits are the only benefits they expected in exchange for their capital contributions.

19.     The Limited Partners admit the allegations that the Tax Credits provide a dollar-for-dollar reduction of income taxes but lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the remaining allegations of paragraph 19.

20.     The Limited Partners lack sufficient information regarding the General Partner's definition of the "Tax Credit Rules", "certain terms and conditions" or "these requirements" to admit or deny the allegations of paragraph 20.

21.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the remaining allegations

of paragraph 21.  The Limited Partners deny that tax credits and tax benefits are the only benefits they expected in exchange for their capital contributions.

22.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 22.

23.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 23.

24.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 24.

25.      The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 25.

26.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 26.

27.     The Limited Partners lack sufficient information regarding the General Partner's definition of a "typical" low-income housing project to admit or deny the allegations of paragraph 27.  Further answering, the Limited Partners state that their expectation was to access their positive capital accounts at the end of the Compliance Period.

28.     The Limited Partners lack sufficient information to admit or deny the allegations in paragraph 28 regarding the nature of the General Partner's risk or its understandings and expectations regarding its investment in the Partnerships.

29.     The Limited Partners lack sufficient information to admit or deny the allegations regarding the General Partner's incentive for participating in the Partnership.  The Limited Partners deny the remaining allegations of paragraph 29.

30.     The Limited Partners deny the allegations of paragraph 30.

31.     The Limited Partners admit that the figures cited in paragraph 31 for Boston Financial Investment Management's financial and real estate investments are reflected on its website.  However, as of June 30, 2020, Boston Financial held 1,125 properties and 98,000 apartment units and no longer held properties in Puerto Rico.

32.     The Limited Partners admit that Boston Financial sponsors investment funds to raise capital to acquire low-income housing tax credits from developers and distribute the credits and other tax benefits to investors and that it so states on its website.  The Limited Partners deny the remaining allegations of paragraph 32.

33.     The Limited Partners admit that Boston Financial offers "investment opportunities at attractive yields" and that its website so states but deny the remaining allegations of paragraph 33.  Further answering, the Limited Partners state that Boston Financial's investments in LIHTC partnerships do further the underlying objectives of the LIHTC program.

34.     The Limited Partners lack sufficient information to admit or deny the allegations regarding any trends in the affordable housing industry.  The Limited Partners deny the remaining allegations of paragraph 34.

35.     The Limited Partners admit the allegations of paragraph 35.

36.     The Limited Partners admit the allegations of paragraph 36.

37.     The Limited Partners admit the allegations of paragraph 37.

38.     The Limited Partners admit that the Partnerships are governed by the LPAs.  With respect to the allegations OF paragraph 38 that the LPAs are "substantially similar", the Limited Partners state that each LPA speaks for itself.  The Limited Partners admit that a copy of the Kings Crossing Complaint is attached to the Complaint as Exhibit B.

39.     The Limited Partners admit the allegations of paragraph 39.

40.     The Limited Partners admit the allegations of paragraph 40.  Further answering, the Limited Partners state that plaintiff was admitted into the Partnerships as General Partner at the same time as the Limited Partners.

41.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 41, the Limited Partners state that each LPA speaks for itself.

42.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 42, the Limited Partners state that each LPA speaks for itself.

43.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 43, the Limited Partners state that each LPA speaks for itself.

44.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 44, the Limited Partners state that each LPA speaks for itself.  Further answering, the Limited Partners state that the General Partner's agreement to continue to use the Project for low-income housing is only one of several conditions with which the General Partner must comply in order to exercise its Buyout Option.

45.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 45, the Limited Partners state that each LPA speaks for itself.

46.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 46, the Limited Partners state that each LPA speaks for itself.

47.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 47, the Limited Partners state that each LPA speaks for itself.

48.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 48, the Limited Partners state that each LPA speaks for itself.

49.     To the extent the General Partner attempts to characterize the contents of the LPAs in paragraph 49, the Limited Partners state that each LPA speaks for itself.

50.     The Limited Partners deny the allegations of paragraph 50.

51.     The Limited Partners deny the allegations of paragraph 51.

52.     The Limited Partners admit that the General Partner must agree to continue to use the Projects for low-income housing purposes subject to restricted rents in order to exercise the Buyout Option but deny the remaining allegations of paragraph 52.  To the extent the General Partner attempts to characterize the contents of the LPAs in the remaining allegations in paragraph 52, the Limited Partners state that each LPA speaks for itself.

53.     The Limited Partners deny the allegations of paragraph 53.

54.     The Limited Partners admit that the existence of the Buyout Option does not nullify the Forced Sale Right.  To the extent the General Partner attempts to characterize the contents of the LPAs in the remaining allegations of paragraph 54, the Limited Partners state that each LPA speaks for itself.  Further answering, the Limited Partners state that the Buyout Option and the Forced Sale Right are simultaneous rights for the year after expiration of the Compliance Period and that those rights are reconciled by allowing the General Partner to

purchase the Limited Partners' Interests at a price that takes into consideration the Limited

Partners' positive capital accounts.

55.     The Limited Partners admit the allegations of paragraph 55.

56.     The Limited Partners admit the allegations of paragraph 56.

57.     The Limited Partners admit that the General Partner sent the three Buyout Notices

dated January 1, 2020 and that copies of those Notices are attached to the Complaint as Exhibits

C, D and E.  The Limited Partners deny the remaining allegations of paragraph 57.

58.     The Limited Partners admit that the General Partner and the Limited Partners

communicated by email from time to time.  The Limited Partners deny the remaining

allegations of paragraph 58.

59.     The Limited Partners admit the allegation of paragraph 59 that they received hard

copies of the Buyout Notices via FedEx on January 2, 2020.  The Limited Partners deny that the

General Partner arranged for delivery of those Notices on January 2, 2020.

60.     To the extent the General Partner attempts to characterize the contents of the

Buyout Notices in paragraph 60, the Limited Partners state that each Notice speaks for itself.

61.     To the extent the General Partner attempts to characterize the contents of the

Buyout Notices in paragraph 61, the Limited Partners state that each Notice speaks for itself.

62.     The Limited Partners admit that the Buyout Notices included exhibits designated

as A-E but deny the remaining allegations of paragraph 62.

63.     The Limited Partners admit the appraisals were completed by an appraiser from

Cushman & Wakefield but deny the remaining allegations of paragraph 63.

64.     The Limited Partners admit they selected Cushman & Wakefield as one of two

appraisers proposed by the General Partner but deny the remaining allegations of paragraph 64.

65.     The Limited Partners admit that Jones performed the appraisals.  Further answering, the Limited Partners state that Boston Financial selected Jones as one of two appraisers proposed by general partners in other instances.  The Limited Partners deny the remaining allegations of paragraph 65.

66.     The Limited Partners deny the allegations of paragraph 66.

67.     To the extent the General Partner attempts to characterize the contents of the Buyout Notices in paragraph 67, the Limited Partners state that each Notice speaks for itself.

68.     The Limited Partners admit that the General Partner sent the Buyout Notices via email on January 1, 2020 and that they received hard copies of the Notices on January 2, 2020. The Limited Partners deny the remaining allegations of paragraph 68.

69.     The Limited Partners deny the allegations of paragraph 69.

70.     The Limited Partners admit the allegations of paragraph 70 that they exercised their Forced Sale Rights on January 2, 2020, the first day available for exercise of that right after the legal holiday, and that copies of the Forced Sale Notices are attached in the Complaint as Exhibits F, G and H.  The Limited Partners deny that the General Partner has exercised its Buyout Rights and that the "pursuit" of the Buyout Option has any legal significance.

71.     The Limited Partners admit that by notice dated January 2, 2020, the first day available for exercise of the right due to the legal holiday on January 1st, the Investor Limited Partners exercised their Forced Sale Rights.  The Limited Partners further state that each Forced Sale Notice speaks for itself.  The Limited Partners deny the remaining allegations of paragraph 71.

72.     To the extent the General Partner attempts to characterize the Forced Sale Notices in paragraph 72, the Limited Partners state that each Notice speaks for itself.

73.     The Limited Partners admit that the Forced Sale Right requires that their Interests be valued as if a dissolution of the Partnership and then liquidation had occurred but deny the remaining allegations of paragraph 73.

74.     The Limited Partners admit the allegations of paragraph 74.

75.     The Limited Partners deny the allegations of paragraph 75.

76.     The Limited Partners admit that they received the Buyout Notices sent by FedEx on January 2, 2020.  Further answering, the Limited Partners state that their responses to the Buyout Notices speak for themselves.  The Limited Partners deny that the Buyout Notices were effective pursuant to the terms of the LPAs.

77.     The Limited Partners admit that they received the Buyout Notices by email on January 1, 2020 but deny that delivery by email constitutes the notice required by Section 13.1 of the LPAs and that the Notices were effective.

78.     The Limited Partners deny the allegations of paragraph 78.

79.     The Limited Partners admit that the Buyout Notices and appraisals contain material errors.  The Limited Partners deny the remaining allegations of paragraph 79.

80.     To the extent the General Partner attempts to characterize the Forced Sale Notices in paragraph 80, the Limited Partners state that each Notice speaks for itself.

81.     The Limited Partners deny the allegations of paragraph 81.

82.     The Limited Partners deny the allegations of paragraph 82.

83.     The Limited Partners admit the allegations of paragraph 83 that upon a valid and effective exercise of the Buyout Options, the General Partner may purchase the Limited Partners' Interests in the Partnerships.  The Limited Partners deny that the General Partner has validly or effectively exercised its Buyout Options.

10

84.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 84, the Limited Partners state that each LPA speaks for itself.

85.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 85, the Limited Partners state that each LPA speaks for itself.

86.     To the extent the General Partner attempts to characterize the provisions of the LPAs in the first sentence of paragraph 86, the Limited Partners state that each LPA speaks for itself.  The Limited Partners deny the remaining allegations of paragraph 86.

87.     The Limited Partners admit the allegations of the first sentence of paragraph 87. The Limited Partners deny the remaining allegations of paragraph 87.

88.     The Limited Partners deny the allegations of paragraph 88.

89.     The Limited Partners deny the allegations of paragraph 89.

90.      To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 90, the Limited Partners state that each LPA speaks for itself.

91.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 91, the Limited Partners state that each LPA speaks for itself.

92.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 92, the Limited Partners state that each LPA speaks for itself.

93.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 93, the Limited Partners state that each LPA speaks for itself.

94.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 94, the Limited Partners state that each LPA speaks for itself.

95.     To the extent the General Partner attempts to characterize the provisions of the LPAs in paragraph 95, the Limited Partners state that each LPA speaks for itself.

96.     The Limited Partners deny the allegations of paragraph 96.

97.     The Limited Partners deny the allegations of paragraph 97.

98.     The Limited Partners deny the allegations of paragraph 98.

99.     The Limited Partners deny the allegations of paragraph 99.

100.     The Limited Partners admit the allegations of paragraph 100 that Amended

Buyout Notices dated January 29, 2020 were sent to the Limited Partners and that copies of

those Notices are attached to the Complaint as Exhibits L, M, and N.

101.     To the extent the General Partner attempts to characterize the contents of the

Amended Buyout Notices in paragraph 101, the Limited Partners state that each Notice speaks

for itself.

102.     To the extent the General Partner attempts to characterize the contents of the

Amended Buyout Notices in paragraph 102, the Limited Partners state that each Notice speaks

for itself.

103.     To the extent the General Partner attempts to characterize the contents of the

Amended Buyout Notices in paragraph 103, the Limited Partners state that each Notice speaks

for itself.

104.     To the extent the General Partner attempts to characterize the contents of the

Amended Buyout Notices in paragraph 104, the Limited Partners state that each Notice speaks

for itself.

105.     To the extent the General Partner attempts to characterize the contents of the

Amended Buyout Notices in paragraph 105, the Limited Partners state that each Notice speaks

for itself.

106.     The Limited Partners deny the allegations of paragraph 106.

107.    The Limited Partners admit that they received returns on their capital contributions but deny the remaining allegations of paragraph 107.

108.    To the extent the General Partner attempts to characterize the contents of the Amended Buyout Notices in paragraph 108, the Limited Partners state that each Notice speaks for itself.

109.    To the extent the General Partner attempts to characterize the contents of the Amended Buyout Notices in paragraph 109, the Limited Partners state that each Notice speaks for itself but deny the Buyout Prices are accurate.

110.    The Limited Partners admit that they responded by letter on February 7, 2020 to the purported Amended Buyout Notices and that copies of those responses are attached to the Complaint as Exhibits O, P and Q.  The Limited Partners deny the remaining allegations of paragraph 110.

111.    To the extent the General Partner attempts to characterize the contents of the letters dated February 7, 2020 in paragraph 111, the Limited Partners state that each letter speaks for itself.

112.    The Limited Partners deny the allegations of paragraph 112.

113.    The Limited Partners deny the allegations of paragraph 113.  Further answering, the Limited Partners state that they and the General Partner are the original parties to the LPAs.

114.    The Limited Partners deny the allegations of paragraph 114.

115.    The Limited Partners admit that they have declined to transfer and are not obligated to transfer their Interests in the Partnerships to the General Partner for the prices stated in the Buyout Notices.  The Limited Partners deny the remaining allegations of paragraph 115.

116.     The Limited Partners state that the LPAs speak for themselves.  Further

answering, the Limited Partners state that their opinions that the Buyout Notices and appraisals

contained material errors were reasonable.

117.     The Limited Partners admit that they have declined to transfer and are not

obligated to transfer their Interests for the prices offered by the General Partner.  The Limited

Partners deny the remaining allegations of paragraph 117.

## <u>COUNT I – DECLARATORY JUDGMENT</u>

118.     The Limited Partners incorporate by reference their answers to paragraphs 1- 117.

119.     Paragraph 119 states a legal conclusion to which no response is required.

120.     Paragraph 120 states a legal conclusion to which no response is required.

121.     The Limited Partners deny the allegations of paragraph 121.

122.     The Limited Partners admit the allegations of paragraph 122.

123.     The Limited Partners admit that they do not agree with the valuation of their

Interests in the Partnerships in the Buyout Notices and that they will not and are not obligated to

sell their Interests for the prices proposed by the General Partner.  The Limited Partners deny

the remaining allegations of paragraph 123.

124.     To the extent the General Partner attempts to characterize the contents of the

LPAs in paragraph 124, the Limited Partners state that each LPA speaks for itself.  The Limited

Partners deny the remaining allegations of paragraph 124.  Further answering, the Limited

Partners state that, in their reasonable opinion, the appraiser disregarded the relevant provisions

of the LPA including, without limitation, the Investor Limited Partner's Forced Sale Right and

the distribution of proceeds in accordance with the partners' positive capital accounts upon

dissolution of the Partnership and liquidation of its assets.

14

125.     The Limited Partners admit they have expressed disagreement with the appraiser's conclusions and that, in their reasonable opinion, the appraisals contain material errors.  The Limited Partners deny the remaining allegations of paragraph 125.  Further answering, the Limited Partners state that, in their reasonable opinion, the appraiser disregarded the relevant provisions of the LPA including, without limitation, the Investor Limited Partner's Forced Sale Right and the distribution of proceeds in accordance with the partners' positive capital accounts upon dissolution of the Partnership and liquidation of its assets.

126.     The Limited Partners deny the allegations of paragraph 126.

127.      The Limited Partners admit the allegations of paragraph 127.

128.     The Limited Partners deny the allegations of paragraph 128.

129.     The Limited Partners deny the allegations of paragraph 129.

### COUNT II – BREACH OF CONTRACT AND THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

130.     The Limited Partners incorporate by reference their answers to paragraphs 1- 129.

131.     Paragraph 131 states a legal conclusion to which no response is required.

132.     Paragraph 132 states a legal conclusion to which no response is required.

133.     The Limited Partners deny the allegations of paragraph 133.

134.     The Limited Partners admit that they have declined to sell and are not obligated to sell their Interests in the Partnerships to the General Partner for the prices stated in the Buyout Notices but deny the remaining allegations of paragraph 134.

135.     Paragraph 135 states a legal conclusion to which no response is required.

136.     The Limited Partners deny the allegations of paragraph 136.

137.     The Limited Partners deny the allegations of paragraph 137.

138.     The Limited Partners deny the allegations of paragraph 138.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The General Partner fails to state a claim on which relief can be granted.

### Second Affirmative Defense

The General Partner is barred from recovery by the terms of the LPA.

### Third Affirmative Defense

The General Partner has failed to satisfy a condition precedent to recovery.

### Fourth Affirmative Defense

The General Partner is barred from recovery by its own material breaches of the LPA.

### Fifth Affirmative Defense

The General Partner is barred from recovery by the doctrine of estoppel.

### Sixth Affirmative Defense

The General Partner is barred from recovery by the doctrine of unclean hands.

### Seventh Affirmative Defense

The Limited Partners have acted in good faith at all times.

## PRAYER FOR RELIEF

**WHEREFORE**, the Limited Partners respectfully request that the Court award the following relief:

1.      Dismiss the General Partner's Complaint with prejudice;

2.      Award the Limited Partners their costs and attorneys' fees; and

3.      Grant the Limited Partners such other relief as is just and proper.

## COUNTERCLAIM

This action concerns the interpretation of the terms of the limited partnership agreements (the "LPAs") for the Kings Crossing Limited Partnership ("Kings Crossing"), the Shell Pointe

Limited Partnership ("Shell Pointe") and Douglas Montague Limited Partnership
("Montague")(together, the "Partnerships").  A dispute has arisen between the plaintiffs-in-
counterclaim, the Limited Partners, and the defendant-in-counterclaim, the General Partner, with
respect to the valuation of the Investor Limited Partners' Interests in the Partnerships for the
purposes of the General Partner's exercise of a buy-out option.  A genuine controversy exists
between the parties as to whether, as maintained by the Limited Partners, the Investor Limited
Partners' capital accounts must be considered when determining the fair market value of their
Interests.

The Limited Partners seek a declaration of the rights and obligations of the parties with
respect to the LPAs and the valuation of the Investor Limited Partners' Interests.  Specifically,
the Limited Partners seek a declaration that (1) the right to force a sale pursuant to Section 6.4J
of the LPA is available to the Investor Limited Partners and (2) exercise of the right to force a
sale triggers dissolution of the Partnership and liquidation of remaining Partnership assets with
the net proceeds distributed in accordance with the partners' positive capital accounts as required
by Section 10.2 of the LPA.  In addition, the Limited Partners seek a declaration that the
purported buyout notices sent by the General Partner on December 31, 2020 and the Amended
Buyout Notices submitted on January 29, 2020 are ineffective as a result of the errors in the
appraisal of the Investor Limited Partners' Interests which, in the reasonable opinion of the
Investor Limited Partners, are material.  Finally, the Limited Partners seek a declaration that (1)
the Investor Limited Partners' exercise of their right to force a sale of the Project on January 2,
2020 was effective; (2) the General Partner breached the LPAs by failing to use best efforts to
find a buyer for the Project; (3) the General Partner's failure to use its best efforts to find a buyer

constituted a material breach of its obligations under the LPAs; and (4) as a result of its breach, the General Partner may not exercise it Buyout Option.

## PARTIES

1.     Plaintiff-in-counterclaim, MMA Kings Crossing LLC ("MMA Kings Crossing"), is a Delaware limited liability company with a principal place of business at 101 Arch Street in Boston, Massachusetts and the Investor Limited Partner of Kings Crossing.

2.     Plaintiff-in-counterclaim, MMA Shell Pointe LLC ("MMA Shell Pointe"), is a Delaware limited liability company with a principal place of business at 101 Arch Street in Boston, Massachusetts and the Investor Limited Partner of Shell Pointe.

3.     Plaintiff-in-counterclaim, MMA Douglas Montague LLC ("MMA Montague"), is a Delaware limited liability company with a principal place of business at 101 Arch Street in Boston, Massachusetts and the Investor Limited Partner of Montague.

4.     MMA Kings Crossing, MMA Shell Pointe and MMA Montague are together referred to as the "Investor Limited Partners".

5.     The Special Limited Partner, plaintiff-in-counterclaim BFIM Special Limited Partner, Inc., ("BFIM") is a Florida corporation with a principal place of business at 101 Arch Street in Boston, Massachusetts and the Special Limited Partner of the Partnerships (the "Special Limited Partner").  The Special Limited Partner was formerly known as MMA Special Limited Partner, Inc.  Together the Investor Limited Partners and the Special Limited Partner are referred to as the "Limited Partners".

6.     Defendant-in-counterclaim, Douglas Company, LLC, is a South Carolina limited liability company with a principal place of business at 607 8th Avenue in Aynor, South Carolina and the General Partner of the Partnerships (the "General Partner").

## FACTUAL ALLEGATIONS

7.       MMA Kings Crossing, BFIM and the General Partner entered into the Kings Crossing LPA as of December 1, 2003.  MMA Kings Crossing made initial capital contributions to Kings Crossing of approximately $2,996,000.  The Kings Crossing LPA is attached to the Complaint as Exhibit B.

8.       MMA Shell Pointe, BFIM and the General Partner entered into the Shell Pointe LPA as of August 1, 2004.  MMA Shell Pointe made initial capital contributions of approximately $3,769,000 to Shell Pointe.  The Shell Pointe LPA is attached hereto as Exhibit 1.

9.       MMA Montague, BFIM and the General Partner entered into the Montague LPA as of June 1, 2004.  MMA Montague made initial capital contributions of approximately $3,949,000 to Montague.  The Montague LPA is attached hereto as Exhibit 2.

10.       The Partnerships are single-purpose limited partnerships the purpose of which is to acquire, construct, develop, operate, manage, lease and otherwise deal with three separate housing projects (the "Projects") which were developed to qualify for Federal Low-Income Housing Tax Credits pursuant to Section 42 of the Internal Revenue Code, 26 U.S.C. 42 ("Section 42").  As such, the Projects generated Federal tax credits for the Investor Limited Partners and are subject to a 15-year Compliance Period.

11.       The Compliance Period for all three Projects expired on December 31, 2019.

12.       Two rights afforded by the LPAs are at issue in this action: (1) the Investor Limited Partners' right to force a sale of the Project with the consequent dissolution of the Partnership and right to obtain distribution of the net proceeds in proportion to the partners' positive capital accounts; and (2) the General Partner's right to buy out the Limited Partners' Interests in the Partnership.

**The Forced Sale Right**

13.     All three LPAs provide that "[i]f requested to do so by the Investor Limited Partner <u>at any time</u> after the Compliance Period, the General Partners shall use their best efforts to sell or refinance the Project on terms acceptable to the Investor Limited Partner."  LPAs, Section 6.4J (the "Forced Sale Right") (emphasis added).

14.     Upon "the sale or other disposition of all or substantially all the assets of the Partnership," the Partnership dissolves.  <u>Id</u>., Article IIIA(i).

15.     Dissolution of the Partnership requires the General Partner to "liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 10.2."  <u>Id</u>., Article IIIB.

16.     Section 10.2 of the LPAs provides that:

> Upon dissolution and termination, after payment of, or adequate provision for, the debts and obligations of the Partnership, the remaining assets of the Partnership shall be distributed to the Partners in accordance with <u>the positive balances in their Capital Accounts</u> after taking into account all Capital Account adjustments for the Partnership taxable year, including adjustments to Capital Accounts pursuant to 10.2B and 10.3B.

<u>Id</u>., Section 10.2A (emphasis added).

17.     Exercise of the Forced Sale Right would lead to dissolution of the Partnership and require distribution of Partnership assets in accordance with Section 10.2 which would take into account any positive balance in the Limited Partners' Capital Accounts.

**The Buyout Option**

18.     The LPAs also provide the General Partner with an "option to purchase Investor Limited Partner's and the Special Limited Partner's entire interest in the Partnership on the terms and conditions as set forth in this Section 6.13 (the "Buyout Option")."  <u>Id</u>., Section 6.13.

19.     The Buyout Option shall be exercised – if at all – "only after expiration of the Compliance Period applicable to the Project and for a period of one (1) year thereafter (the "Option Period")."  Id., Section 6.13B.

20.     For the purposes of exercising the Buyout Option:

> The price of the Investor Limited Partner's Interest in the Partnership (the "Buyout Price") shall be the greater of (i) all federal, state and local taxes imposed on the Limited Partner attributable to the Buyout; or (ii) the fair market value (as of the date of the closing of the Buyout) of the Investor Limited Partner's Interests as determined in accordance with this Section 6.13.

Id., Section 6.13C (the "Option Price").

21.     The Buyout Option may be exercised only on written notice (the "Buyout Notice") during the Buyout Option Period by the General Partner at least 60 days prior to the proposed closing date.  Among other requirements, the Buyout Notice must include an appraisal of the fair market value of the Investor Limited Partner's Interest in the Partnership, as of the closing date, by an appraiser acceptable to the Investor Limited Partner.  Id., Sections 6.13C (ii)(2); 6.13D.

22.     Prior to submitting a Buyout Notice, the General Partner must propose to the Investor Limited Partner two appraisers with certain specified qualifications.  Id., Section 6.13D. Within five (5) business days after the General Partner's written submission of the proposed appraisers, the Investor Limited Partner "shall approve one or both appraisers."  Id.

23.     For the purposes of determining the fair market value of the Limited Partner's Interests, the appraiser is directed to consider the value of the assets of the Partnership and to "give due consideration to all other relevant factors" relating to the value of those Interests including "limitations on Investor Limited Partner's ability to require liquidation."  Id., Section 6.13E(iv).

24.     "Interest" is defined in the LPAs as "all the interest of a Partner in Cash Flow and other distributions, <u>capital</u>, profits and losses, tax credits, and otherwise in the Partnership including all allocations and distributions and all rights under this Agreement . . . ." <u>Id</u>., Article I, Defined Terms (emphasis added).

25.     Therefore, in determining the fair market value of the Investor Limited Partner's Interest for the purposes of the General Partner's exercise of the Buyout Option, the appraiser must give due consideration to the Investor Limited Partner's capital accounts.

26.     Section 6.13C (ii) of the LPAs provides:

> Any Buyout Notice which fails to include the items required in this Section 6.13 shall not constitute an effective Buyout Notice.  If a Buyout Notice includes appraisals or calculations which, in the reasonable opinion of the Investor Limited Partner, contain material errors, the notice shall not constitute an effective Buyout Notice.  Absent an effective Buyout Notice, the Option may not be exercised.

**<u>Purported Exercise of Buyout Notice</u>**

27.     On June 3, 2019, the General Partner submitted proposals for two appraisers to the Investor Limited Partners.

28.     On June 5, 2019, the Investor Limited Partners selected Cushman & Wakefield for the appraisals of Kings Crossing, Shell Pointe, and Montague.  The Limited Partners also noted their intention to exercise their Forced Sale Rights on January 1, 2020 and stated that Cushman & Wakefield needed take this into account in their appraisal process.

29.     The General Partner stated it would forward the message to the appraiser but that neither party had "the right to tell the appraiser what he must or must not consider when doing the appraisal; that is all laid out in the LPA."

30.     On December 31, 2019, the General Partner sent, via FedEx, purported Buyout Notices for the Limited Partners' Interests in the Partnerships.  The General Partner also sent the

Buyout Notices to the Limited Partners via email on January 1, 2020.  Attached to each Buyout Notice was an appraisal of the Investor Limited Partner's Interest as of August 31, 2019.  The Buyout Notices are attached to the Complaint as Exhibits C, D and E.

31.     The appraiser opined that the fair market value of the Limited Partner Interests in Kings Crossing was $29,000 as of August 31, 2019.  After certain adjustments, the General Partner calculated the Buyout Price as $33,400 – materially less than the share of net proceeds distributable to the MMA Kings Crossing based on the relative value of its positive capital account.

32.     The appraiser opined that the fair market value of the Limited Partner Interests in Shell Pointe was $152,000 as of August 31, 2019.  After certain adjustments, the General Partner calculated the Buyout Price as $170,174 – materially less than the share of net proceeds distributable to MMA Shell Pointe based on the relative value of its positive capital account.

33.     The appraiser opined that the fair market value of the Limited Partner Interests in Montague was $131,000 as of August 31, 2019.  After certain adjustments, the General Partner calculated the Buyout Price as $145,602 – materially less than the share of net proceeds distributable to MMA Montague based on the relative value of its positive capital account.

34.     The Buyout Notices did not comply with the LPAs' notice requirements.  The Notices sent by FedEx on December 31, 2019 did not constitute written notice "during the Option Period" because they were sent while the Compliance Period was still in effect.  See LPAs, Section 6.13C (ii).  Notices shall be "deemed to have been given when the same are . . . (ii) deposited with Federal Express or similar overnight delivery service."  See LPAs, Section 13.1.

35.     The Buyout Notices emailed on January 1, 2020 were also ineffective because any notice must be (i) sent by certified or registered mail; (ii) sent by Federal Express or similar overnight delivery service; (iii) transmitted by telecopier or other facsimile transmission, answer back requested; or (iv) delivered personally.  LPAs, Section 13.1.  There is no provision for notice via email.

36.     As previously communicated to the General Partner, on January 2, 2020, the first day available for exercise of the right due to the legal holiday on January 1, 2020, the Investor Limited Partners provided the General Partner with written notice that the Investor Limited Partners were exercising their Forced Sale Rights pursuant to Section 6.4J of the LPA.  The Investor Limited Partners requested that the General Partner use its "best efforts to sell or refinance the Project on terms acceptable to the Investor Limited Partner."  The Forced Sale Notices are attached to the Complaint as Exhibits F, G and H.

37.     Notwithstanding the issue of ineffective notice, the Limited Partners responded to each of the General Partner's Buyout Notices on January 9, 2020 with a detailed analysis in which they informed the General Partner that, in the reasonable opinion of the Investor Limited Partners, the Buyout Notices and appraisals contained material errors and did not constitute effective Buyout Notices.  The January 9, 2020 Letters are attached to the Complaint as Exhibits I, J and K.

38.     Among other material errors in the Buyout Notice and appraisals, the January 9, 2020 Letters noted the following:

- the failure to recognize that exercise of the Forced Sale Right would cause a dissolution of the Partnership requiring distribution of Partnership assets under Section 10.2, Distribution Upon Dissolution rather than Section 10.1B, Distribution of Capital Transaction Proceeds;

- the failure to recognize that exercise of the Forced Sale Right and liquidation of the Partnership required assets to be distributed in accordance with the partners' capital accounts;

- the failure to recognize that the Forced Sale Right and the Buyout Option are simultaneous rights;

- ignoring that the definition of a partner's "Interest" includes capital;

- ignoring that at the end of the Compliance Period there are no limitations on the Investor Limited Partner's ability to require liquidation;

- application of a discount for lack of control ignoring the Investor Limited Partner's right to force a sale and liquidate/dissolve the Partnership;

- application of a discount for lack of marketability ignoring that the Investor Limited Partners may transfer their Interests at any time without General Partner consent;

- the incorrect assumption that exercise of the Forced Sale Right would result in a protracted process where no suitable buyer for the Project would be found;

- improper intermingling discounts of the Limited Partner's Interests with discounts to the value of real property and then applying a further discount for potential delay in the ability to sell the Project; and

- using August 31, 2019 for valuation of the Investor Limited Partners' Interests rather than the date of closing proposed by the General Partner as required by Section 6.13C (ii) of the LPA despite opining that the date of valuation matters.

39.     The Limited Partners stated that they were willing to consult with the General Partner in good faith on reasonable notice to discuss the nature and magnitude of these errors and how they might be cured.  They also invited the General Partner to submit a new or amended Buyout Notice within the Option Period that cured the material errors.  They reiterated their expectation that the General Partner would proceed with best efforts to find a buyer for the Projects pursuant to exercise of the Investor Limited Partners' Forced Sale Rights.

40.     On January 29, 2020, the General Partner sent Amended Buyout Notices which cured the notice issue and revised the valuation dates to match the date of the new closing of March 31, 2020.  However, the General Partner refused to cure the most significant material errors.  The Amended Buyout Notices are attached to the Complaint as Exhibits L, M and N.

41.     In the Amended Buyout Notice, the appraiser opined that the fair market value of the Limited Partner Interests in Kings Crossing was $0.  The General Partner calculated the Buyout Price as $0 – materially less than the share of net proceeds distributable to the MMA Kings Crossing based on the relative value of its positive capital account.

42.     The appraiser opined that the fair market value of the Limited Partner Interests in Shell Pointe was $140,000.  The General Partner also calculated the Buyout Price as $140,000 – materially less than the share of net proceeds distributable to MMA Shell Pointe based on the relative value of its positive capital account.

43.     The appraiser opined that the fair market value of the Limited Partner Interests in Montague was $126,00.  However, without explanation, the General Partner calculated the Buyout Price as only $122,00 – $4,000 less than the appraised amount and materially less than the share of net proceeds distributable to MMA Montague based on the relative value of its positive capital account.

44.     In the appraisals attached to the Amended Buyout Notices, the appraiser continued to adhere to the erroneous conclusion that the Forced Sale Right is not "economically relevant" for valuation purposes and failed to consider the Investor Limited Partners' positive capital accounts in valuation of their Interests.

45.     Among others, the General Partner also made the following flawed arguments in its Amended Buyout Notices:

a.  The Investor Limited Partners' objections merely reflected their "subjective disagreement" with the appraiser rather than "material errors";

b.  Capital accounts were irrelevant in determining fair market value of the Investor Limited Partners' Interests because the capital accounts would not transfer to an entity buying that Interest;

c.  Even if Article IIIA and Section 10.2 of the LPAs applied, the General Partner had accrued substantial partnership management fees which would reduce the capital accounts accordingly; and

d.  Return of the Investor Limited Partners' positive capital accounts was never contemplated by the Partners' business deal.

46.     On February 7, 2020, the Limited Partners responded in writing to each of the Amended Buyout Notices.  In addition to refuting the General Partner's baseless arguments, the Limited Partners reiterated their expectation that the General Partner would proceed with best efforts to find a buyer for the Projects pursuant to exercise of the Investor Limited Partners' Forced Sale Rights.  The February 7, 2020 responses are attached to the Complaint as Exhibits O, P and Q.

47.     As the Limited Partners noted in their letters of February 7, 2020, their objections do not reflect mere "subjective disagreement" with the appraiser.  The parties did not agree that the appraisal would be final and binding nor did they "delegate" the value determination entirely to the appraiser.  The parties specifically agreed that the Investor Limited Partner could object to the Buyout Notice or appraisal based on its "reasonable opinion" and it did so in these three instances.

48.     The General Partner's argument that the capital accounts were irrelevant because they could not be transferred to the buyer of the Investor Limited Partner's Interest is plainly wrong.  The LPAs expressly provide for the transfer of capital accounts to substituted Partners.  See LPAs, Section 4.3B.

27

49.     The General Partner's claim that its partnership management fees would reduce the value of the Investor Limited Partners' capital accounts is also misplaced.  Those fees were not intended to be cumulative and should have been paid annually out of cash flow.  The LPAs define the Partnership Management Fee as a fee "payable from time to time" pursuant to Section 6.10B.  LPA, Article I.  Section 6.10B provides that the fee is an amount equal to "7% of Cash Receipts per annum" and that it is payable in accordance with Article X.  Id., Section 6.10B. Section 10.1A provides for payment of the Partnership Management Fee as a distribution from Cash Flow.  Id., Section 10.1A.  The Kings Crossing LPA refers to the fee as the "Incentive Management Fee" in Section 10.1A but as the "Partnership Management Fee" elsewhere. Furthermore, the accounting for those fees did not meet normal GAAP accounting requirements. If the fee was to be an accrued liability, it should have been reflected as such on the Partnerships' Audited Financial Statements in such year but was not.

50.     Finally, contrary to the General Partner's assertion, the Investor Limited Partners did expect to receive the benefit of their positive capital accounts after expiration of the Compliance Period.

51.     The Investor Limited Partners' expectations are reflected in three separate "Investment Committee Packages" prepared in anticipation of the proposed investments in the Partnerships in order to establish expected rates of return on the investments, both for the pricing of tax credits and expected returns of tax, cash and residual benefits.  The Investment Committee Packages consist, in part, of sections entitled "Deal Structure" or "Transaction Summary" which outline the general terms of the investments and a Tax Credit Investment Model ("Investment Model") composed of multiple exhibits containing financial assumptions and projections for the

investment.  The relevant sections of the Investment Committee Packages are attached hereto as Exhibits 3, 4 and 5.

52.     For Kings Crossing, the Deal Structure includes a section on "Residuals" that reflects a 40% Net Return for the Investor Limited Partner.  Exhibit 16 of the Investment Model shows a projected capital account for the Investor Limited Partner in the amount of $1,275,212 at year 2020, two years after completion of the Compliance Period.  Exhibit 14 of the Investment Model calculates the projected residual value of the investment as $1,212,449 with a sale of the Project in 2020 and describes this as a projected 40% return of the net capital contribution of $2,996,000.  This return of the positive capital account to the Investor Limited Partner is highlighted by the following statement with a box around it: *Positive capital account forces return of capital* (italics in original; underlining substituted for box).  This statement clearly reflects the expectation by MMA Kings Crossing that it would receive the benefit of its positive capital account upon sale of the Project after completion of the Compliance Period.

53.     For Shell Pointe, the Deal Structure includes a section on "Residuals" that reflects a 38% Net Return for the Investor Limited Partner.  Exhibit 16 of the Investment Model shows a projected capital account for the Investor Limited Partner in the amount of $1,436,583 at year 2021, three years after completion of the Compliance Period.  Exhibit 14 of the Investment Model calculates the projected residual value of the investment as $1,436,439 with a sale of the Project in 2021and describes this as a projected 38% return of the net capital contribution of $3,769,000.  This return of the positive capital account to the Investor Limited Partner is highlighted by the following statement with a box around it: *Positive capital account forces return of capital* (italics in original; underlining substituted for box).  This statement clearly

reflects the expectation by MMA Shell Pointe that it would receive the benefit of its positive capital account upon sale of the Project after completion of the Compliance Period.

54.     For Montague, the Transaction Summary includes a section on "Residuals" that reflects a 35.2% Net Return for the Investor Limited Partner upon sale of the Project.  Exhibit 16 of the Investment Model shows a projected capital account for the Investor Limited Partner in the amount of $1,390,849 at year 2021, three years after completion of the Compliance Period. Exhibit 14 of the Investment Model calculates the projected residual value of the investment as $1,390,710 with a sale of the Project in 2021and describes this as a projected 35% return of the net capital contribution of $3,949,000.  This return of the positive capital account to the Investor Limited Partner is highlighted by the following statement with a box around it: *Positive capital account forces return of capital* (italics in original; underlining substituted for box).  This statement clearly reflects the expectation by MMA Montague that it would receive the benefit of its positive capital account upon sale of the Project after completion of the Compliance Period.

55.     Not only did the Investor Limited Partners anticipate return of their positive capital accounts after the expiration of the Compliance Period for these Projects, but, upon information and belief, the General Partner was aware of these expectations and signed off on them at the time the LPAs were executed.

56.     The Document Schedule attached as Exhibit B to each LPA lists "Investment Assumptions" (#3) as one of the "Related Agreements" and "Investment Assumptions" are defined in Article I of the LPAs as "the financial schedules and underlying assumptions listed as Investment Assumptions on the Document Schedule."

57.     Upon information and belief, the Investment Models contained within the Investment Committee Packages formed the basis for the Investment Assumptions identified on the Document Schedule.

58.     In connection with the investment in the Partnerships, the General Partner's managing member, David Douglas, signed Closing Certificates in which he certified to the Investor Limited Partners that "[t]he investment assumptions are accurate and complete in all material respects and are reasonable in light of all of the facts and circumstances."  The Closing Certificates are attached hereto as Exhibits 6, 7 and 8.

59.     The LPA also provides that "[t]he General Partners hereby represent and warrant to the Investor Limited Partner that the following are true as of Investment Closing . . . and at all times hereafter… (xxi) All of the representations and warranties set forth in the Closing Certificate are true and correct."  LPA § 6.5 (xxi).

60.     The Document Schedule attached as Exhibit B to each LPA also lists the Closing Certificates (#5) as "Related Agreements."

61.     The General Partner has claimed that even if Buyout Prices were calculated on a hypothetical sale of the Project leading to a liquidation, sales proceeds would first be distributed according to Section 10.1B as a pre-dissolution capital transaction and then the remaining assets would be distributed according to the Liquidation Provision.  Complaint, ¶¶ 89-97.  However, even if proceeds are distributed first under Section 10.1B, Section 10.2A would require the General Partner to pay cash to the Partnership in an amount equal to the negative balance in its capital account which would be distributed to the other partners in accordance with the positive balance in their capital accounts.  With the requirement to restore negative capital balances,

distribution of liquidation proceeds would result in a substantially similar amount being paid to the Investor Limited Partner under either scenario.

62.    In accordance with Section 6.13(C)(ii), the Investor Limited Partners' letters of January 9, 2020 and February 7, 2020 promptly notified the General Partner that, in the reasonable opinion of the Investor Limited Partners, the appraisals and calculations included in the Buyout Notice contained multiple material errors and the Notices did not constitute effective Buyout Notices.

**COUNT I**
(Declaratory Relief –28 U.S.C. §2201)

63.    The Limited Partners incorporate by reference their allegations in paragraphs 1-62.

64.    There is an actual controversy between the Limited Partners, on the one hand, and the General Partner, on the other, as to the following issues:

a.    whether the right to force a sale pursuant to Section 6.4J of the LPAs is available to the Investor Limited Partners notwithstanding the General Partner's subsequent purported exercise of their Buyout Option;

b.    whether the Investor Limited Partners' exercise of their right to force a sale pursuant to Section 6.4J of the LPA was effective;

c.    whether exercise of the right to force a sale by the Investor Limited Partners triggers dissolution of the Partnerships and liquidation of remaining Partnership assets with the net proceeds distributed in accordance with the partners' positive capital accounts as required by Section 10.2 of the LPA;

d.    whether the Investor Limited Partners' opinion – that the appraiser's failure to consider the value of the Investor Limited Partners' capital accounts in

32

determining the fair market value of their Interests was a material error – was

reasonable for the purposes of Section 6.13C(ii) of the LPA;

e.   whether the General Partner's Buyout Notice was effective;

f.   whether the General Partner was obligated to use its best efforts to sell or

refinance the Projects after receiving the Forced Sale Notices;

g.   whether the General Partner's failure to use best efforts to sell or refinance the

Projects constituted a material breach of its obligations under the LPAs; and

h.   whether the General Partner's breach of its obligations under the LPAs

nullifies its right to exercise the Buyout Option.

65.      A declaratory judgment would terminate the uncertainty or controversy giving

rise to these proceedings.

## COUNT II
(Breach of Contract)

66.      The Limited Partners incorporate by reference their allegations in paragraphs 1-

65.

67.      On January 2, 2020, the Investor Limited Partners provided the General Partner

with written notice that the Investor Limited Partners were exercising their Forced Sale Rights

pursuant to Section 6.4J of the LPA and requested that the General Partner use its "best efforts to

sell or refinance the Project on terms acceptable to the Investor Limited Partner."

68.      By letter dated January 9, 2020, the Investor Limited Partner stated their

expectation that the General Partner would proceed with best efforts to find a buyer for the

Projects pursuant to exercise of the Investor Limited Partners' Forced Sale Rights.

69.     By letter dated January 29, 2020, the Investor Limited Partner reiterated their expectation that the General Partner would proceed with best efforts to find a buyer for the Projects pursuant to exercise of the Investor Limited Partners' Forced Sale Rights.

70.     The General Partner failed to confirm that it was attempting to find a buyer for the Projects.

71.     Upon information and belief, the General Partner has made no efforts to find a buyer for the Projects much less use its best efforts to find a buyer.

72.     The General Partner's failure to use best efforts to sell the Projects is a material breach of its obligations under the LPAs.

73.     The General Partner's breach of its obligations nullifies its right to exercise the Buyout Option.

74.     The Limited Partners have been harmed by the General Partner's failure to use best efforts to sell the Projects in breach of its obligations under Section 6.4J of the LPA.

**WHEREFORE**, pursuant to 28 U.S.C. §2201, the Limited Partners respectfully request that the Court award the following relief:

1.     Enter an Order that:

    a.     the right to force a sale pursuant to Section 6.4J of the LPAs is available to the Investor Limited Partners notwithstanding the General Partner's purported exercise of its Buyout Option;

    b.     the Investor Limited Partners' exercise of their right to force a sale pursuant to Section 6.4J of the LPA was effective;

    c.     exercise of the right to force a sale by the Investor Limited Partners triggers dissolution of the Partnership and liquidation of remaining Partnership

assets with the net proceeds distributed in accordance with the partners' positive capital accounts as required by Section 10.2 of the LPA;

d.   the Investor Limited Partners' opinion – that the appraiser's failure to consider the value of the Investor Limited Partners' capital account in determining the fair market value of their Interests was a material error – was reasonable for the purposes of Section 6.13C(ii) of the LPA;

e.   the General Partner's Buyout Notice was ineffective;

f.   the General Partner was obligated to use its best efforts to sell or refinance the Projects after receiving the Forced Sale Notice;

g.   the General Partner's failure to use best efforts to sell or refinance the Projects constituted a material breach of its obligations under the LPAs;

h.   the General Partner's breach of its obligations under the LPAs nullifies its right to exercise the Buyout Option; and

2.   Award the Limited Partners any monetary damages to which they are entitled;

3.   Grant the Limited Partners such other relief as is just and proper.

Respectfully submitted,

MMA KINGS CROSSING LLC; MMA SHELL POINTE,
LLC; MMA DOUGLAS MONTAGUE, LLC; and
BFIM SPECIAL LIMITED PARTNER, INC.

By their attorneys,


/s/ *Karen E. Friedman*
David E. Lurie BBO #542030
Karen E. Friedman, BBO #548943
Lurie Friedman LLP
One McKinley Square
Boston, MA 02109
Tel: (617) 367-1970
dlurie@luriefriedman.com
kfriedman@luriefriedman.com

September 9, 2020


## CERTIFICATE OF SERVICE


I, Karen E. Friedman, hereby certify that this document filed through the CM/ECF
system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF) on September 9, 2020.

/s/ *Karen E. Friedman*
Karen E. Friedman