# EXHIBIT 1

**SHELL POINTE, LP**

## AMENDED AND RESTATED AGREEMENT

## OF LIMITED PARTNERSHIP

**Dated as of August 1, 2004**

W318390.1  031249.3038

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS ..................................................................................1

ARTICLE II CONTINUATION, NAME AND PURPOSE.................................................17
Section 2.1    Continuation...................................................................17
Section 2.2    Name and Office; Agent for Service ................................17
Section 2.3    Purpose.........................................................................17
Section 2.4    Authorized Acts .............................................................17

ARTICLE III TERM AND DISSOLUTION ...................................................................19

ARTICLE IV PARTNERS; CAPITAL ...........................................................................19
Section 4.1    General Partners............................................................19
Section 4.2    Limited Partners............................................................20
Section 4.3    Partnership Capital and Capital Accounts ........................20
Section 4.4    Withdrawal of Capital.....................................................21
Section 4.5    Liability of Limited Partners ...........................................21
Section 4.6    Additional Limited Partners............................................21
Section 4.7    Agreement to be Bound by Documents .............................21

ARTICLE V CAPITAL CONTRIBUTIONS OF INVESTOR LIMITED PARTNER .................22
Section 5.1    Installments of Capital Contributions ..............................22
Section 5.2    Adjustment to Capital Contributions of Investor Limited Partner...........23
Section 5.3    Repurchase of Investor Limited Partner's Interest ...........25
Section 5.4    Redemption of Partnership Interest. ................................27

ARTICLE VI RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNERS .............27
Section 6.1    Restrictions on Authority................................................27
Section 6.2    Tax Matters Partner.......................................................29
Section 6.3    Business Management and Control; Designation of Managing General Partner; Certain Rights of the Special Limited Partner...............30
Section 6.4    Duties and Obligations of the General Partners................31
Section 6.5    Representations and Warranties.....................................34
Section 6.6    Indemnification ............................................................37
Section 6.7    Liability of General Partners to Limited Partners..............38
Section 6.8    Certain Obligations of the Developer ...............................39
Section 6.9    Obligation to Provide for Operating Expenses...................39
Section 6.10   Certain Payments to the General Partners and Affiliates....40
Section 6.11   Joint and Several Obligations ........................................41
Section 6.12   Reserve Accounts..........................................................41
Section 6.13   Buyout Option...............................................................41

ARTICLE VII WITHDRAWAL AND REMOVAL OF A GENERAL PARTNER....................44
Section 7.1    Voluntary Withdrawal ....................................................44
Section 7.2    Obligation to Continue....................................................44
Section 7.3    Successor General Partner .............................................44

W318390.1  031249.3038

Section 7.4     Interest of Predecessor General Partner......................................44
Section 7.5     Designation of New General Partners..........................................45
Section 7.6     Amendment of Certificate; Approval of Certain Events .......................45
Section 7.7     Removal of the General Partners ..............................................45

ARTICLE VIII TRANSFER OF LIMITED PARTNER INTERESTS ......................................49

Section 8.1     Right to Assign ..............................................................49
Section 8.2     Substitute Limited Partners ..................................................50
Section 8.3     Assignees ....................................................................50

ARTICLE IX LOANS; MORTGAGE REFINANCING; PROPERTY DISPOSITION ..............................51

Section 9.1     General ......................................................................51
Section 9.2     Refinancing and Sale .........................................................52
Section 9.3     Sales Commissions ............................................................52

ARTICLE X PROFITS, LOSSES AND DISTRIBUTIONS ..............................................53

Section 10.1    Distributions Prior to Dissolution ...........................................53
Section 10.2    Distributions Upon Dissolution ...............................................54
Section 10.3    Profits, Losses and Tax Credits ..............................................55
Section 10.4    Minimum Gain Chargebacks and Qualified Income Offset .........................57
Section 10.5    Special Provisions ...........................................................58

ARTICLE XI MANAGEMENT AGENT ..............................................................60

Section 11.1    Management Agent .............................................................60
Section 11.2    Special Power of Attorney ....................................................61

ARTICLE XII BOOKS AND REPORTING, ACCOUNTING, TAX ELECTION, ETC............................62

Section 12.1    Books, Records and Reporting .................................................62
Section 12.2    Bank Accounts ................................................................65
Section 12.3    Elections ....................................................................65
Section 12.4    Special Adjustments ..........................................................65
Section 12.5    Fiscal Year ..................................................................66

ARTICLE XIII GENERAL PROVISIONS ..........................................................66

Section 13.1    Notices ......................................................................66
Section 13.2    Word Meanings ................................................................66
Section 13.3    Binding Provisions ...........................................................66
Section 13.4    Applicable Law ...............................................................67
Section 13.5    Counterparts .................................................................67
Section 13.6    Paragraph Titles .............................................................67
Section 13.7    Separability of Provisions; Rights and Remedies ..............................67
Section 13.8    Effective Date of Admission ..................................................68
Section 13.9    Delivery of Certificate ......................................................68
Section 13.10   Additional Information .......................................................68
Section 13.11   Further Documents and Actions ................................................68
Section 13.12   Brokers or Finders ...........................................................69
Section 13.13   Amendment ....................................................................69

## SHELL POINTE, LP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP dated as of August 1, 2004, among DOUGLAS COMPANY, LLC, a South Carolina limited liability company, BLUE CROW DEVELOPMENT, LLC, a South Carolina limited liability company, as General Partners; MMA SPECIAL LIMITED PARTNER, INC., a Florida corporation, as Special Limited Partner; MMA SHELL POINTE, LLC, a Delaware limited liability company, as Investor Limited Partner; and DAVID D. DOUGLAS, as Original (and Withdrawing) Limited Partner.

### Preliminary Statement

The Partnership was formed as a limited partnership under the Uniform Act pursuant to an Agreement of Limited Partnership dated as of ZApril 24, 2003, (the "Original Partnership Agreement") and a Certificate of Limited Partnership dated as of April 3, 2003 (the "Certificate") filed with the Office of the Secretary of State of the State of South Carolina (the "Filing Office") on April 8, 2003.

The purposes of this amendment to, and restatement of, the Original Partnership Agreement are to (i) admit the Investor Limited Partner and the Special Limited Partner as Partners; (ii) provide for the withdrawal of the Original Limited Partner as Limited Partner; and (iii) to set out more fully the rights, obligations and duties of the Partners.

Now, therefore, it is agreed and certified, and the Original Partnership Agreement is hereby amended and restated in its entirety, as follows:

### ARTICLE I

### DEFINED TERMS

The defined terms used in this Agreement shall have the meanings specified below:

"*Accountants*" means Smith Sapp Bookhout Crumpler & Calliham of Myrtle Beach, South Carolina, or any other firm of certified public accountants as may be engaged by the General Partners with the Consent of the Investor Limited Partner.

"*Adjusted Aggregate Federal Credit Amount*" means the product of (i) 99.99% and (ii) the aggregate amount of Federal Tax Credits that is determined by the Accountants, at Cost Certification, to be available to the Property (and is reflected in the final IRS Form(s) 8609 for the Property) for the entire Credit Period, as such amount may be increased or decreased as a result of a subsequent determination by the Accountants, a Final Determination or a Recapture Event.

"*Adjustment Fraction*" means a fraction separately determined as to each Fiscal Year, the numerator of which shall be the Consumer Price Index most recently published before the end of such Fiscal Year, and the denominator of which shall be the Consumer Price Index most recently published prior to the Admission Date.

"*Admission Date*" means the date on which the Investor Limited Partner is admitted to the Partnership pursuant to Section 13.8.

"*Adverse Consequences*" means (i) all damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses actually paid, or reasonably expected to be paid, by the party suffering the Adverse Consequences in connection with any and all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, and rulings and (ii) the costs of any fees or other compensation reasonably necessary to a third party in connection with replacement of a General Partner.

"*Affiliate*" means, when used with reference to a specified Person: (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, partner, or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of, or controls, 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person. Affiliate of the Partnership or a General Partner does not include a Person who is a partner in a partnership or joint venture with the Partnership if that Person is not otherwise an Affiliate of the Partnership or General Partner.

"*Agreement*" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"*Agency Set-Aside Test*" means the election by the Partnership, in the 2003 Low-Income Housing Credit Application dated April 4, 2003 (the "Tax Credit Application") to (i) 36 of the units in the Project shall be three bedroom units; (ii) set aside 52 dwelling units in the Project for rental to tenants at or below 50% of area median income, as adjusted for family size; (iii) provide supportive services; (iv) give preference to persons on public housing waiting lists; (v) such other material elections and representations, including but not limited to the provision of certain amenities for the Project, as the Partnership made in the Tax Credit Application.

"*Appraised Value*" means, as of the Determination Date, the estimated fair market value of an asset determined by Independent Appraisers in accordance with the procedures set forth in Section 7.7F. In determining the Appraised Value of the real estate comprising the Property, such Independent Appraisers shall take into account the rent and occupancy restrictions affecting the Project which are set forth in the Code or in the Project Documents, as well as any increase in real estate taxes which is triggered by the removal of a General Partner.

"*Assignment*" shall mean any assignment, transfer or sale, and the words "*assign,*" "*assignee*" and "*assignor*" shall have correlative meanings, except in each case where the sense of this Agreement requires a different construction.

"*Breakeven*" means the first day following a specified period of months commencing on or after Final Closing during each of which, as determined by the Accountants, the Project has produced income (other than rental subsidies) actually received by the Partnership on a cash basis from normal operations plus rental subsidies on an accrual basis at least equal to all cash requirements of the Project on an accrual basis (not including distributions to Partners out of Cash Flow but including all debt service at the greater of actual levels or the levels in effect following Permanent Mortgage Commencement, whether or not Permanent Mortgage Commencement shall have occurred, real estate taxes assuming full assessment, and reserve requirements imposed upon the Project by the Project Documents or this Agreement) and, on an annualized basis, all projected expenditures, including those of a seasonal nature, which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation. If free rent or other rental concessions shall have been granted to tenants, the calculation of income pursuant to the preceding sentence shall be adjusted so that the effect of such concessions is amortized equally over the term of all leases (excluding renewal periods) to which it applies. The determination of the Accountants that Breakeven has occurred, in the form attached to Exhibit D, shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property to determine, among other things, that there is no deferred maintenance of the Project; *provided*, *however*, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven shall be deemed to have occurred.

"*Builder*" means Norsouth Construction Corporation, a Georgia corporation, and its successors.

"*Building*" or "*Buildings*" means any or all of the buildings to be located on the Land which, in the aggregate, will contain 72 dwelling units in nine buildings upon completion of construction.

"*Capital Account*" means, with respect to any Partner, the Capital Account maintained by the Partnership with respect to such Partner, consisting of (i) the amount of cash such Partner has contributed to the Partnership *plus* (ii) the fair market value of any property such Partner has contributed to the Partnership net of liabilities assumed by the Partnership or to which such property is subject *plus* (iii) the amount of profits and tax-exempt income allocated to such Partner *less* (iv) the amount of losses allocated to such Partner *less* (v) the amount of all cash distributed to such Partner *less* (vi) the fair market value of any property distributed to such Partner net of liabilities assumed by such Partner or to which such property is subject *less* (vii) such Partner's share of any other expenditures which are not deductible by the Partnership for federal income tax purposes or which are not allowable as additions to the basis of Partnership property, and subject to such other adjustments as may be required under the Code.

"*Capital Contribution*" means the total amount of cash contributed or agreed to be contributed to the Partnership by each Partner as shown in the Schedule. Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner in respect to the Partnership interest of such then Partner. The term "Capital Contribution" shall include any Special Capital Contribution.

"*Capital Transaction*" means any transaction the proceeds of which are not includable in determining Cash Flow, including without limitation the sale, refinancing or other disposition of all or substantially all of the assets of the Partnership, but excluding loans to the Partnership (other than a refinancing of any Mortgage Loan) and contributions of capital to the Partnership by the Partners.

"*Cash Available for Debt Service Requirements*" means, for any specified period of consecutive months beginning not earlier than Final Closing, the excess of (i) all Cash Receipts during such period over (ii) all cash requirements of the Partnership properly allocable to such period of time on an accrual basis (not including distributions or fees to Partners payable solely out of Cash Flow of the Partnership such as the Partnership Management Fee) and, on an annualized basis, all projected expenditures, including those of a seasonal nature which might reasonably be expected to be incurred on an unequal basis during a full annual period of operation, as determined by the Accountants but specifically excluding Debt Service Requirements. For purposes of this definition, (i) cash requirements of the Partnership shall include to the extent not otherwise covered above, full funding of reserves, normal repairs and necessary capital improvements and (ii) if free rent or other rental concessions shall have been granted to tenants, the calculation of rental revenues under clause (i) of the preceding sentence shall be adjusted so that the effect of such concessions is amortized equally over the term of all leases (excluding renewal periods) to which they apply.

"*Cash Flow*" means the excess of Cash Receipts over Operating Expenses. Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

"*Cash Receipts*" means with respect to a Fiscal Year or other applicable period, all rental revenue, laundry income, parking revenue, and other incidental revenues which are received by the Partnership on a cash basis during such period and arise from normal operations of the Project but specifically excluding interest on Partnership reserves, proceeds from insurance (other than business or rental interruption insurance), loans, proceeds of a Capital Transaction or Capital Contributions. In addition, any amount released without restriction from any escrow account in a Fiscal Year shall be considered a cash receipt of the Partnership for such Fiscal Year.

"*Certificate*" means the certificate of limited partnership of the Partnership under the Uniform Act, as amended from time to time in accordance with the terms hereof and the Uniform Act.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder at the time of reference thereto.

"*Commitments*" means and includes, the commitment of the Permanent Lender to make the Permanent Loan and any documents and other instruments delivered to or required by the Lenders or the Governmental Agency by or from the Partnership in connection with any of such commitments, as amended from time to time.

"*Completion Date*" means the latest of: (i) the date on which the Investor Limited Partner shall have received copies of all requisite certificates or permits permitting occupancy of

100% of the apartment units in the Project as issued by each Governmental Agency having jurisdiction; *provided*, *however*, that if such certificates or permits are of a temporary nature, the *"Completion Date"* shall not be deemed to have occurred unless that work remaining to be done is of a nature which would not impair the permanent occupancy of any of such apartment units; (ii) the date of delivery to the Investor Limited Partner of an "as-built" survey sufficient to allow delivery of a date-down endorsement to the Title Policy without a survey exception and otherwise in compliance with the requirement of Section 6.5 (viii); or (iii) the date as of which the Inspecting Architect certifies that the work to be performed by the Builder under the Construction Contract is substantially complete. Any representation by any General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; *provided*, *however*, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received any such General Partner's representation, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

*"Compliance Period"* means the entire period during which the "compliance period" described in Section 42(i)(1) of the Code shall be applicable to any Building.

*"Consent of the Investor Limited Partner"* means the prior written consent or approval of the Investor Limited Partner, or, if at any time there is more than one Investor Limited Partner, the prior written consent or approval of at least 51% in interest of the Investor Limited Partners.

*"Construction Contract"* means the construction contract between the Partnership and the Builder providing for the construction of the Improvements, as amended from time to time.

*"Construction Lender"* means MuniMae Midland Construction Finance, as maker of the Construction Loan, together with its successors and assigns in such capacity.

*"Construction Loan"* means the construction loan in the amount of $3,517,700 to be made by the Construction Lender.

*"Consumer Price Index"* means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

*"Cost Certification"* means the submission to, and acceptance by, the Credit Agency of a certified audit by the Accountants of the Partnership's development and related costs for purposes of establishing the amount of Federal Tax Credits available to the Project.

*"Credit Agency"* means the South Carolina State Housing Finance and Development Authority.

*"Credit Allocation"* means the Carryover Allocation dated December 31, 2003 providing for an allocation of tax credits to the Project.

"*Credit Period*" means the entire period during which the "credit period" described in Section 42(f)(1) shall be applicable to any Building.

"*Cumulative Priority Distribution*" means, as of a point in time, the amount, on a cumulative basis, of the Priority Distribution to which the Investor Limited Partner shall become entitled hereunder.

"*Debt Service Coverage Ratio*" means, for any specified period of consecutive calendar months beginning not earlier than Final Closing, a fraction, the numerator of which is the Cash Available for Debt Service Requirements with respect to such period and the denominator of which is the Debt Service Requirements for such period. The achievement by the Partnership of a specified Debt Service Coverage Ratio shall be confirmed by the Accountants and shall be subject to independent confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property for the purpose of confirming that the Property is in good condition and repair (ordinary wear and tear excepted); *provided*, *however*, that (i) no objection by the Investor Limited Partner to the determination of the Accountants based on its physical inspection of the Property shall be valid unless the General Partners are notified of such objection, and the specific reasons therefor, within seven (7) business days following the completion of such inspection and (ii) in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

"*Debt Service Requirements*" means, for any specified period of consecutive calendar months beginning not earlier than Final Closing, all debt service, mortgage insurance premium and/or other cash requirements imposed by the Mortgage Loan Documents or any other indebtedness properly allocable to such period of time on an annualized accrual basis as determined by the Accountants.

"*Deferred Development Fee*" has the meaning attributed thereto in the Development Agreement.

"*Designated Prime Rate*" means the annual rate of interest which is at all times equal to the lesser of (i) the highest prime rate as published in the *Wall Street Journal* (or any comparable publication selected by the Investor Limited Partner in its reasonable discretion if the *Wall Street Journal* ceases to publish such index) plus 1%, with calculations of interest to be made on a daily basis and on the basis of a three hundred sixty (360)-day year and (ii) the maximum rate permitted by law in the applicable context.

"*Designated Proceeds*" means the proceeds of the Mortgage Loans, any net rental or other miscellaneous income of the Partnership as of the Completion Date (to the extent not otherwise covered by this Designated Proceeds definition) which is permitted by any applicable Lender or Governmental Agency to be utilized for Development Costs, the Capital Contributions (excluding any Special Capital Contributions and Capital Contributions of the General Partners in excess of the amounts permitted under Section 4.1), and any insurance proceeds arising out of casualties prior to the Development Obligation Date.

"*Determination Date*" means the last day of the month preceding the month in which the Removal Notice Date occurs.

"*Developer*" means Douglas Development LLC, a South Carolina limited liability company acting in its capacity as developer of the Project and not in its capacity as a General Partner.

"*Development Advances*" has the meaning set forth in the Development Agreement.

"*Development Agreement*" means the Amended and Restated Development Agreement of even date herewith between the Partnership and the Developer, as amended.

"*Development Amount*" has the meaning attributed thereto in the Development Agreement.

"*Development Costs*" means all costs (including the Development Amount net of the Deferred Development Fee) incurred to (i) acquire the Land, (ii) complete the construction of the Improvements or cause the same to be completed in a good and workmanlike manner, free and clear of all mechanics', materialmen's or similar liens, and equip the Improvements or cause the same to be equipped, all substantially in accordance with the Project Documents and the drawings and specifications forming a part of the Construction Contract, (iii) arrive at Final Closing in substantial conformity with the Project Documents, (iv) discharge all Partnership liabilities and obligations arising out of any casualty giving rise to the receipt of insurance proceeds, (v) pay or provide for all other payments, expenses, escrows or reserves required by any Lender, Governmental Agency or Partnership creditor to be made, incurred or funded through the Development Obligation Date (other than Operating Expenses incurred through the Development Obligation Date and reserves which are to be funded from other sources) and (vi) pay all Environmental Compliance Costs and all costs associated with the performance of any radon remediation activities which may be required pursuant to Section 12.1J.

"*Development Obligation Date*" means the latest of (i) the Completion Date, (ii) Final Closing, (iii) achievement of Breakeven for a period of three (3) consecutive calendar months or (iv) delivery of the Certificate of Achievement of Development Obligation Date in the form attached hereto as Exhibit D.

"*Document Schedule*" means the Schedule of Documents attached hereto as Exhibit B.

"*Economic Risk of Loss*" has the meaning set forth in Treasury Regulation Section 1.752-2.

"*Election Notice*" has the meaning given to it in Section 5.3B.

"*Eligible Basis*" has the meaning set forth in Section 42(d) of the Code.

"*Eligible Development Costs*" means Development Costs which are includable in Eligible Basis, as determined by the Accountants.

"*Entity*" means any general partnership, limited partnership, limited liability company or partnership, corporation, joint venture, trust, business trust, cooperative or association.

"*Environmental Compliance Costs*" means all costs necessary to bring the Land and the Project into compliance with all Hazardous Waste Laws.

"*Event of Bankruptcy*" means, as to a specified Person:

(i)    the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days; or

(ii)    the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the failure of such Person generally to pay his debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing; or

(iii)    in the case of a Person who is a General Partner, the voluntary withdrawal of such Person as a General Partner in violation of the terms of this Agreement.

"*Extended Use Agreement*" means the agreement required to be entered into between the Credit Agency and the Partnership respecting long-term use restrictions and satisfying all of the requirements of Section 42(h)(6) of the Code.

"*Facility*" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"*Federal Tax Credit Shortfall Payment*" has the meaning provided in Section 5.2C.

"*Federal Tax Credits*" means the tax credits for which the Project is eligible under Section 42 of the Internal Revenue Code.

"*Fifty Percent Completion Date*" means the date as of which the Inspecting Architect certifies that the work to be performed by the Builder under the Construction Contract is fifty

percent (50%) complete (based on the ratio of the cost of completed items under the Construction Contract to the total Construction Contract amount, taking into account change orders and other revisions, as of the date of such certification). Any representation by the General Partners under this Agreement that the Fifty Percent Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection within fifteen (15) business days after having received such General Partners' representation, then the Investor Limited Partner shall be deemed to have waived the physical inspection requirement.

"*Final Closing*" means the date upon which all of the following events have occurred: (i) the Completion Date, (ii) Permanent Mortgage Commencement, (iii) the Project's being free of any mechanics' or other liens (except for the Mortgages and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Investor Tax Counsel (or by an endorsement of either such title policy)), (iv) the completion by the Accountants of a certified audit of the Partnership's and the Builder's construction costs as a part of cost certification to the extent required by the Lenders and the Governmental Agency, (v) the agreement and acceptance of such cost certification by the Lenders and the Governmental Agency to the extent required by the Lenders and the Governmental Agency, (vi) the disbursement of proceeds under the Mortgage Loans has been made in the full amount permitted by such cost certification, and (vii) all amounts due in connection with the construction of the Project have been paid or provided for.

"*Final Determination*" means the earliest to occur of (i) the date on which a decision, judgment, decree or other order has been issued by any court of competent jurisdiction, which decision, judgment, decree or other order has become final (i.e., all allowable appeals requested by the parties to the action have been exhausted), (ii) the date on which the Service has entered into a binding agreement with the Partnership with respect to such issue or on which the Service has reached a final administrative determination with respect to such issue which, whether by law or agreement, is not subject to appeal, (iii) the date on which the time for instituting a claim for refund has expired, or if a claim was filed the time for instituting suit with respect thereto has expired, or (iv) the date on which the applicable statute of limitations for raising an issue regarding a federal income tax matter with respect to the Partnership has expired.

"*Fiscal Year*" means the twelve-month period which begins on the first day of January and ends on the thirty-first day of December of each calendar year (or ends on the date of final dissolution for the year in which the Partnership is wound up and dissolved).

"*General Partners*" means any Person or Persons designated as a General Partner in the Schedule or any Person who becomes a General Partner as provided herein, in such Person's capacity as a General Partner of the Partnership. If at any time the Partnership shall have a sole General Partner, the term "General Partners" shall be construed as singular.

"*Governmental Agency*" means, as applicable, the Credit Agency, and/or any other government agency having jurisdiction over the particular matter to which reference is being made.

"*Guarantor*" means David D. Douglas.

"*Guaranty Agreement*" means the guaranty of even date herewith, made by the Guarantor in favor of the Investor Limited Partner.

"*Hazardous Material*" means and includes any pollutant or contaminant or any hazardous, toxic or radioactive waste, substance or material, including without limitation those listed in or regulated under any Hazardous Waste Laws, polychlorinated biphenyls, petroleum, petroleum-based or petroleum-derived products, mold, and asbestos or asbestos-containing materials.

"*Hazardous Waste Laws*" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"*Improvements*" means the Buildings and any related facilities to be constructed and/or rehabilitated in accordance with the Project Documents.

"*Independent Appraiser*" means a firm which is generally qualified to render opinions as to the fair market value of assets such as those owned by the Partnership, which is mutually acceptable to the General Partners and the Special Limited Partner and which satisfies the following criteria:

    (i)    such firm is not a Partner, or an Affiliate of the Partnership or any Partner;

    (ii)    such firm (or a predecessor in interest to the assets and business of such firm) has been in business for at least five (5) years, and at least one of the principals of such firm has been in the active business of appraising substantially similar assets for at least ten (10) years;

    (iii)    such firm has regularly rendered appraisals of substantially similar assets for at least five (5) years on behalf of a reasonable number of unrelated clients, so as to demonstrate reasonable market acceptance of the valuation opinions of such firm;

    (iv)    one or more of the principals or appraisers of such firm are members in good standing of an appropriate professional association or group which establishes and maintains professional standards for its members; and

    (v)    such firm renders an appraisal to the Partnership only after entering into a contract that specifies the compensation payable for such appraisal.

*"Initial Occupancy Date"* shall mean the first date upon which not less than 100% of the Low Income Units in the Project have been occupied by Qualified Tenants under bona fide written leases with terms of not less than one year at average rental rates (taking into account free rent and other concessions) not less than those forecast in the Investment Assumptions and upon terms satisfying the requirements of Section 42 of the Code.

*"Inspecting Architect"* means an architect chosen by the Investor Limited Partner or any successor to such firm.

*"Installment"* means any Installment of the Capital Contributions of the Investor Limited Partner referred to in Section 5.1.

*"Interest"*, or words of like import, shall mean all the interest of a Partner in Cash Flow and other distributions, capital, profits and losses, tax credits, and otherwise in the Partnership, including all allocations and distributions and all rights under this Agreement, and also shall include such interests and rights of such Partner in any successor Entity formed pursuant to this Agreement.

*"Investment Assumptions"* means the financial schedules and underlying assumptions listed as the Investment Assumptions on the Document Schedule.

*"Investment Closing"* means the date of delivery of this Agreement.

*"Investor Limited Partner"* means MMA Shell Pointe, LLC, a Delaware limited liability company, and shall include any other Persons admitted as an Investor Limited Partner pursuant to Section 4.6 or admitted as a Substitute Limited Partner pursuant to Section 8.1D, and their respective successors in such capacity.

*"Investor Tax Counsel"* means Nixon Peabody LLP, of Washington, D.C., or other counsel acceptable to the Investor Limited Partner.

*"Land"* means the parcels of land on which the Improvements are located in Charleston County, South Carolina, as described in the Mortgage.

*"Lender"* means the Construction Lender and/or the Permanent Lender, as the context may require.

*"Limited Partner"* or *"Limited Partners"* mean any or all of those Persons designated as Limited Partners in the Schedule, any Person admitted as a Limited Partner pursuant to Section 4.6, or any Person who becomes a Substitute Limited Partner as provided herein, in each such Person's capacity as a Limited Partner of the Partnership. Such terms shall include the Special Limited Partner, the Investor Limited Partner and any Persons who may succeed to the Interests of such Limited Partners.

*"Low Income Unit"* means any of the 72 dwelling units in the Project which are to be held for occupancy by the Partnership in such manner as to qualify such units as qualified low-income housing units under Section 42(i)(3) of the Code.

W318390.1  031249.3038                         11

"*Management Agent*" means Intermark Management Company, in its capacity as such, or any successor thereto engaged by the General Partners as the management agent for the Project with the Consent of the Investor Limited Partner.

"*Management Agreement*" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals.

"*Management Fee*" means the amount payable from time to time by the Partnership to the Management Agent for management services in accordance with the Management Agreement which shall be subject to any Requisite Approvals.

"*Managing General Partner*" means any Managing General Partner designated as provided in Section 6.3B.

"*Material Default*" has the meaning set forth in Section 7.7B.

"*MMA Financial*" means MMA Financial TC Corp., a Delaware corporation, and its successors.

"*Mortgage*" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Property from the Partnership to any Lender; and, where the context admits, "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan.  In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages.  The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"*Mortgage Loan*" means the Construction Loan and/or the Permanent Loan, as the context may require.

"*Mortgage Loan Commitments*" means and includes the commitment of (i) the Construction Lender to make the construction Mortgage Loan of up to $3,517,700 and (ii) the Permanent Lender to make the permanent Mortgage Loan of up to $3,147,000.

"*Mortgage Loan Documents*" means the loan agreements, Notes, Mortgages and other documents evidencing and securing any Mortgage Loan or otherwise entered into connection therewith.

"*Net Capital Contribution*" means $3,769,000.

"*Note*" means and includes any promissory note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any note supplemental to said original note issued to a Lender or any note issued to a Lender in substitution for any such original note.

"*Operating Expense Loan*" means a loan to the Partnership pursuant to Section 6.9A which is repayable without interest and only as provided in Article X.

"*Operating Expenses*" means (i) up to and including the Development Obligation Date, those expenses, properly accruable through such date which may be properly charged as operating expenses of the Project under standard accounting procedures and which are allocable, in accordance with generally accepted accounting principles, to apartment units for which all requisite approvals for occupancy have been obtained; such operating expenses may include real estate taxes and debt service and mortgage insurance premiums, if any, with respect to the Mortgage Loans (to the extent such operating expenses are not funded out of Designated Proceeds), but shall not include any costs required to be capitalized in accordance with generally accepted accounting principles; and (ii) after the Development Obligation Date, all the costs and expenses of any type incurred incidental to the ownership and operation of the Project, including, without limitation, taxes, capital improvements reasonably deemed necessary by the General Partners and not funded out of any reserves for such, mortgage and bond insurance premiums, if any, and the cost of operations, debt service, maintenance and repairs, and the funding of any reserves required to be maintained by any Lender or Governmental Agency or pursuant to this Agreement, but shall not include (i) repayments of Operating Expense Loans made pursuant to Section 6.9A or Working Capital Loans pursuant to Section 6.9B or (ii) distributions to Partners pursuant to Article X.

"*Operating Reserve*" means the operating reserve described in Section 6.12B.

"*Other Development Costs*" means Development Costs which are not Eligible Development Costs.

"*Partner*" means any General Partner or Limited Partner.

"*Partner Nonrecourse Debt*" means any Partnership liability (i) that is considered non-recourse under Treasury Regulation Section 1.1001-2 *or* for which the creditor's right to repayment is limited to one or more assets of the Partnership *and* (ii) for which any Partner or Related Person bears the Economic Risk of Loss.

"*Partner Nonrecourse Debt Minimum Gain*" means the amount of partner nonrecourse debt minimum gain and the net increase or decrease in partner nonrecourse debt minimum gain determined in a manner consistent with Treasury Regulation Sections 1.704-2(d), 1.704-2(i)(2) and (i)(3) and 1.704-2(k).

"*Partnership*" means the limited partnership governed by this Agreement as said limited partnership may from time to time be constituted.

"*Partnership Counsel*" means Blanco, Tackabery, Combs & Matamoros P.A. or such other counsel as the General Partners may designate from time to time as counsel for the Partnership.

"*Partnership Management Fee*" means the fee payable from time to time by the Partnership to the General Partners for their management services to the Partnership pursuant to Section 6.10B.

W318390.1  031249.3038                      13

"*Partnership Minimum Gain*" means the amount determined by computing, with respect to each Partnership Nonrecourse Liability, the amount of gain, if any, that would be realized by the Partnership if it disposed of (in a taxable transaction) the property subject to such liability in full satisfaction of such liability, and by then aggregating the amounts so computed. Such computations shall be made in a manner consistent with Treasury Regulation Sections 1.704-2(d) and 1.704-2(k).

"*Partnership Nonrecourse Liability*" means any Partnership liability (or portion thereof) for which no Partner or Related Person bears the Economic Risk of Loss.

"*Payment Certificate*" has the meaning given it in Section 5.1B(i).

"*Permanent Lender*" means Midland Affordable Housing Group Trust.

"*Permanent Loan*" means the loan in the original principal amount of approximately $3,103,000 to be made by the Permanent Lender to the Partnership.

"*Permanent Mortgage Commencement*" means the date when the principal amount and date of maturity of the Permanent Loan have been finally determined and principal amortization of the Permanent Loan has commenced.

"*Person*" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"*Priority Distribution*" means, as to any Fiscal Year of the Partnership, the product of the "Applicable Amount" times the Adjustment Fraction determined in accordance with the following sentence. The "Applicable Amount" shall be $0 until the Completion Date and $3,500 per annum (pro rated for periods of less than a full Fiscal Year during which such Applicable Amount shall apply) thereafter.

"*Project*" or "*Property*" means the Land and the Improvements.

"*Project Documents*" means and includes this Agreement, the Construction Contract, the Guaranty Agreement, the Mortgage Loan Documents, the Credit Allocation, the Extended Use Agreement, the Development Agreement, any Regulatory Agreement, the Management Agreement, the Commitments and all other documents relating to the Project which are required by, or have been executed in connection with, any of the foregoing documents.

"*Projected Aggregate Federal Credit Amount*" means $4,771,090 which is the product of (i) 99.98% and (ii) the aggregate amount of Federal Tax Credits available to the Property during the Credit Period, as reflected in the Investment Assumptions. If, following any determination or redetermination of the Adjusted Aggregate Federal Credit Amount pursuant to Section 5.2A, such amount is different than the Projected Aggregate Federal Credit Amount, then, for purposes of any subsequent application of Section 5.2A, the term "Projected Aggregate Federal Credit Amount" shall mean the Adjusted Aggregate Federal Credit Amount, provided that any required adjustment(s), payment(s) or Federal Tax Credit Shortfall Payments have been made pursuant to the provisions of Section 5.2 on account of such difference.

"*Qualified Income Offset Item*" means (i) an allocation of loss or deduction that, as of the end of each year, reasonably is expected to be made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Partnership, (b) pursuant to Section 706(d) of the Code as the result of a change in any Partner's interest in the Partnership, or (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as the result of a distribution by the Partnership of unrealized receivables or inventory items and (ii) a distribution that, as of the end of such year, reasonably is expected to be made to a Partner to the extent it exceeds offsetting increases to such Partner's Capital Account which reasonably are expected to occur during or prior to the Partnership taxable year in which such distribution reasonably is expected to occur.

"*Qualified Tenant*" means a tenant (i) with income not exceeding the percentage of area gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than twelve (12) months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents.

"*Recapture Event*" means an event, as evidenced by a determination thereof by the Accountants or as a result of a Final Determination, which results in a recapture with respect to all or any portion of the Partnership's Tax Credits under Section 42(j) of the Code or other applicable provisions of law and/or which results in a disallowance of any Tax Credits previously claimed by the Partnership.

"*Regulations*" means the rules and regulations of any Governmental Agency which are applicable to the Project or the Partnership.

"*Regulatory Agreement*" means any regulatory agreements, affordability restrictions, restrictive covenants or other similar documents entered or to be entered into between or by the Partnership and/or for the benefit of any Lender or Governmental Agency with respect to the Project, as amended from time to time.

"*Related Agreements*" means each agreement, promissory note and certificate referred to in the Document Schedule.

"*Related Person*" has the meaning set forth in Treasury Regulation Section 1.752-4(b) or any successor regulation thereto.

"*Removal Notice*" shall have the meaning set forth in Section 7.7.

"*Removal Notice Date*" shall have the meaning set forth in Section 7.7.

"*Requisite Approvals*" means any required approvals of the Lender and each Governmental Agency to an action proposed to be taken by the Partnership.

"*Retirement*" (including the forms "*Retire*" and "*Retired*") means, as to a General Partner, and shall be deemed to have occurred automatically upon, the occurrence of death, adjudication of insanity or incompetence, Event of Bankruptcy, dissolution or voluntary or involuntary withdrawal from the Partnership for any reason. Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law, death,

incapacity or pursuant to any terms of this Agreement. A General Partner which is an Entity (an "Entity General Partner") also will be deemed to have Retired upon the sale or other disposition (except by reason of death) of a controlling interest in such Entity General Partner. Without limitation of the foregoing, any of the foregoing events occurring as to an individual or Entity which directly or indirectly holds a controlling interest in an Entity General Partner shall also be deemed to constitute the Retirement of any such Entity General Partner. For purposes of this definition, "controlling interest" shall mean the power to direct the management and policies of such Entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"*Schedule*" means the Schedule of Partners annexed hereto as <u>Exhibit A</u> as amended from time to time and as so amended at the time of reference thereto.

"*Service*" means the Internal Revenue Service.

"*Special Capital Contribution*" means a capital contribution described in and made pursuant to Section 6.9A.

"*Special Endorsements*" means non-imputation, comprehensive, contiguity (if the Land consists of more than one parcel), access, zoning (including any applicable parking provisions), Fairways, blanket easement, subdivision, survey, separate tax lot and any other endorsements reasonably requested by the Special Limited Partner to the extent available in the State, each in a form reasonably acceptable to the Special Limited Partner.

"*Special Limited Partner*" means MMA Special Limited Partner, Inc., a Florida corporation, as Special Limited Partner and its successors in such capacity.

"*State*" means the State of South Carolina.

"*Substitute Limited Partner*" means any Person who is admitted to the Partnership as a Limited Partner under the provisions of Section 8.2 or Section 8.1D.

"*Tax Credit Shortfall Payments*" means Federal Tax Credit Shortfall Payments.

"*Tax Credits*" means the Federal Tax Credits.

"*Tenant Income Certification*" means a tenant's initial tax credit certification, including the tenant income certification/certificate of resident eligibility, all sources used in verifying income and assets (including, but not limited to, third party verification, checking and savings accounts, pay stubs, verification of assets, etc.), a copy of one completed lease signed and dated for each building in the Property, and a copy of the first and last page of each resident lease in each building in the Property, showing the start date of the lease and signature of the resident(s) and owner.

"*Title Policy*" means the ALTA owner's policy of title insurance issued to the Partnership by _____ Title Insurance Company as endorsed to include the Special Endorsements and to increase the amount thereof to $_____ and to update such policy to the date of the Investment Closing.

"*TMP*" means the General Partner designated as Tax Matters Partner of the Partnership in accordance with Section 6.2.

"*Uniform Act*" means the Revised Uniform Limited Partnership Act as in effect under the laws of the State, as amended from time to time.

"*Vessel*" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 *et seq*., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"*Working Capital Loan*" means a loan to the Partnership pursuant to Section 6.9B which is repayable only as provided in Article X.

## ARTICLE II

## CONTINUATION, NAME AND PURPOSE

### Section 2.1   Continuation

The parties hereto hereby agree to continue the limited partnership known as Shell Pointe, LP, which was formed pursuant to the provisions of the Uniform Act.

### Section 2.2   Name and Office; Agent for Service

A. The Partnership shall continue to be conducted under the name and style set forth in Section 2.1. The principal office of the Partnership shall be at 607 8th Street, Aynor, South Carolina. The General Partners may at any time change the location of such principal office and shall give prompt notice of any such change to the Limited Partners.

B. The name and address of the agent of the Partnership for service of process shall be: Brad Queener, 607 8th Street, Aynor, South Carolina.

### Section 2.3   Purpose

The purpose of the Partnership is to acquire, construct, rehabilitate, develop, repair, improve, maintain, operate, manage, lease, dispose of and otherwise deal with the Project in accordance with any applicable Regulations and the provisions of this Agreement. The Partnership shall not engage in any other business or activity.

### Section 2.4   Authorized Acts

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VI, the Partnership is, and the General Partners acting on its behalf are, hereby authorized:

(i)     To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(ii)     To acquire, construct, rehabilitate, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease the Project and any other real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(iii)     To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership and to secure the same by mortgage, deed of trust, security interest, pledge or other lien on the Property or any other assets of the Partnership, to the extent permitted by the Project Documents.

(iv)     To prepay in whole or in part, refinance, renew, recast, increase, modify or extend any Mortgage and in connection therewith to execute any extensions, renewals, or modifications of such Mortgage.

(v)     To employ any Person, including any Affiliate, to perform services for, or to sell goods to, the Partnership and to pay for such goods and services; *provided that* (except with respect to any contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length.

(vi)     To execute any and all notes, mortgages and security agreements in order to secure loans from any Lender and any and all other documents, including but not limited to the Project Documents, required by any Lender or any Governmental Agency in connection with each Mortgage and the acquisition, construction, rehabilitation, repair, development, improvement, maintenance and operation of the Property.

(vii)     To execute agreements with any Governmental Agency.

(viii)     To execute leases of the apartment units in the Project.

(ix)     To modify or amend the terms of any agreement or contract which the General Partners are authorized to enter into on behalf of the Partnership; *provided, however*, that such terms as amended shall not (1) materially adversely affect the Partnership or the Limited Partners, or (2) be in contravention of any of the terms or conditions of this Agreement.

(x)     To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

W318390.1 031249.3038                                    18

    (xi)    To execute the Related Agreements and any notices, documents or instruments permitted or required to be executed or delivered in connection therewith or pursuant thereto.

## ARTICLE III

## TERM AND DISSOLUTION

A. The Partnership shall continue in full force and effect until December 31, 2054, except that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

    (i)    the sale or other disposition of all or substantially all the assets of the Partnership;

    (ii)    the Retirement of a General Partner unless the business of the Partnership is continued pursuant to Article VII;

    (iii)    the election to dissolve the Partnership made in writing by the General Partners with the Consent of the Investor Limited Partner and any Requisite Approvals; or

    (iv)    the entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction.

B. Upon dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VII), the General Partners (or for purposes of this paragraph their trustees, receivers, successors or legal representatives) shall cause the cancellation of the Certificate, liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 10.2. Notwithstanding the foregoing, in the event such liquidating General Partners shall determine that an immediate sale of part or all of the Partnership's assets would cause undue loss to the Partners, the liquidating General Partners may, in order to avoid such loss, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy the Partnership debts and obligations (other than Operating Expense Loans).

## ARTICLE IV

## PARTNERS; CAPITAL

### Section 4.1    General Partners

A.    The General Partners of the Partnership are Douglas Company, LLC, and Blue Crow Development, LLC, and their addresses and Capital Contributions are set forth in the Schedule. In no event shall the aggregate Capital Contributions of the General Partners (excluding any Special Capital Contributions) exceed $100 without the Consent of the Investor Limited Partner.

B    In the event the entire Development Amount has not been paid by the tenth anniversary of the Completion Date, the General Partners shall make a Capital Contribution to the Partnership in the amount necessary to pay the balance of the Development Amount and the General Partners shall cause the Partnership to immediately apply such proceeds to the discharge of such obligation in full.

### Section 4.2   Limited Partners

A. The Special Limited Partner is hereby admitted to the Partnership.  Its address and Capital Contribution are set forth in the Schedule.

B. The Investor Limited Partner is hereby admitted to the Partnership.  Its address and Capital Contributions are set forth in the Schedule.  The payment of its Capital Contribution is governed by Section 5.1.

C. The Original Limited Partner is David D. Douglas.  By his execution of this Agreement, the Original Limited Partner hereby withdraws as Limited Partner, and the Original Limited Partner, as such, shall have no further rights with respect to the Partnership as of the Admission Date.

### Section 4.3   Partnership Capital and Capital Accounts

A. The capital of the Partnership shall be the aggregate amount contributed by the Partners as set forth in the Schedule.  No interest shall be paid by the Partnership on any Capital Contribution.  The Schedule shall be amended and, if necessary or appropriate, amendments to the Certificate shall be filed from time to time to reflect the withdrawal or admission of Partners and any changes in the Interest held or amounts contributed or agreed to be contributed by any Partner.

B. An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an Interest.  The original Capital Account established for each such substituted Partner shall be in the same amount as, and shall replace, the Capital Account of the Partner which such substituted Partner succeeds, and, for the purposes of this Agreement, such substituted Partner shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Partner which such substituted Partner succeeds.  The term "substituted Partner", as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the allocations and distributions of the Partnership by reason of such Person succeeding to the Interest of a Partner by assignment of all or any part of a Partner's Interest.  To the extent a substituted Partner receives less than 100% of the Interest of a Partner he succeeds, the original Capital Account of such substituted Partner and its Capital Contribution shall be in proportion to the Interest he receives and the Capital Account of the Partner who retains a partial Interest in the Partnership and its Capital Contribution shall continue, and not be replaced, in proportion to the Interest he retains.  Any special basis adjustments under Section 743 of the Code resulting from an election by the Partnership pursuant to Section 754 of the Code shall not be taken into account for any purpose in establishing and maintaining Capital Accounts for the Partners pursuant to this Section 4.3.

C. Nothing in this Section 4.3 shall affect the limitations on transferability of Interests set forth in Article VII or Article VIII.

### Section 4.4     Withdrawal of Capital

Except as may be specifically provided in this Agreement, no Partner shall have the right to (i) withdraw from the Partnership all or any part of its Capital Contribution or (ii) demand and receive property of the Partnership in return for its Capital Contribution or in respect of its Interest.

### Section 4.5     Liability of Limited Partners

A. No Limited Partner shall be liable for any debts, liabilities, contracts, or obligations of the Partnership. A Limited Partner shall be liable only to make payments of its Capital Contribution as and when due hereunder. After its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Uniform Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

B. In no event shall any Person who is at any time a member or manager of the Investor Limited Partner, or any partner, member or Affiliate of any such Person, have any personal liability for the payment or performance of any obligation of the Investor Limited Partner under the provisions of this Agreement or any document or instrument to be delivered in connection with this Agreement, including, without limitation, the obligations of the Investor Limited Partner to contribute capital to the Partnership. All parties dealing with the Investor Limited Partner shall look solely to the assets of the Investor Limited Partner for the satisfaction of any such obligation.

### Section 4.6     Additional Limited Partners

The General Partners may admit additional Limited Partners only with the Consent of the Investor Limited Partner.

### Section 4.7     Agreement to be Bound by Documents

Each General Partner and Limited Partner shall be bound by the terms of this Agreement and the Project Documents. Any incoming General Partner and Limited Partner, as a condition of receiving any Interest, shall agree to be bound by this Agreement and the Project Documents to the same extent and on the same terms as the other General Partners and Limited Partners, respectively. Upon any dissolution of the Partnership or any transfer of the Property while any Mortgage is held by any Lender, no title or right to the possession and control of the Property and no right to collect the rents therefrom shall pass to any Person who is not, or does not become, bound in a manner satisfactory to the Lender and the Governmental Agency to the Project Documents and the provisions of this Agreement. The Project Documents shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns as long as the corresponding Mortgage Loans shall be outstanding.

## ARTICLE V

## CAPITAL CONTRIBUTIONS OF INVESTOR LIMITED PARTNER

### Section 5.1     Installments of Capital Contributions

A. The Investor Limited Partner shall contribute as its Capital Contribution the sum of $3,769,000, payable in four (4) installments (the "Installments") as follows:

(i)     the first Installment (the "First Installment") in the amount of $2,261,400 shall be paid on the date of Investment Closing based on draw requests as approved by the Special Limited Partner and the Construction Lender;

(ii)     the second Installment (the "Second Installment") in the amount of $753,800, shall be paid on the latest to occur of: (a) Completion Date, and (b) the date the Accountants determine the amount of the Tax Credits;

(iii)     the third Installment (the "Third Installment") in the amount of $565,350 shall be payable on the latest to occur of (a) Final Closing, and (b) receipt of a Tenant Income Certification for each of the Qualified Tenants in the Property;

(iv)     the fourth installment (the "Fourth Installment") in the amount of $188,450 shall be payable upon the receipt by the Partnership of properly executed Forms 8609 with respect to all of the Buildings comprising the Project and receipt of a properly recorded Extended Use Agreement.

B. The obligation of the Investor Limited Partner to make each Installment (except as otherwise provided) is subject to each of the following conditions:

(i)     The General Partners shall have properly completed, executed and delivered to the Investor Limited Partner a certificate relating to the appropriate remaining Installments (the "Payment Certificate"), in the forms attached hereto as exhibits relating to the appropriate remaining Installments, dated the date such Installment is to be paid to the Partnership and attaching the Title Policy endorsement and any other materials referred to therein. In connection with the payment of each Installment, the Investor Limited Partner shall have the right to conduct a physical inspection of the Property to determine that the condition of the Project is consistent with sound business practices in the geographic area in which the Project is located, including no deferred maintenance. The Investor Limited Partner shall conduct such inspection within fifteen (15) business days of being requested to do so by the General Partner, provided, however, that the Investor Limited Partner will be deemed to waive such physical inspection requirement if it does not make such inspection within fifteen (15) business days of receipt of a written request by the General Partner to do so (which may be sent prior to the date of the Payment Certificate, but not more than fifteen (15) business days prior to the date of the Payment Certificate).

(ii)     In the case of the First Installment, all Requisite Approvals to the admission of the Investor Limited Partner pursuant to this Agreement shall have been obtained and the Project shall have received a Credit Allocation in the amount of at least $477,204 per annum.

(iii)     Each of the representations and warranties set forth in Section 6.5 shall in all material respects be true and correct in all material respects.

(iv)     No event shall have occurred which would permit the Investor Limited Partner to give an Election Notice under Section 5.3.

(v)     From and after the date of the occurrence of an Event of Bankruptcy as to any General Partner, any Guarantor or the Developer, the obligation of the Investor Limited Partner to pay the Installments shall be suspended, and such obligation shall be reinstated only when such Event of Bankruptcy shall have been cured in a manner approved in writing by the Investor Limited Partner.

(vi)     No Installment shall be payable unless all conditions for all prior Installments have been satisfied.

**Section 5.2     Adjustment to Capital Contributions of Investor Limited Partner**

The Capital Contribution of the Investor Limited Partner shall be subject to adjustment in the manner provided in this Section 5.2.

A. Federal Downward Basis Adjuster   If at any time and from time to time the Accountants shall determine that, or there shall be a Final Determination or a Recapture Event pursuant to which, the Adjusted Aggregate Federal Credit Amount properly allocable to the Investor Limited Partner during the Credit Period for all of the Buildings in the Project is or will be less than the Projected Aggregate Federal Credit Amount, then the Capital Contribution of the Investor Limited Partner shall be reduced in the aggregate by the "Federal Adjustment Factor" (as hereinafter defined) for each $1.00 that the Adjusted Aggregate Federal Credit Amount is less than the Projected Aggregate Federal Credit Amount (the resulting product being referred to herein as the "Federal Adjustment Amount"). The "Adjustment Factor" shall be an amount equal to $0.921. The Federal Adjustment Amount shall be increased by the amount of any interest and/or penalties paid or payable by the Investor Limited Partner (or its participants) as a result of any Recapture Event affecting the calculation of the Federal Adjustment Amount.

B. Federal Timing Adjuster   If at any time and from time to time the Accountants shall determine that, or there shall be a Final Determination or a Recapture Event pursuant to which, the amount of the Federal Tax Credits properly allocable to the Investor Limited Partner is less than $92,771 in 2005, or $463,856 in 2006 (the "Target Amounts"), then the Capital Contribution of the Investor Limited Partner shall be reduced by $0.75 for each $1.00 that the Federal Tax Credits properly allocable to the Investor Limited Partner is less than $92,771 in 2005, or $463,856 in 2006 (a "Federal Timing Adjustment"). Notwithstanding the foregoing, however, in the event that the Adjusted Aggregate Federal Credit Amount shall vary from the

Projected Aggregate Federal Credit Amount in effect on the date of the Investment Closing, the Target Amounts for purposes of the preceding sentence shall be adjusted by the same percentage by which the Adjusted Aggregate Federal Credit Amount varies from the Projected Aggregate Federal Credit Amount.

C. Payment of Federal Adjustments  Any Federal Adjustment Amount (as increased pursuant to the last sentence of Section 5.2A) or Federal Timing Adjustment shall be applied first to reduce the amount of any unpaid portions of the Installments of the Capital Contribution of the Investor Limited Partner, in order, by a corresponding amount. If the aggregate Federal Adjustment Amount (as increased pursuant to the last sentence of Section 5.2A) and Federal Timing Adjustment exceeds the amount of such unpaid Installments, then the General Partners shall make a payment (a "Federal Tax Credit Shortfall Payment") to the Investor Limited Partner in the amount of such excess within thirty (30) days of the date of the determination in question. Unless the treatment thereof as a Capital Contribution is approved in writing by the Investor Limited Partner in its sole discretion, any such Federal Tax Credit Shortfall Payment by the General Partners shall not constitute a Capital Contribution, loan or advance to the Partnership and shall not be reimbursable by the Partnership, but shall be treated as a payment by the General Partners to the Investor Limited Partner for breach of warranty by the General Partners to the Investor Limited Partner. If full payment of such excess amount is not received within such thirty (30)-day period, the unpaid balance shall thereafter bear interest at the Designated Prime Rate. Notwithstanding the foregoing if any portion of the Tax Credit Shortfall Payment results from any event occurring after the Development Obligation Date which is not the result of the negligent or fraudulent acts of the General Partner or its agents, then the amount of such excess shall be paid to the Investor Limited Partner from the first available Cash Flow in any fiscal year (prior to payment of any loans or fees to the General Partners), but any amount which remains unpaid at the time of a Capital Transaction shall be paid as provided in Section 10.1B, as a first priority thereunder. In addition, if any Federal Tax Credit shortfall Payment due as a result of an event occurring after the Development Obligation Date is equal to less than 0.005% of the Projected Aggregate Federal Credit Amount, then such amount shall be repayable from Cash Flow as the highest priority. If Cash Flow is insufficient to pay the entire outstanding amount during a twelve month period, the General Partners shall pay any such outstanding amount as set forth above.

D. Provisional Adjustments  If, upon receipt by the Investor Limited Partner of a Payment Certificate with respect to any Installment, the Investor Limited Partner shall have a reasonable basis to believe that the amount of such Installment would have been subject to reduction if the Accountants had made a current determination or projection under Section 5.2A or 5.2B above, the Investor Limited Partner may so notify the General Partners within seven (7) business days of receipt of such Payment Certificate, and the General Partners shall thereupon engage the Accountants to make such determination or projection (unless the General Partners and Investor Limited Partner shall mutually agree upon the adjustments to be made). The amount of the Installment in question shall then be provisionally reduced in accordance with such projection or agreement; provided, however, that if the Accountants' subsequent determinations with respect to matters provisionally reduced under this paragraph shall vary from the determinations or mutual agreements described herein, then either (i) the Investor Limited Partner shall promptly pay to the Partnership the amounts, if any, by which the provisional reduction exceeded the reduction as subsequently determined or (ii) the amount, if

any, by which the reduction as subsequently determined exceeded the provisional reduction shall be applied against future Installments or refunded as provided in Section 5.2C above. The due date for payment by the Investor Limited Partner of any Installment which shall become the subject of the procedure described in this paragraph shall be tolled pending determination of the provisional reduction (if any) as provided herein.

### Section 5.3    Repurchase of Investor Limited Partner's Interest

A. The General Partners hereby agree to purchase the Interest of the Investor Limited Partner if any of the following events shall occur:

(i)    Final Closing shall not have taken place on or before August 1, 2006, *provided, however*, that such date may be automatically extended for a period of up to twelve (12) months to the extent the expiration dates set forth in the Project Documents shall have been extended beyond such date; or

(ii)    at any time prior to the Development Obligation Date, (1) any action to foreclose any Mortgage shall have been commenced and such action is not terminated or withdrawn within thirty (30) days or a binding agreement with the holder(s) thereof to effect the same entered into within such period, and any notice of acceleration of indebtedness waived or withdrawn; (2) any action is commenced to foreclose any mechanics' or any other lien (other than the lien of any Mortgage) against the Project and such action has not within thirty (30) days been either bonded against in such a manner as to preclude the holder of such lien from having any recourse to the Property or to the Partnership for payment of any debt secured thereby, or affirmatively insured against by the title insurance policy or an endorsement thereto issued to the Partnership by a reputable title insurance company (which insurance company will not have indemnity from or recourse against Partnership assets by reason of any loss it may suffer by reason of such insurance) in an amount satisfactory to Special Tax Counsel; (3) construction or operation of the Project shall have been enjoined by a final order (from which no further appeals are possible) of a court having jurisdiction and such injunction shall continue for a period of thirty (30) days; (4) any of the Commitments is terminated, withdrawn or becomes unenforceable (except as a result of full performance thereof in accordance with its terms) and such Commitment is not reinstated (or replaced on terms at least as favorable to the Partnership) within thirty (30) days; (5) a casualty occurs resulting in substantial destruction of more than 50% of the Project, or there is substantial destruction of less than 50% of the Project and the insurance proceeds (if any) are insufficient to restore the Project or the Project is not so restored within twenty-four (24) months following such casualty; or (6) the Project shall become ineligible for 30% or more of the low-income housing tax credit anticipated to be generated by the Project, as calculated on the basis of the information set forth in the Investment Assumptions; or

(iii)    any Lender or Governmental Agency shall disapprove, or fail to give a required approval of, the Investor Limited Partner as a Partner of the Partnership.

B.  If any such event set forth in Section 5.3A shall occur, the General Partners shall give notice to the Investor Limited Partner of the obligations of the General Partners hereunder to purchase its Interest (such obligation being herein called a "Purchase Obligation" and such notice the "Purchase Obligation Notice") within fifteen (15) days after the occurrence of any event giving rise to such obligation.  If the Investor Limited Partner elects to sell its Interest hereunder, it shall give the General Partners notice of such election (an "Election Notice") within thirty (30) days after such Purchase Obligation Notice from the General Partners is received by the Investor Limited Partner (or, in the event that such Purchase Obligation Notice from the General Partners is not given, at any time after the occurrence of such event).

C.  Within ten (10) business days after delivery to the General Partners of an Election Notice from the Investor Limited Partner, the General Partners shall pay the Investor Limited Partner a purchase price (the "Purchase Price") in cash (with interest thereon at an annual rate one percentage point above the Designated Prime Rate commencing on the fifth (5th) day following the date of such delivery) equal to (i) 110% of the Investor Limited Partner's Net Capital Contribution (whether or not theretofore paid-in to the Partnership), *less* (ii) the sum of (a) that portion of the Net Capital Contribution which has not theretofore been paid-in to the Partnership, (b) the amount of Cash Flow theretofore distributed by the Partnership in respect of the Investor Limited Partner's Interest and (c) the amount of any Tax Credits allocable to the Interest which will not be recaptured as a result of the disposition of said Interest or otherwise.

D.  Upon the giving of its Election Notice, the Investor Limited Partner shall have no further obligations under this Agreement, and the General Partners shall indemnify and defend the Investor Limited Partner and hold it harmless against any such obligations.  The General Partners shall take all action and shall pay all costs necessary to enable the Investor Limited Partner to receive and retain the Purchase Price as against any creditor of any General Partner or the Partnership.  Notwithstanding the purchase by the General Partners of the Interest of the Investor Limited Partner pursuant to Section 5.3A, to the extent permitted under the applicable provisions of the Code, the Investor Limited Partner shall be allocated any profits or losses and tax credits in respect of said Interest for the period prior to the date of the receipt by the Investor Limited Partner of payment therefor.  Anything herein to the contrary notwithstanding, title to the Interest of the Investor Limited Partner shall not vest in the General Partners until payment in full of the Purchase Price therefor.  Upon such payment, the General Partners shall forthwith cause an amendment hereto and to the Certificate and any other necessary papers to be executed, filed, recorded and published wherever required showing such substitution.

E.  No agreement affecting the Project shall prevent the exercise by the Investor Limited Partner of its right to require the purchase by the General Partners of its Interest in the manner described in this Section 5.3.

F.  The Investor Limited Partner shall have the right to waive its right to have its Interest repurchased at any time during which any of such rights shall be in effect.  Any such waiver shall be exercised by delivery to the General Partners of a written notice stating under which clause(s) of this Section it is waiving its right to have its Interest repurchased and that its rights thereunder are thereby irrevocably waived from that date forward.

G. Should any General Partner repurchase the Interest of the Investor Limited Partner pursuant to this Section 5.3, then the Special Limited Partner agrees to withdraw from the Partnership at the same time as the Investor Limited Partner's withdrawal is effective.

### Section 5.4      Redemption of Partnership Interest.

The Investor Limited Partner shall have the right, exercised by giving written notice to the Partnership within one hundred eighty (180) days following the end of the Compliance Period, to require the Partnership to redeem the Interest of the Investor Limited Partner for a redemption price of $100, and the Partnership shall promptly so redeem such Interest, whereupon the Investor Limited Partner shall cease to be a Partner and shall have no further rights, duties or obligations with respect to the Partnership or any of the other Partners.

## ARTICLE VI

## RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNERS

### Section 6.1      Restrictions on Authority

A. Notwithstanding any other provisions of this Agreement, the General Partners shall have no authority to perform any act in respect of the Partnership or the Project in violation of (i) any applicable law or regulation or (ii) any agreement between the Partnership and any Lender or Governmental Agency.

B. The General Partners shall not have any authority to do any of the following acts without the Consent of the Investor Limited Partner and any Requisite Approvals:

(i)      to incur indebtedness for money borrowed on the general credit of the Partnership, except as specifically permitted by Article IX, or

(ii)      following completion of construction of the Improvements, to construct any new capital improvements, or to replace any existing capital improvements if construction or replacement would substantially alter the use of the Property, or

(iii)      to acquire any real property in addition to the Property (other than easements or similar rights necessary or convenient for the operation of the Project), or

(iv)      to cause the Partnership to make any loan or advance to any Person (for purposes of this clause 6.1B(iv), accounts receivable in the ordinary course of business from Persons other than the General Partners or their Affiliates shall not be deemed to be advances or loans), or

(v)      to lease any Low Income Unit to other than Qualified Tenants or otherwise operate the Project in such a manner or take any action which could

cause any Low Income Unit to fail to be treated as a qualified low-income housing unit under Section 42(i)(3) of the Code or which would cause the recapture by the Partnership of any low-income housing credit under Section 42 of the Code, or

(vi)     after the Investment Closing, to enter into any material Project Document or to amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partners or their Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investor Limited Partner (notwithstanding that the Investor Limited Partner is neither a party to nor express beneficiary of such provision or was not a Partner when such provision became effective), or

(vii)    to obtain, increase, refinance or materially modify any Mortgage Loan after Investment Closing or to sell or convey the Property or any substantial portion thereof, except as provided in Article IX, and except that the General Partners may cause the Partnership to grant easements and similar rights affecting the Land to obtain utility services for the Project or for other purposes necessary or convenient for the operation of the Project, or

(viii)   to cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for the Partnership or for any substantial part of the Partnership's business or property, or to cause the Partnership to consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership, or

(ix)     to pledge or assign any of the Capital Contribution of the Investor Limited Partner or the proceeds thereof, or

(x)      to amend any of the Related Agreements, or

(xi)     to permit the merger, termination or dissolution of the Partnership, or

(xii)    to approve any changes to the plans and specifications for the Project which would result, either individually or in the aggregate, in an overall development cost increase or decrease in excess of $25,000 (*provided*, *however*, that any Consent of the Investor Limited Partner required under this clause (xii) shall not be unreasonably withheld) or

(xiii)   to take any action which would cause the Property or any part thereof to be treated as tax exempt use property within the meaning of Section 168(h) of the Code.

C. The General Partners shall not (a) cause the Partnership to utilize Cash Flow to acquire interests in other Entities or (b) cause the Partnership to invest the proceeds of any sale or refinancing of the Project unless a sufficient portion thereof is distributed to the Investor Limited Partner to enable each participant thereof, assuming that it is in a combined federal, state and local marginal income tax bracket of 40%, to pay the federal, state and local income tax liability arising from the sale or refinancing which generated such proceeds, and in any event sale or refinancing proceeds shall not be reinvested without the Consent of the Investor Limited Partner.

D. Any Partner may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, and development of real estate, regardless of whether such real estate directly competes with the Project, and neither the Partnership nor any Partner shall have any rights by reason of this Agreement in and to such independent ventures.

**Section 6.2    Tax Matters Partner**

A. The Managing General Partner is hereby designated as the Tax Matters Partner for the Partnership.  Upon the Retirement of the Person serving as the TMP (the "Retired TMP"), the Partnership shall designate a successor TMP in accordance with Treasury Regulation Section 301.6231(a)(7)-1 or any successor Regulation, but such designee shall not become the TMP until the designation of such Person has been approved by Consent of the Investor Limited Partner.  Such successor TMP shall notify the Service of its designation as such for such year as well as for all prior years for which the Retired TMP served in such capacity.

B. The TMP shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit.  The fees and expenses of such counsel shall be a Partnership expense and shall be paid by the Partnership.  Such counsel shall be responsible for representing the Partnership; it shall be the responsibility of the General Partners and of the Investor Limited Partner, at their own expense, to employ tax counsel to represent their respective separate interests.

C. The TMP shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, and shall furnish to each Partner who so requests in writing, a copy of each notice or other communication received by the TMP from the Service (except such notices or communications as are sent directly to such requesting Partner by the Service).  All reasonable third party costs and expenses incurred by the TMP in serving as the TMP shall be Partnership expenses and shall be paid by the Partnership.

D. The TMP shall have no authority, without the Consent of the Investor Limited Partner, to (i) enter into a settlement agreement with the Service which purports to bind Partners other than the TMP, (ii) file a petition as contemplated in Section 6226(a) or 6228 of the Code, (iii) intervene in any action as contemplated in Section 6226(b) of the Code, (iv) file any request contemplated in Section 6227(b) of the Code, (v) enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code or (vi) take any other substantial action which would affect the Investor Limited Partner.

E.  The relationship of the TMP to the Investor Limited Partner is that of a fiduciary, and the TMP hereby acknowledges its fiduciary obligation to perform its duties in such manner as will serve the best interests of the Partnership and the Investor Limited Partner.

F.  The Partnership shall indemnify the TMP (including the officers and directors of a corporate TMP) against judgments, fines, amounts paid in settlement and expenses (including attorneys' fees) reasonably incurred by the TMP in any civil, criminal or investigative proceeding in which the TMP is involved or threatened to be involved by reason of being the TMP, *provided that* the TMP acted in good faith, within what it reasonably believed to be in the best interests of the Partnership or its Partners.  The TMP shall not be indemnified under this provision against any liability to the Partnership or its Partners to any greater extent than the indemnification allowed by Section 6.6 of this Agreement.  The indemnification provided by this subparagraph shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any applicable statute, agreement, vote of the Partners, or otherwise.

**Section 6.3      Business Management and Control; Designation of Managing General Partner; Certain Rights of the Special Limited Partner**

A.  The General Partners shall have the exclusive right to manage the business of the Partnership in accordance with this Agreement.  No Limited Partner shall have any authority or right to act for or bind the Partnership.

B.  The powers and duties of the General Partners hereunder may be exercised in the first instance by one or more Managing General Partners.  Each Managing General Partner is hereby authorized to execute and deliver in the name and on behalf of the Partnership all such documents and papers (including any required by any Lender or Governmental Agency) as such Managing General Partner deems necessary or desirable in carrying out such duties hereunder. Douglas Company LLC is hereby designated as the initial Managing General Partner; if such Person shall become unable to serve in such capacity or shall cease to be a General Partner, the remaining General Partners may from time to time designate from among themselves by consent one or more substitute or additional Managing General Partners.  If for any reason no designation is in effect, the powers of the Managing General Partners shall be exercised by the majority consent of the remaining General Partners.  A designation of a successor as Managing General Partner or the designation of an additional Managing General Partner pursuant to Section 7.3 or 7.5 shall supersede any designation or other exercise of rights pursuant to this Section 6.3B.

C.  In the event that (i) the Partnership is in material default of any of its obligations under the Project Documents, (ii) any General Partner, Developer or Guarantor is in default in any material respect under any of its obligations under this Agreement or any of the Related Agreements, (iii) a Recapture Event shall have occurred, (iv) a sole General Partner shall Retire, (v) an Event of Bankruptcy shall have occurred as to a General Partner, the Developer or any Guarantor or (vi) the General Partner or its Affiliate shall have committed fraud or breach of fiduciary duty, the Special Limited Partner may, at its election, give notice of such default or event to the then General Partners, if any, and, (a) in the case of a default, if such default is not cured within ten (10) business days (or cured within a reasonable time (not to exceed thirty (30) days) in the event it is impossible to cure such default within such ten (10)-day period, *provided*

*that* the General Partner is diligently and in good faith seeking to cure such default and there has been no assignment of or institution of proceedings to foreclose any Mortgage), or (b) in the event of such Retirement, Recapture Event or Event of Bankruptcy, promptly after the occurrence of such event, the Special Limited Partner or any Entity of which a majority of the stock or beneficial interest is owned, directly or indirectly, by the Special Limited Partner or MMA Financial, may, with the Consent of the Investor Limited Partner, elect to become an additional General Partner with all the rights and privileges of a General Partner.  The Special Limited Partner shall provide the General Partners with true and correct copies of the written instruments evidencing such Consent of the Investor Limited Partner within ten (10) days after the Special Limited Partner's receipt thereof.   Upon such election by the Special Limited Partner or such Entity and such Consent, the Special Limited Partner or such Entity shall automatically become and shall be deemed a General Partner and each Partner hereby irrevocably appoints the Special Limited Partner (with full power of substitution) as the attorney-in-fact of such Partner for the purpose of executing, acknowledging, swearing to, recording and/or filing any amendment to this Agreement and the Certificate necessary or appropriate to confirm the foregoing. If the Special Limited Partner or such Entity shall become an additional General Partner as herein stated, its Interest shall not be increased thereby (except that the Special Limited Partner may assign its Interest to such Entity).  In the event of the admission of the Special Limited Partner or such Entity as a General Partner pursuant to this Section 6.3, and if there are then any other General Partners, the Special Limited Partner or such Entity shall have managerial rights, authority and voting rights of 51% on any matters to be decided or voted upon by the General Partners or the Managing General Partner, as the case may be, and the rights and authority of the remaining General Partners or the Managing General Partner, as the case may be, shall be deemed equally divided among them.

**Section 6.4     Duties and Obligations of the General Partners**

A.  The General Partners shall use their reasonable best efforts to carry out the purposes, business and objectives of the Partnership, and shall devote to Partnership business such time and effort as may be reasonably necessary to (i) supervise the activities of the Management Agent, (ii) make inspections of the Project to determine if the Project is being properly maintained and that necessary repairs are being made thereto, (iii) prepare or cause to be prepared all reports of operations which are to be furnished to the Partners by any Lender or Governmental Agency, (iv) with the Consent of the Investor Limited Partner, elect to defer the commencement of the Credit Period for all or any portion of the low-income housing tax credit allowable to the Partners under Section 42(g) of the Code, to the extent that any such deferral may be in the best economic interest of the Investor Limited Partner, (v) cause the Project to be insured in accordance with the requirements set forth in Exhibit C, and (vi) cause the Partnership and the Project to comply with the Agency Set-Aside Test.

B.  Subject to the Project Documents and the requirements of Section 42 of the Code, the General Partners shall use reasonable efforts consistent with sound management practice to maximize income produced by the Project, including, if necessary, seeking any necessary approvals of, and implementing, appropriate adjustments in the rent schedule of the Project.

C.  The General Partners shall timely execute and record in the appropriate filing office an Extended Use Agreement.  The General Partners shall hold for occupancy such percentage of

the apartments in the Project in such a manner as to qualify the entire Project as a qualified low income housing project under Section 42(g) of the Code as interpreted from time to time in regulations and rulings promulgated thereunder. The General Partners shall not take any action which would cause the termination or discontinuance of the qualification of the Project as a "qualified low income housing project" under Section 42(g) of the Code or which would cause the recapture of any low income housing tax credit under the Code without the Consent of the Investor Limited Partner.

D. The General Partners shall prepare and submit to the Secretary of the Treasury (or any other Governmental Agency designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information and shall take any and all other action required (i) to insure that the Partnership (and its Partners) will continue to qualify for the low-income housing credit described in Section 42 of the Code for all Low Income Units and (ii) unless the Consent of the Investor Limited Partner is received to act otherwise in a particular instance, to avoid recapture of such credit for failure to comply with the requirements of Section 42 of the Code.

E. Except as provided in or contemplated by the Project Documents and the Commitments in existence at Investment Closing, the General Partners agree that neither they nor any Related Person will at any time bear the Economic Risk of Loss for payment or performance of any Mortgage Loan. Each General Partner agrees that it will not cause any Limited Partner at any time to bear the Economic Risk of Loss for payment or performance under any Note or Mortgage. Each Limited Partner agrees not to take any action which would cause it to bear the Economic Risk of Loss for payment of any Mortgage Loan.

F. The General Partners shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in their immediate possession or control. The General Partners shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership.

G. No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

H. The General Partners shall be solely responsible for the following:

(1) analyzing the Qualified Allocation Plan ("QAP") for targeted areas within a state;

(2) identifying potential land sites and analyzing the demographics of potential sites;

(3) analyzing a site's economy and forecasting future growth potential;

(4) determining the site's zoning status and possible rezoning strategies;

(5) contacting local government officials concerning access to utilities, public transportation, impact fees and local ordinances;

(6)     performing environmental tests on selected sites;

(7)     negotiating the purchase of the Land and its related financing;

(8)     causing the Partnership to acquire the Land;

(9)     processing necessary documentation with the Credit Agency in connection with the low income housing credit;

(10)    arranging the permanent mortgage financing for the Project; and

(11)    arranging for the admission to the Partnership of the Investor Limited Partner and the Special Limited Partner.

In consideration for its services set forth in this Section 6.4H, the General Partners have received their interests in the profits of the Partnership as set forth in Section 10.3.  The General Partners shall not assign any of these duties to the Developer.

I.   The General Partners shall (i) not store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Project, or at or on any other Facility or Vessel owned, occupied, or operated either by any General Partner, any Affiliate of a General Partner, or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible; (ii) neither directly nor indirectly transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Limited Partners with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; (y) upon any General Partner's receipt of any notice to such effect from any federal, state, or other Governmental Agency; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such Governmental Agency in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Project.

J.   If requested to do so by the Investor Limited Partner at any time after the Compliance Period, the General Partners shall use their best efforts to sell or refinance the Project on terms acceptable to the Investor Limited Partner.  One such action may be to submit a written request to the Credit Agency of the State to find a Person to acquire the Partnership's interest in the low-income portion of the Project and/or take such other action permitted or required by the Code as the Investor Limited Partner may reasonably request to effect a sale of the Project pursuant to a "qualified contract" under Section 42(h)(6)(F) of the Code or to terminate the Extended Use Agreement.  Any proposal either from the Credit Agency or from another buyer of the Project which is acceptable to the Investor Limited Partner shall be accepted by the Partnership.

K. In the event that the Investor Limited Partner shall give notice to the General Partners that in the reasonable judgment of the Investor Limited Partner depreciation deductions will no longer be allocated to the Investor Limited Partner as a result of the treatment of the Mortgage Loan or Development Amount as Partner Nonrecourse Debt ("Related Party Financing"), then the General Partners shall take all such action as may be necessary to assure that any outstanding balance of such Related Party Financing shall constitute a Partnership Nonrecourse Liability and the Investor Limited Partner shall give its Consent to allow the General Partners to take all necessary action, provided such action does not have any negative tax consequences for the Partnership or the Investor Limited Partner. One such action shall be the assignment of the outstanding balance of such Related Party Financing to an Entity which is not a Related Person.

L. The General Partners shall cause all leases of dwelling units in the Project to contain a provision obligating tenants to notify the Management Agent immediately of any suspected water leaks, moisture problems or mold in dwelling units or common areas of the Project. In addition, the General Partners shall furnish such reports and implement such actions, if any, required under the provisions of Section 12.1J.

**Section 6.5    Representations and Warranties**

The General Partners hereby represent and warrant to the Investor Limited Partner that the following are true as of Investment Closing, will be true on the due date for payment of each Installment and at all times hereafter:

(i)     The Partnership is a duly organized limited partnership validly existing under the laws of the State and has complied with all recording requirements with each proper Governmental Agency necessary to establish the limited liability of the Limited Partners as provided herein.

(ii)    No litigation or proceeding against the Partnership, any General Partner, Guarantor, the Builder or the Developer, nor any other litigation or proceeding directly affecting the Project, is pending before any court, administrative agency or other Governmental Agency which would, if adversely determined, have a material adverse effect on the Partnership, any General Partner, Guarantor, the Builder, the Developer or their respective businesses or operations, except for such matters as to which the likelihood of such a determination adverse to the Partnership is, in the opinion of Partnership Counsel or other counsel acceptable to the Investor Limited Partner, remote.

(iii)   No default by any General Partner, any Affiliate thereof having any relationship with the Project, or the Partnership, in any material respect has occurred or is continuing (nor has there occurred any continuing event which, with the giving of notice or the passage of time or both, would constitute such a default in any material respect) under any of the Project Documents.

(iv)    The Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms).

(v)    All accounts and reserves are fully funded to the extent currently required by the Project Documents and this Agreement.

(vi)    No Partner or Related Person bears the Economic Risk of Loss with respect to the indebtedness evidenced by any Note and secured by any Mortgage, except to the extent contemplated by the Project Documents and the Commitments as they exist on the date of Investment Closing.

(vii)    All building, zoning and other applicable certificates, permits, approvals and licenses necessary to permit the construction, rehabilitation, repair, use, occupancy and operation of the Project have been obtained (other than prior to completion of the Project or a specified portion thereof, such as will be issued only after the completion of the Project or such specified portion thereof) and neither the Partnership nor any General Partner has received any notice or has any knowledge of any violation with respect to the Project of any law, rule, regulation, order or decree of any Governmental Agency having jurisdiction which would have a material adverse effect on the Project or the construction, use or occupancy thereof, except for violations which have been cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction.

(viii)    The Partnership owns the fee simple interest in the Property and has good and marketable title thereto, free and clear of any liens, charges or encumbrances other than the Mortgages, matters set forth in the Title Policy delivered at Investment Closing, encumbrances the Partnership is permitted to create under Sections 2.4 and 6.1, and mechanics' or other liens which have been bonded or insured against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Property or the Partnership for payment of any debt secured thereby. None of the liens, charges, encumbrances or exceptions set forth in the Title Policy delivered at Investment Closing has or will have a material adverse effect upon the construction or operation of the Project.

(ix)    The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to the Partnership or the Property by any General Partner or an Affiliate thereof which is an Entity have been or will be duly authorized by all necessary action, and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the organizational documents of any such Entity or any agreement by which any such Entity or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree. Each such Entity is duly organized and validly existing under the law of the state of its organization.

(x)    No General Partner is in default in any material respect in the observance or performance of any provision of this Agreement to be observed or performed by such General Partner.

(xi)    The Related Agreements are in full force and effect and no default by any party thereto (other than the Investor Limited Partner or its Affiliates) has occurred or is continuing thereunder (nor has there occurred any event which, with the giving of notice or the passage of time, or both, would constitute such a default in any material respect thereunder).

(xii)   No Event of Bankruptcy has occurred and is continuing with respect to the Partnership, any General Partner, any Guarantor or the Developer.

(xiii)  The Project will qualify on and after the Completion Date as a "qualified low-income housing project" under Section 42(g) of the Code and all Low Income Units in the Project will qualify as "low income units" under Section 42(i)(3) of the Code.

(xiv)   All tax returns, financial statements, Schedules K-1 and reports due under Sections 12.1B and 12.1E have been properly filed and/or transmitted, as applicable.

(xv)    No General Partner, Affiliate of a General Partner, or Person for whose conduct any General Partner is or was responsible has ever: (i) owned, occupied, or operated a Facility or Vessel on which any Hazardous Material was or is stored, transported, or disposed of (except if such storage, transport or disposition was or is at all times in compliance with applicable Hazardous Waste Laws); (ii) directly or indirectly transported, or arranged for transport, of any Hazardous Material (except if such transport was or is at all times in compliance with applicable Hazardous Waste Laws); (iii) caused or was legally responsible for any release or threat of release of any Hazardous Material; (iv) received notification from any federal, state or other Governmental Agency of (x) any potential, known, or threat of release of any Hazardous Material from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, Affiliate of a General Partner, or Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; or (y) the incurrence of any expense or loss by any such Governmental Agency or by any other Person in connection with the assessment, containment, or removal of any release or threat of release of any Hazardous Material from the Project or any such Facility or Vessel.

(xvi)   To the best of the General Partners' knowledge, no Hazardous Material was ever or is now stored on, transported or disposed of on the Land (except to the extent any such storage, transport or disposition was at all times in compliance with all Hazardous Waste Laws).

(xvii)  No General Partner, Affiliate of a General Partner, shareholder of a General Partner, director of a General Partner, officer of a General Partner or manager of a General Partner has ever (i) been convicted of a crime; (ii) had a judgment entered against them for fraud, willful misconduct or breach of

fiduciary duty; or (iii) been sanctioned by HUD, the Securities and Exchange Commission or any other government agency.

(xviii) There are currently no criminal or civil actions or administrative proceedings pending against the General Partners or their Affiliates, shareholders, directors, officers or managers.

(xix)   The Adjusted Aggregate Federal Credit Amount shall be at least $4,771,090.

(xx)   The Partnership's basis in the Project as of the later of December 31, 2003 or six months from the date of the Credit Allocation was greater than 10% of the Partnership's reasonably expected basis in the Project as of December 31, 2003 and each Building will be placed in service no later than December 31, 2005.

(xxi)   All of the representations and warranties set forth in the Closing Certificate are true and correct.

(xxii)   The Project and the Partnership shall at all times meet the requirements of the Agency Set-Aside Test.

(xxiii) None of the Mortgage Loans are subject to covenants requiring maintenance of specified debt service coverage ratios.

**Section 6.6**   **Indemnification**

A. Each General Partner (including any Retired General Partner) shall be indemnified by the Partnership against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by him or it in connection with the Partnership, *provided that* the same were not the result of negligence or misconduct on the part of any General Partner or any of its "Designated Affiliates" (as such term is defined in Section 6.7B) and were the result of a course of conduct which such General Partner, in good faith, determined was in the best interest of the Partnership. Any indemnity under this Section 6.6A shall be provided out of and to the extent of Partnership assets only, and no Limited Partner shall have any personal liability on account thereof; *provided, however*, that no indemnification shall be provided for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (i) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee and the court approves indemni- fication of litigation costs; (ii) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of litigation costs; or (iii) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made.

B. The Partnership shall not incur that cost of that portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.

C.  The General Partners agree promptly to indemnify, defend and hold harmless the Partnership and the Limited Partners from and against any and all claims, losses, damages, costs, expenses and liabilities which the Partnership and the Limited Partners may incur by reason of any liabilities to which either the Partnership or the Project is subject at the Admission Date; *provided, however*, that the foregoing indemnification shall not apply to any Mortgage, necessary contractual obligations normally incurred in connection with the Property, or to acts for which such General Partner is entitled to indemnification under Section 6.6A.

D.  The General Partners agree to promptly indemnify, defend, and hold harmless the Partnership and the Limited Partners from and against any claims, losses, damages, costs, expenses or liabilities which the Partnership and the Limited Partners may incur on account of the presence or escape of any Hazardous Material at or from the Property (or at any other location).  Any such claims, losses, damages, costs, expenses or liabilities may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of the General Partners.  Notwithstanding anything else set forth in this Agreement, this indemnification shall survive the withdrawal of any General Partner and/or the termination of this Agreement.

E.  The General Partners shall defend, indemnify and hold harmless the Partnership and the Limited Partners from any liability, loss, damage, fees, costs and expenses, judgments or amounts paid in settlement incurred by reason of any demands, claims, suits, actions or proceedings arising out of the General Partners' or any Designated Affiliate's negligence, misconduct, fraud, a material breach of fiduciary duty or a material breach of this Agreement, including without limitation any material breach by any General Partner or any Designated Affiliate of any representation, warranty, covenant or agreement set forth in Section 6.5 or elsewhere in this Agreement, including all reasonable legal fees and costs incurred in defending against any claim or liability or protecting itself or the Partnership from, or lessening the effect of, any such breach.  The foregoing indemnification shall be a recourse obligation of the General Partners and shall survive the dissolution of the Partnership and/or the death, retirement, incompetency, bankruptcy or withdrawal of any General Partner.

### Section 6.7   Liability of General Partners to Limited Partners

A.  Except as set forth in Section 6.6, no General Partner or Designated Affiliate (as defined in Section 6.7B) shall be liable, responsible or accountable for damages or otherwise to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of such General Partner or Designated Affiliate (i) if such General Partner or Designated Affiliate, in good faith, determined that such course of conduct was in the best interests of the Partnership and (ii) such course of conduct did not constitute negligence, breach of fiduciary duty or misconduct on the part of that General Partner or Designated Affiliate or breach of this Agreement.

B.  As used in Sections 6.6 and 6.7, a "Designated Affiliate" is any Person performing services on behalf of the Partnership, within the scope of authority of the General Partner who: (i) directly or indirectly controls, is controlled by, or is under common control with any General Partner, (ii) owns or controls 10% or more of the outstanding voting securities of any General Partner, (iii) is an officer, director, partner, member or trustee of any General Partner, or (iv) if

any General Partner is an officer, director, partner, member or trustee, of any Entity for which such General Partner acts in any such capacity.

### Section 6.8    Certain Obligations of the Developer

A. The Partnership has entered into an agreement with the Developer pursuant to which the Developer is obligated to complete the construction of the Improvements and to pay certain development costs and other expenses as set forth in the Development Agreement.

B. The undertakings of the Developer set forth in the Development Agreement are made for the benefit of and shall be enforceable by the Partnership and the Partners and shall not inure to the benefit of any creditor of the Partnership other than a Partner, notwithstanding any pledge or assignment by the Partnership of this Agreement or the Development Agreement or any rights thereunder.

C. The General Partners hereby unconditionally jointly and severally guarantee to the Partnership and the Investor Limited Partner the due and punctual performance of all obligations of the Developer under the Development Agreement. The General Partners hereby agree that their obligations hereunder shall constitute a guaranty of payment and not of collection and shall be unconditional irrespective of the regularity or enforceability of this Agreement or any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor or any other circumstances which might otherwise limit the recourse to the General Partners. The undertakings of the General Partners set forth in this Section 6.8 and in Section 6.9 are made for the benefit of the Partners and shall not inure to the benefit of any creditor of the Partnership other than a Partner, notwithstanding any pledge or assignment by the Partnership of this Agreement or any rights hereunder.

D. In addition to the foregoing, the General Partners hereby guarantee to the Limited Partners the prompt payment by the Partnership of all Other Development Costs. Accordingly, if the amount of Other Development Costs exceeds the balance of Designated Proceeds remaining after payment of all Eligible Development Costs, the General Partners shall furnish to the Partnership the funds required to pay such excess at or prior to the time such excess is payable by the Partnership. Amounts so furnished to fund such excess Other Development Costs shall not be reimbursable, shall not be credited to the Capital Account of any Partner or otherwise change the Interest of any Person in the Partnership, but shall be the sole expense and responsibility of the General Partners as a cost incurred by them in fulfilling their guaranty under this Section 6.8D.

### Section 6.9    Obligation to Provide for Operating Expenses

A. During the period commencing on the Admission Date and ending on the third anniversary of the Development Obligation Date, the General Partners agree that if the Partnership requires funds to discharge Operating Expenses (other than to make payments to Partners, payments of any outstanding Operating Expense Loans or other obligations herein provided to be payable solely out of Cash Flow or distributions of proceeds from a Capital Transaction), the General Partners shall furnish to the Partnership the funds required. Amounts so furnished to fund Operating Expenses incurred prior to the Development Obligation Date

shall be deemed Special Capital Contributions. Amounts furnished to fund Operating Expenses incurred on or after the Development Obligation Date shall constitute Operating Expense Loans. Notwithstanding the foregoing, however, the General Partners shall not be obligated to make Operating Expense Loans under this Section 6.9A to the extent that the outstanding aggregate principal amount of such Operating Expense Loans (excluding Operating Expense Loans made pursuant to Section 6.12B) would exceed $350,000. Any such Operating Expense Loans shall not bear interest and be repayable only as provided in Article X.

### Section 6.10   Certain Payments to the General Partners and Affiliates

A. For its services in connection with the development of the Property and the supervision to completion of the construction of the Improvements and as reimbursement for Development Advances, the Developer shall be entitled to receive the amounts set forth in the Development Agreement.

B. In consideration of its services in the day-to-day administration of the business affairs of the Partnership, the General Partners shall receive an Partnership Management Fee in an amount equal to 7% of Cash Receipts per annum. Such fee shall be payable in accordance with Article X.

C. All of the Partnership's expenses shall be billed directly to, and paid by, the Partnership to the extent practicable. Subject to the terms of this Agreement, reimbursements to a General Partner or any of its Affiliates by the Partnership shall be allowed subject to the following conditions:

(i)     such goods or services must be necessary for the prudent formation, development, organization or operation of the Partnership;

(ii)     reimbursement for goods or services provided by Persons who are not affiliated with a General Partner shall not exceed the cost to a General Partners or their Affiliates of obtaining such goods or services; and

(iii)     reimbursement for goods and services obtained directly from a General Partner or its Affiliates shall not exceed the amount the Partnership would be required to pay independent parties for comparable goods and services in the same geographic location and shall not include reimbursement for the general overhead of the General Partners or their Affiliates (including salaries and benefits of employees thereof).

D. Neither the General Partners nor any of their Affiliates shall be entitled to any compensation, fees or profits from the Partnership in connection with the acquisition, construction, development or rent-up of the Land or Improvements or for the administration of the Partnership's business or otherwise, except for (i) payments provided for or referred to in Sections 2.4(v) or 6.10, (ii) payments of the Management Fee and the Partnership Management Fee, (iii) fees and distributions under Article X, and (iv) such other fees and distributions as may be permitted to be paid by any Lender or the Governmental Agency out of the proceeds of any Mortgage Loan.

**Section 6.11    Joint and Several Obligations**

If there is more than one General Partner, all obligations of the General Partners hereunder shall be joint and several obligations of the General Partners, except as herein expressly provided to the contrary.

**Section 6.12    Reserve Accounts**

A. The General Partners shall establish a reserve account for capital replacements, which account shall be funded by monthly deposits of $_____, which amount equals $200 per unit per year (or such greater amount as may be required by any Lender or, subject to any Requisite Approvals, such lesser amount as shall be approved in writing by the Special Limited Partner from time to time) commencing on the Completion Date.  Withdrawals from such reserve shall be utilized solely to fund capital repairs and improvements deemed necessary by the General Partners.

B.    The General Partners shall cause the Partnership to establish the Operating Reserve in the initial amount of $127,500.  The Operating Reserve shall be funded in the first instance from the proceeds of the Third Installment of the Capital Contributions of the Investor Limited Partner; provided, however, that if for any reason such proceeds shall be insufficient to fully fund the Operating Reserve at such time, the General Partners shall promptly fund any such shortfall.  Any amount so furnished by the General Partners shall constitute an Operating Expense Loan.  Funds in the Operating Reserve may be used to pay Operating Expenses, to the extent required, subject to any Requisite Approvals and to the Consent of the Investor Limited Partner.  Funds in the Operating Reserve may be used to fund Operating Expenses prior to the funding of Operating Expense Loans pursuant to Section 6.9A.  Upon achieving 115% Debt Service Coverage Ratio for three consecutive calendar years, the amount of the Operating Reserve may be reduced to $75,000.  Upon achieving 115% Debt Service Coverage Ratio for an additional calendar year, the amount of the Operating Reserve may be reduced to $37,950.  Any remaining funds in the Operating Reserve shall be released to the Partnership upon achieving 115% Debt Service Coverage Ratio for an additional (fifth) calendar year.

**Section 6.13    Buyout Option**

A. The Investor Limited Partner grants to the Managing General Partner, for so long as it is the Managing General Partner of the Partnership, an option to purchase Investor Limited Partner's and the Special Limited Partner's entire interest in the Partnership on the terms and conditions as set forth in this Section 6.13 (the "Option").

B. The Option granted herein shall be exercised, if at all, only after expiration of the Compliance Period applicable to the Project and for a period of one (1) year thereafter (the "Option Period").

C. The price of the Investor Limited Partner's Interest in the Partnership (the "Buyout Price") shall be the greater of (i) all federal, state and local taxes imposed on the Limited Partner attributable to the Buyout; or (ii) the fair market value (as of the date of the closing of the Buyout) of the Investor Limited Partner's Interests as determined in accordance with this Section 6.13.

(i)      The Option may be exercised only upon the written agreement of Managing General Partner to continue to use the Project for low-income housing purposes subject to restricted rents for the greater of:  (A) the Compliance Period; or (B) the duration of the Extended Use Period.

(ii)      The Option may be exercised only upon written notice (the "Buyout Notice") during the Option Period of intent to exercise the Option given by Managing General Partner to the Investor Limited Partner at least sixty (60) days, but not more than one hundred twenty (120) days, prior to the proposed closing date as proposed by the Managing General Partner. The Buyout Notice shall set forth the proposed closing date.  In addition the Buyout Notice shall include the following (all to be calculated as of the closing date proposed by the Managing General Partner in its Buyout Notice):

(1)      an appraisal of the assets of the Partnership by an appraiser selected in accordance with this Section 6.13;

(2)      an appraisal of the fair market value of the Investor Limited Partner's Interest in the Partnership by an appraiser selected in accordance with this Section 6.13;

(3)      a calculation by the Managing General Partner of the principal amount and accrued interest of all outstanding indebtedness secured by the Project,

(4)      a calculation by the Managing General Partner of the federal, state and local taxes to be borne by the Investor Limited Partner attributable to a sale of the Investor Limited Partner's Interest; and

(5)  a calculation by the Managing General Partner in accordance with the requirements of this Section 6.13 of the proposed Buyout Price.

Any Buyout Notice which fails to include the items required in this Section 6.13 shall not constitute an effective Buyout Notice.  If a Buyout Notice includes appraisals or calculations which, in the reasonable opinion of the Investor Limited Partner, contain material errors, the notice shall not constitute an effective Buyout Notice.  Absent an effective Buyout Notice, the Option may not be exercised.  In the event Investor Limited Partner concludes that a notice fails to constitute an effective Buyout Notice, the Investor Limited Partner shall promptly so notify the Managing General Partner and the Managing General Partner may submit new or amended Buyout Notices at any time during the Option Period.

D. Appraisals performed of the value of the Investor Limited Partner's and the Special Limited Partner's Interest shall be performed by an Accredited Senior Appraiser as certified by the American Society of Appraisers and acceptable to the Limited Partner (an "ASA Appraiser") or an MAI certified real estate appraiser acceptable to the Limited Partner (an "MAI Appraiser").  Prior to submitting a Buyout Notice, Managing General Partner shall propose to Investor Limited Partner two appraisers.  Both appraisers shall be either an ASA Appraiser or an MAI Appraiser or both. Within five (5) business days after written submission of the proposed appraisers by Managing General Partner, Investor Limited Partner shall approve

one or both appraisers and so notify the Managing General Partner.  Managing General Partner shall engage at its expense any appraiser approved by Investor Limited Partner to perform the appraisal required under this Section 8.21.

E.  For the purposes of determining the value of the assets of the Partnership, the appraiser shall be specifically directed to assume that limitations on tenant income and permitted rents, as set forth in the Extended Use Agreement, shall remain in effect throughout the Extended Use Period.  For the purposes of determining the fair market value of the Investor Limited Partner's and the Special Limited Partner's Interest, the appraiser shall consider the value of the assets of the Partnership and give due consideration to all other relevant factors relating to the value of the Investor Limited Partner's and the Special Limited Partner's Interest including without limitation:

(i)     provisions relating to restrictions on the amount of rent and the level of tenant incomes;

(ii)    limitations on the market for the Interest including limitations resulting from the lack of marketability, transferability, and liquidity;

(iii)   limitations on Investor Limited Partner's management control and management selection;

(iv)    limitations on Investor Limited Partner's ability to require liquidation; and

(v)     any other reasonably applicable limitations on marketability and control.

F.  The Investor Limited Partner shall be responsible for its own attorneys' fees incurred in connection with the review of documents related to  the closing.  All other costs of the Buyout, including the costs of any appraiser selected under the procedures set forth in this Section 6.13, the Accountants' fees and any filing fees, shall be paid by the Managing General Partner.

G.  Closing shall occur on the closing date set forth in an effective Buyout Notice or as soon thereafter as commercially reasonable.  The Buyout Price shall be paid in cash at closing and the Investor Limited Partner and the Special Limited Partner shall transfer its Interest to the Managing General Partner at closing.  The Managing General Partner shall pay all costs and fees associated with its acquisition of the Investor Limited Partner's and the Special Limited Partner's Interest including any certifications, opinions of counsel (for either party), and title insurance if requested by the Managing General Partner.

H. In the event the Managing General Partner exercises the Buyout Option, and notwithstanding any provisions to the contrary in this Agreement, at the closing of the Buyout,

the Partnership shall be authorized to distribute all funds remaining in the Operating Reserves maintained pursuant to Section 6.12B to the Managing General Partner to be used to purchase the Interest of the Investor Limited Partner in accordance with this Section and to the extent such funds exceed the Buy-Out Price, for any other purpose in the discretion of the Managing General Partner.

## ARTICLE VII

## WITHDRAWAL AND REMOVAL OF A GENERAL PARTNER

### Section 7.1    Voluntary Withdrawal

No General Partner shall have the right to withdraw or Retire voluntarily from the Partnership or sell, assign or encumber its Interest without the Consent of the Investor Limited Partner and any Requisite Approvals.

### Section 7.2    Obligation to Continue

In the event of the Retirement of any General Partner, the remaining General Partners, if any, and any successor General Partner shall have the obligation to continue the business of the Partnership employing its assets and name. Immediately after the occurrence of such Retirement, the remaining General Partners, if any, shall notify the Investor Limited Partner thereof.

### Section 7.3    Successor General Partner

A.  Upon the occurrence of any Retirement, the remaining General Partners may designate a Person to become a successor General Partner to the Retired General Partner.  Any Person so designated, subject to any Requisite Approvals, the Consent of the Investor Limited Partner and, if required by the Uniform Act or any other applicable law, the consent of any other Partner so required, shall become a successor General Partner.

B.  If any Retirement shall occur at a time when there is no remaining General Partner and no successor General Partner is to be admitted pursuant to Section 7.3A or the remaining General Partners do not elect to continue the business of the Partnership pursuant to Section 7.2, then the Investor Limited Partner shall have the right, subject to any Requisite Approvals and Section 6.3C, to designate a Person to become a successor General Partner.

C.  If the Investor Limited Partner elects to reconstitute the Partnership and admit a successor General Partner pursuant to this Section 7.3, the relationship of the Partners in the reconstituted Partnership shall be governed by this Agreement.

### Section 7.4    Interest of Predecessor General Partner

A.  Except as provided in Section 7.3A, no assignee or transferee of all or any part of the Interest of a General Partner shall have any automatic right to become a General Partner.  Until the acquisition of the Interest of a Retiring General Partner pursuant to Section 7.4C or 7.7, such

Interest shall be deemed to be that of an assignee and the holder thereof shall be entitled only to such rights as an assignee may have as such under the laws of the State.

B. Anything herein contained to the contrary notwithstanding, any General Partner withdrawing voluntarily in violation of Section 7.1 shall remain liable for all of its obligations under this Agreement, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such withdrawal (except as provided in Section 6.7), except for any loss or damage attributable to the default, negligence or misconduct of a successor General Partner admitted in its place under this Agreement.

C. The disposition of the General Partner Interest of a General Partner Retiring voluntarily in compliance with this Agreement shall be accomplished in such manner as shall be acceptable to the remaining General Partners and shall be approved by Consent of the Investor Limited Partner. Any other Retirement of a General Partner shall be governed by Section 7.7D.

### Section 7.5   Designation of New General Partners

The General Partners may, with the written consent of all Partners, at any time designate new General Partners, each with such Interest as a General Partner in the Partnership as the General Partners may specify, subject to any Requisite Approvals.

Any new General Partner shall, as a condition of receiving any interest in the Partnership property, agree to be bound by the Project Documents and any other documents required in connection therewith and by the provisions of this Agreement, to the same extent and on the same terms as any other General Partner.

### Section 7.6   Amendment of Certificate; Approval of Certain Events

Upon the admission of a new General Partner, the Schedule shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed as required by the Uniform Act.

Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized under the provisions of this Agreement, and hereby ratifies and confirms each amendment of this Agreement necessary or appropriate to give effect to any such transaction.

### Section 7.7   Removal of the General Partners

A. In addition to any other rights granted to the Limited Partners hereunder, the Special Limited Partner shall have the right to remove and replace the General Partner in accordance with the provisions of this Section 7.7 if a Material Default occurs and is not cured within the time period set forth in this Section 7.7. If at any time there is more than one General Partner, all General Partners may be removed and replaced in accordance with the provisions of this Section 7.7 in the event of a Material Default by any General Partner.

B.  As used in this Section 7.7, "Material Default" means the occurrence of any of the following events:

(i)   a breach by any General Partner (or any of its Affiliates) of any of its representations or warranties contained herein or in the performance of any of its obligations under this Agreement or any Related Agreement;

(ii)   a violation by any General Partner of any material law, regulation or order applicable to the Partnership, or a material breach by the Partnership or any General Partner under any Project Document or other material agreement or document affecting the Partnership or the Project which has not been timely cured and which may have a material adverse effect on the Partnership, the Investor Limited Partner or the Project;

(iii)   an Event of Bankruptcy as to any General Partner, any Guarantor or the Partnership;

(iv)   the commencement of foreclosure proceedings with respect to any Mortgage which have not been withdrawn or dismissed within thirty (30) days after the date of such commencement; or

(v)   gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty by a General Partner or any Affiliate of a General Partner providing services to or in connection with the Partnership or the Project.

C.  In the event that the Special Limited Partner determines to remove any General Partner pursuant to the provisions of this Section 7.7, the Special Limited Partner shall notify the General Partner in writing of the Material Default that is the cause for the removal of the General Partner (any such notice being referred to herein as a "Removal Notice" and the date of such Removal Notice being referred to herein as the "Removal Notice Date").  In the case of any Material Default described in clauses (i) or (ii) of Section 7.7B above, the General Partner shall have ten (10) business days (or twenty (20) business days if it is a non-monetary default) from the Removal Notice Date to cure the Material Default; provided, however, that if a non-monetary Material Default cannot be reasonably cured within twenty (20) business days, the General Partner shall not be removed if the General Partner commences such cure within twenty (20) business days and proceeds in good faith to cure diligently thereafter, provided that the cure is completed within sixty (60) business days following the Removal Notice Date (or such lesser period as is required to cure the Material Default), and the failure to cure such Material Default within a shorter period does not have a material adverse effect on the Partnership, the Property, or the Investor Limited Partner.  For purposes of this paragraph, the failure to provide or maintain any insurance required by this Agreement shall be deemed to be a monetary default.  If the General Partner fails to cure within the specified time period, or if no cure right is afforded under the terms hereof, the removal of the General Partner shall be deemed to be effective as of the expiration of any applicable cure period described above; otherwise, such removal shall be effective upon the conclusion of the applicable cure period without a cure of such Material Default reasonably acceptable to the Investor Limited Partner.

The General Partner shall have no right to cure any Material Default described in clause (v) of Section 7.7B above. Each Partner hereby irrevocably appoints the Special Limited Partner (with full power of substitution) as the attorney-in-fact of such Partner for the purpose of executing, acknowledging, swearing to, recording and/or filing any amendment to this Agreement and the Certificate necessary or appropriate to confirm the foregoing.

D. If a General Partner is removed pursuant to this Section 7.7, such General Partner's interest in the Partnership shall be converted to a Limited Partner interest. The removed General Partner shall still be entitled to (i) the unpaid principal balance of any Operating Expense Loans, and (ii) any fees owed to the General Partner and/or its Affiliates in the manner described in Section 7.7E below minus (y) an amount equal to any Adverse Consequences suffered by the Partnership or the Limited Partners as a result of the acts or omissions of the General Partner prior to its removal, including, without limitation, the Material Default creating the right of the Special Limited Partner to remove the General Partner pursuant to the provisions of this Section 7.7. Any transfer taxes that are triggered by the removal and the cost of any additional title insurance or title endorsements deemed to be necessary by the Special Limited Partner as a result of such removal shall be paid by the removed General Partner.

E. In the event of the removal of the General Partner pursuant to the provisions of this Section 7.7, any fees or loans owed to the General Partner or its Affiliates (including, without limitation, any unpaid Development Amount) for services performed prior to the Removal Notice Date shall be paid in accordance with any agreements in effect prior to the Removal Notice Date, provided, however, that (i) if any Adverse Consequences suffered by the Partnership or the Limited Partners exceed the amounts payable to the General Partner pursuant to any fee or loan agreements, or (ii) there exist any unpaid obligations or liabilities of the General Partner that relate to the period up to and including the effective date of the removal of the General Partner, any such unpaid fees or loans owed to the General Partner or its Affiliates shall, to the extent of any such Adverse Consequences or obligations or liabilities, as the case may be, be treated as if they were paid to the General Partner (or such Affiliates) and applied by the General Partner (or such Affiliates) to the payment or satisfaction of such Adverse Consequences, obligations or liabilities, and, to the extent of such application, the obligation of the Partnership to make actual cash payments of such fees to the General Partner (or such Affiliates) shall be reduced or eliminated, as the case may be.

F. If a General Partner is removed pursuant to this Section 7.7, the removed General Partner shall still be entitled to receive: (i) 10% of Cash Flow as set forth in Section 10.1.A; and (ii) 10% of distributions from a Capital Transaction as set forth in Section 10.1.B.

G. In the event that the General Partner is removed pursuant to the provisions of this Section 7.7, (i) all agreements between the Partnership and the General Partner and/or its Affiliates may, at the election of the Partnership, be terminated and, except for payment of the services rendered and due to the General Partner (or such Affiliates), the Partnership shall have no further obligations under such agreements, and (ii) the removed General Partner shall be liable for all reasonable costs and expenses incurred by the Partnership or the Limited Partners in connection with the admission to the Partnership of a successor General Partner, which shall be considered Adverse Consequences for a purpose of this Section. From and after the effective date of its removal, the removed General Partner shall not be liable for obligations of the

Partnership incurred subsequent to such effective date unless such obligations arise out of acts or omissions of the removed General Partner prior to such effective date. The removed General Partner shall continue to be liable for all obligations, liabilities, and guarantees incurred by it in its capacity as the General Partner and any Partnership obligations not listed in the prior year's financial statements or otherwise described in writing to the Special Limited Partner, and for any Adverse Consequences caused by or arising out of its acts or omissions, prior to the effective date of its removal. Without limiting the generality of the foregoing, and in addition to any of its other obligations hereunder, the removed General Partner shall continue to be liable for any payments or advances due to the Limited Partners or the Partnership pursuant to the Capital Contribution adjustment provisions of Article V as a result of any adjustments determined thereunder, other than adjustments arising from a Recapture Event or the acts or omissions of any replacement or successor General Partner, in either case subsequent to the effective date of the removal of the removed General Partner.

H. In the event that the General Partner is removed pursuant to the provisions of this Section 7.7, the Special Limited Partner may designate a Person or Persons, including, without limitation, an Affiliate of the Special Limited Partner, to become a successor General Partner or Partners replacing the removed General Partner, subject to any Requisite Approvals and to the terms of the Project Documents.

I. The election by the Special Limited Partner to remove any General Partner pursuant to the provisions of this Section 7.7 shall not limit or restrict the availability and use of any other remedy that the Special Limited Partner or the Investor Limited Partner may have with respect to any General Partner in connection with its undertakings and responsibilities under this Agreement, and the exercise by the Special Limited Partner of the rights granted to it in this Section 7.7 is understood by the parties hereto to be permitted by the Uniform Act as the exercise of powers not constituting participation in the control of the business so as to cause the Special Limited Partner (or the Investor Limited Partner) to be liable for Partnership obligations as a general partner.

J. In the event that the General Partner is removed pursuant to the provisions of this Section 7.7, the removed General Partner shall immediately deliver to the Special Limited Partner all books, records, tax and financial information relating to the Partnership and the Property that are in the possession or under the control of the General Partner or any of its Affiliates. The General Partner agrees that if it fails to comply with the provisions of this Section 7.7L, the Limited Partners may enforce such provisions by specific performance, and no portion of the Removal Purchase Price shall be payable unless the provisions of this Section are fully and promptly complied with.

K. If the General Partner fails to comply with any of its obligations under this Section 7.7 or contests the right of the Special Limited Partner to exercise the removal or other rights described in this Section 7.7, any costs and expenses incurred by the Limited Partners in enforcing their rights in this Section 7.7, including, without limitation, legal fees and expenses, shall be paid by the General Partner upon presentation of an itemized statement describing the same, which costs shall be deemed to be Adverse Consequences for purposes of this Section.

L.  In the event that the Special Limited Partner sends a Removal Notice, the Special Limited Partner may, as of such date, elect to become, or to designate another Person, including, without limitation, an Affiliate of the Investor Limited Partner or the Special Limited Partner, to become, an additional General Partner with all the rights and privileges of a General Partner. Upon such election by the Special Limited Partner, the Special Limited Partner or such other Entity shall automatically become and shall be deemed to be a General Partner and each Partner hereby irrevocably appoints the Special Limited Partner (with full power of substitution) as the attorney-in-fact of such Partner for the purpose of executing, acknowledging, swearing to, recording and/or filing any amendment to this Agreement and the Certificate necessary or appropriate to confirm the foregoing.  If the Special Limited Partner or such other Person shall become an additional General Partner as herein stated, its interest in the Partnership shall not be increased as a result thereof.  In the event of the admission of the Special Limited Partner or such Person as a General Partner pursuant to this Section 7.7N, and if there are then any other General Partners, the Special Limited Partner or such other Person shall have managerial rights, authority and voting rights of 51% on any matters to be decided or voted upon by the General Partners or the Managing General Partner, as the case may be, and the rights and authority of the remaining General Partners or the Managing General Partner, as the case may be, shall be deemed equally divided among them.  The Special Limited Partner shall be entitled to receive reasonable compensation for serving as a General Partner under this Section.

## ARTICLE VIII

## TRANSFER OF LIMITED PARTNER INTERESTS

### Section 8.1    Right to Assign

A.  Except as restricted in this Article VIII or by operation of law, and subject to the Regulations, each Limited Partner shall have the right to assign its Interest and to substitute its assignee in its place as a Substitute Limited Partner without the consent of the General Partners.

B.  The General Partners, at the sole expense of the assigning Limited Partner, shall cooperate in good faith to effect such assignment as expeditiously as possible, including without limitation the execution of appropriate amendments to, or updates of, the Related Agreements and/or any other documents which the assigning Limited Partner reasonably determines necessary or appropriate to accomplish such assignment, including, but not limited to, any amendments, updated opinion of Partnership Counsel, authorizing resolutions of the General Partner and Developer and any other documents reasonably deemed necessary and appropriate by the Investor Limited Partner.  In addition, in the event of a transfer of any interest in the Investor Limited Partner, the General Partner agrees to make such changes to this Agreement and the Related Agreements as the Investor Limited Partner may reasonably request.

C.  The assignor shall assume any costs incurred by the Partnership in connection with an assignment of its Interest.

D.  Notwithstanding the foregoing, or any other provision of this Agreement: (1) the Investor Limited Partner may pledge, without the consent of the General Partners or any other Person, its Interest to Fleet National Bank, as Agent (together with its successors and/or assigns

in such capacity, "Fleet") to secure a loan to an affiliate of the Investor Limited Partner, the proceeds of which have been used by the Investor Limited Partner to make its Capital Contribution to the Partnership (the "Fleet Pledge"); (2) Fleet shall have the rights of a secured party to retain, sell or transfer the Interest so pledged in accordance with the Fleet Pledge; (3) Fleet shall have the right to transfer or assign its rights hereunder and under the Fleet Pledge without the consent of the General Partners or any other Person; (4) in the event of any enforcement of the Fleet Pledge and the foreclosure upon or other disposition of the Interest, Fleet (or its nominee, successor, transferee or assignee) shall be immediately, automatically and unconditionally admitted as a Substitute Limited Partner, subject only to its execution of an agreement to be bound by this Agreement,  and (5) so long as the Fleet Pledge shall not have been released in accordance with its terms, (a) the Interests will not be, and will not become, "investment property" or held in a "securities account" (within the meaning of the Uniform Commercial Code of the State (the "UCC") and will be, and will remain, "general intangibles" within the meaning of Article 9 of the UCC and (b) any action by any Partner to cause any of the Interests to be deemed to be or to be treated as a "security" or as "investment property" or to be held in a "securities account" within the meanings of Article 8 and Article 9, respectively, of the UCC, shall be void and of no effect.   Fleet, as Agent, is an intended third party beneficiary of this section.

### Section 8.2   Substitute Limited Partners

Each Limited Partner shall have the right to substitute an assignee as a Limited Partner in its place, subject to any Requisite Approvals.  Any Substitute Limited Partner shall agree to be bound (to the same extent to which its predecessor in interest was so bound) by the Project Documents and this Agreement as a condition to its being admitted to the Partnership.

### Section 8.3   Assignees

A. Any permitted assignee of a Limited Partner which does not become a Substitute Limited Partner shall have the right to receive the same share of profits, losses and distributions of the Partnership to which the assigning Limited Partner would have been entitled.

B. Any assigning Limited Partner shall cease to be a Limited Partner and shall no longer have any rights or obligations of a Limited Partner except that, unless and until the assignee of such Limited Partner is admitted to the Partnership as a Substitute Limited Partner, said assigning Limited Partner shall retain the statutory rights and be subject to the statutory obligations of an assignor limited partner under the Uniform Act as well as the obligation to make the Capital Contributions attributable to the Interest in question, if any portion thereof remains unpaid.

C. There shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making each assignment; such instrument must evidence the written acceptance of the assignee to this Agreement and the Project Documents.  If such an instrument is not so filed, the Partnership need not recognize any such assignment for any purpose.

D. In the case of any assignment of a Limited Partner's Interest as a Limited Partner, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and required documentation.

E. An assignee who does not become a Substitute Limited Partner and who desires to make a further assignment of its Interest shall also be subject to the provisions of this Article VIII.

## ARTICLE IX

## LOANS; MORTGAGE REFINANCING; PROPERTY DISPOSITION

### Section 9.1    General

A. The Partnership shall be authorized to obtain the Mortgage Loans to finance the acquisition, development and construction of the Property and (to the extent permitted by the Lender) shall secure the same by the Mortgages.  Except as set forth in the Project Documents as they exist on the date of Investment Closing, each Mortgage shall provide that no Partner or Related Person shall bear the Economic Risk of Loss for all or any part of such Mortgage Loans.  Notwithstanding the foregoing, the General Partners shall have no authority to enter into the Permanent Loan without the consent of the Special Limited Partner if the annual debt service thereon from and after Permanent Mortgage Commencement shall exceed $257,617.

B. Subject to Section 6.1, the General Partners are specifically authorized, for and on behalf of the Partnership, to execute the Project Documents and any permitted amendments thereto and, subject to the limitations set forth herein, such other documents as they deem necessary or appropriate in connection with the acquisition, development, operation and financing of the Property.

C. All Partnership borrowings shall be subject to Section 6.1, this Article, the Project Documents and the Regulations.  To the extent borrowings are permitted, they may be made from any source, including Partners and Affiliates.  The Partnership may accept Development Advances as and when permitted pursuant to the Development Agreement, and may issue instruments evidencing Operating Expense Loans and Working Capital Loans.

D. If any Partner shall lend any monies to the Partnership, any such loan shall be unsecured and the amount of any such additional loan shall not be an increase of its Capital Contribution.  Until such time as the General Partners and the Developer shall have performed fully their obligations to make Operating Expense Loans, Working Capital Loans and Development Advances, any loan from a General Partner or an Affiliate of a General Partner shall be an obligation of the Partnership to the Partner or Affiliate only if it constitutes an Operating Expense Loan, Working Capital Loan or Development Advance in accordance with the provisions of this Agreement or the Development Agreement, as applicable, and shall be repayable as therein provided.  Subject to the preceding sentence, any loans to the Partnership by a General Partner or an Affiliate of a General Partner may be made on such terms and conditions as may be agreed on by the Partnership, consistent with good business practices.

E. Subject to the provisions of this Agreement with respect to related party loans, a limited partner or member (which may include without limitation the Federal Home Loan Mortgage Corporation) in the Investor Limited Partner (such limited partner or member being referred to herein as a "Mortgagee Limited Partner") at any time may make, guarantee, own acquire, or otherwise credit enhance, in whole or in part, a loan secured by a mortgage, deed of trust, trust deed, or other security instrument encumbering the Property owned by the Partnership (any such loan being referred to as a "Related Mortgage Loan"). Under no circumstances will a Mortgagee Limited Partner be considered to be acting on behalf or as an agent or the alter ego of the Investor Limited Partner. A Mortgagee Limited Partner may take any actions that the Mortgagee Limited Partner, in its discretion, determines to be advisable in connection with its Related Mortgage Loan (including in connection with the enforcement of its Related Mortgage Loan). Each Partner agrees, to the extent permitted by applicable law, that no Mortgagee Limited Partner owes the Partnership or any Partner any fiduciary duty or other duty or obligation whatsoever by virtue of such Mortgagee Limited Partner being a limited partner or member in the Investor Limited Partner. Neither the Partnership nor any Partner will make any claim against a Mortgagee Limited Partner, or against the Investor Limited Partner in which the Mortgagee Limited Partner is a partner or member, relating to a Related Mortgage Loan and alleging any breach of any fiduciary duty, duty of care, or other duty whatsoever to the Partnership or to any Partner based in any way upon the Mortgagee Limited Partner's status as a limited partner or member of the Investor Limited Partner.

### Section 9.2    Refinancing and Sale

The Partnership may not increase the amount of or otherwise materially modify any Mortgage Loan, obtain any new Mortgage Loan or refinance any Mortgage Loan (other than pursuant to and substantially in accordance with a Commitment in existence at Investment Closing) including any required transfer or conveyance of Partnership assets for security or mortgage purposes, and may not sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership without the Consent of the Investor Limited Partner. In the event that an Affiliate of MMA Financial shall be ready, willing and able to furnish financing on substantially equivalent terms, the Consent of the Investor Limited Partner to any proposed refinancing of a Mortgage Loan may be conditioned upon the substitution of such Affiliate as the maker of such refinanced Mortgage Loan. Notwithstanding the foregoing, no such Consent shall be required for the leasing of apartments to tenants in the normal course of operations; *provided, however*, unless such Consent is obtained the Partnership shall lease the Project in such a manner as to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code, and shall lease all of the Low Income Units to Qualified Tenants.

### Section 9.3    Sales Commissions

In connection with the sale of the Property by the Partnership, no Person may receive real estate commissions in excess of that which is reasonable, customary, and competitive with those paid in similar transactions in the same geographic area. Real estate commissions may be paid to an Affiliate of a General Partner.

# ARTICLE X

## PROFITS, LOSSES AND DISTRIBUTIONS

**Section 10.1   Distributions Prior to Dissolution**

A. *Distribution of Cash Flow*. Subject to any Requisite Approvals, (i) net rental income generated through the Completion Date shall be includable in Designated Proceeds and shall be available to the Developer and the General Partners for the purposes and subject to the conditions set forth in the Development Agreement and Section 6.8D hereof, (ii) Cash Flow in respect of the period from the Completion Date through the Development Obligation Date shall be used to pay the Priority Distribution to the Investor Limited Partner, with any balance used to pay any Deferred Development Fee or distributed to the General Partners and (iii) Cash Flow for each Fiscal Year (or fractional portion thereof) after the Development Obligation Date shall be distributed, within ninety (90) days after the end of each Fiscal Year, in the following order of priority:

*First*, to the Investor Limited Partner until the Investor Limited Partner has received distributions under this Section 10.1A (exclusive of distributions constituting Tax Credit Shortfall Payments) equal to the Cumulative Priority Distribution;

*Second*, to the payment of any Deferred Development Fee;

*Third*, to the repayment of any Operating Expense Loans or Working Capital Loans then outstanding; and

*Fourth*, 10.5% of the balance remaining after Clause *Third* above shall be distributed to the Investor Limited Partner;

*Fifth*, to the payment of the Partnership Management Fee;

*Sixth*, any balance, 1% shall be distributed to the Investor Limited Partner and 99% to the General Partners.

If the Partnership shall have unfunded operating deficits or if any Tax Credit Shortfall Payments shall be then due and owing to the Investor Limited Partner, then the General Partners and their Affiliates shall not be entitled to any distributions, fees or loan repayments under this Section 10.1A and any amounts which would otherwise have been paid or distributed to the General Partners and their Affiliates pursuant to this Section 10.1A shall be reduced by such unpaid Tax Credit Shortfall Payments and the amount which would otherwise have been distributed to the Investor Limited Partner pursuant to this Section 10.1A shall be increased by such unpaid Tax Credit Shortfall Payments.

B. *Distributions of Capital Transaction Proceeds*

Prior to dissolution, if the General Partners shall determine that there are proceeds available for distribution from a Capital Transaction, such proceeds shall be applied and distributed as follows:

*First*, to discharge, to the extent required by any lender or creditor, the debts and obligations of the Partnership (other than items listed in the ensuing clauses of this Section 10.1B);

*Second*, to fund reserves for contingent liabilities to the extent deemed reasonable by the General Partners (other than items listed in the ensuing clauses of this Section 10.1B);

*Third*, to the payment of any outstanding Operating Expense Loans and any outstanding Working Capital Loans;

*Fourth*, to the repayment of any outstanding Deferred Development Fee;

*Fifth*, to the Investor Limited Partner an amount equal to the excess (if any) of (i) the amount of the Cumulative Priority Distribution over (ii) the sum of (a) prior distributions under this Clause Fifth and (ii) prior distributions of Cash Flow to the Investor Limited Partner (exclusive of amounts thereof constituting Tax Credit Shortfall Payments);

*Sixth*, to the Investor Limited Partner an amount equal to any theretofore unpaid Tax Credit Shortfall Payments;

*Seventh*, $10,000 to the Special Limited Partner; and

*Eighth*, the balance of such proceeds shall be distributed 10.5% to the Investor Limited Partner and 89.5% to the General Partners.

C. *Sharing of Distributions*

All distributions to the respective classes of the Partners shall be shared by the members of such classes in accordance with the percentages set forth opposite their respective names on the Schedule, except as otherwise provided in this Agreement.

**Section 10.2   Distributions Upon Dissolution**

A. Upon dissolution and termination, after payment of, or adequate provision for, the debts and obligations of the Partnership, the remaining assets of the Partnership shall be distributed to the Partners in accordance with the positive balances in their Capital Accounts after taking into account all Capital Account adjustments for the Partnership taxable year, including adjustments to Capital Accounts pursuant to Sections 10.2B and 10.3B. In the event that a General Partner or Investor Limited Partner has a negative balance in its Capital Account following the liquidation of the Partnership or its Interest after taking into account all Capital Account adjustments for the Partnership taxable year in which the liquidation occurs, such Partner shall pay to the Partnership in cash an amount equal to the negative balance in its

Capital Account. Such payment shall be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation) and shall, upon liquidation of the Partnership, be paid to recourse creditors of the Partnership or distributed to other Partners in accordance with the positive balances in their Capital Accounts. Notwithstanding the foregoing, the obligation of the Investor Limited Partner to contribute such deficit shall be zero unless and until it shall notify the Partnership in writing of its election to have a different amount (the "Designated Amount") apply, which Designated Amount may be increased or reduced (subject to the provisions of the following sentence) by similar written notice from the Investor Limited Partner at any subsequent date. No such notice shall be effective with respect to any Fiscal Year unless the same shall be given prior to the end of such Fiscal Year. No subsequent reduction to the Designated Amount shall reduce the same below the Investor Limited Partner's deficit balance in its Capital Account (as such Capital Account is increased by the Investor Limited Partner's share of Partnership Minimum Gain) at the end of the Partnership's immediately preceding tax year.

B. With respect to assets distributed in kind to the Partners in liquidation or otherwise, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be profits and losses realized by the Partnership immediately prior to the liquidation or other distribution event; and (ii) such profits and losses shall be allocated to the Partners in accordance with Section 10.3B, and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of such fair market value over the outstanding principal balance of and accrued interest on any debt by which the property is encumbered. For the purposes of this Section 10.2B, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such assets, taking into account the fair market value of the associated financing (but subject to Section 7701(g) of the Code), and the Partnership's adjusted basis for such assets as determined under Section 1.704-1(b). This Section 10.2B is merely intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distribution event, and nothing contained in this Section 10.2B or elsewhere herein is intended to treat or cause such distributions to be treated as sales for value. The fair market value of such assets shall be determined by an appraiser to be selected by the General Partners with the Consent of the Investor Limited Partner.

### Section 10.3   Profits, Losses and Tax Credits

A. Except as otherwise specifically provided in this Article, for each Fiscal Year or portion thereof, profits, tax-exempt income, losses and non-deductible, non-capitalizable expenditures incurred and/or accrued by the Partnership, shall be allocated 0.02% to the General Partners and 99.98% to the Investor Limited Partner.

B. Except as otherwise specifically provided in Section 10.4 or elsewhere in this Article, all profits and losses arising from a Capital Transaction shall be allocated to the Partners as follows:

*As to profits*:

*First*, an amount of profit equal to the aggregate negative balances (if any) in the Capital Accounts of all Partners having negative balance Capital Accounts

shall be allocated to such Partners in proportion to their negative Capital Account balances until all such Capital Accounts shall have zero balances; and

*Second*, an amount of profits shall be allocated to each of the Partners until the positive balance in the Capital Account of each Partner equals, as nearly as possible, the amount of cash which would be distributed to such Partner if the aggregate amount in the Capital Accounts of all Partners were cash available to be distributed in accordance with the provisions of Clauses *Fifth* through *Eighth* of Section 10.1B.

*As to losses*:

*First*, an amount of losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Partners having positive balance Capital Accounts shall be allocated to such Partners in proportion to their positive Capital Account balances until all such Capital Accounts shall have zero balances; *provided*, *however*, that if the amount of losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Partners having positive balances in their Capital Accounts, then such losses shall be allocated to the Partners in such proportions and in such amounts so that the Capital Account balances of each Partner shall equal, as nearly as possible, the amount such Partner would receive if an amount equal to the excess of (a) the sum of all Partners' balances in their Capital Accounts computed prior to the allocation of losses under this clause *First* over (b) the aggregate amount of losses to be allocated to the Partners pursuant to this clause *First* were distributed to the Partners in accordance with the provisions of Clauses *Fifth* through *Eighth* of Section 10.1B; and

*Second*, the balance, if any, of such losses shall be allocated 0.02% to the General Partners and 99.98% to the Investor Limited Partner.

C. If the Partnership (i) incurs recourse obligations or Partner Nonrecourse Debt (including without limitation Operating Expense Loans), (ii) accepts Special Capital Contributions pursuant to Section 6.9 or (iii) incurs losses from extraordinary events which are not recovered from insurance or otherwise (the items referred to in clauses (i), (ii) and (iii) being hereinafter referred to collectively as the "Section 10.3C Items") in respect of any Partnership taxable year, then the calculation and allocation of profits and losses shall be adjusted as follows: *first*, an amount of deductions (consisting of operating expenses and not cost recovery deductions) attributable to the Section 10.3C Items shall be allocated to the General Partners; and *second*, the balance of such deductions shall be allocated as provided in Section 10.3A. For purposes of this Section 10.3C, extraordinary events includes casualty losses, losses resulting from liability to third parties for tortious injury, losses resulting from a breach of a legal duty by the Partnership or by the General Partners, and deductions resulting from other liabilities which are not incurred in the ordinary course of business. Nothing in this Section 10.3C shall prevent the Partnership from recovering an extraordinary loss from a General Partner who is liable therefor by law or under this Agreement.

D. If any Section 10.3C Items shall be repaid from cash generated in respect of any Fiscal Year, then the allocation of profits and losses under Section 10.3A for such Fiscal Year shall be adjusted as follows: *first*, the General Partners shall be allocated an amount of the gross income of the Partnership equal to the lesser of (i) the amount of items of loss or expense previously allocated to the General Partners under Section 10.3C and not previously offset by allocations of gross income under this Section 10.3D or items thereof and (ii) the amount of the Section 10.3C Items repaid in such year and *second*, all remaining gross income and all expenses shall be allocated as provided in Section 10.3A. Nothing in this Section 10.3D shall be construed to authorize the return of Special Capital Contributions. This section shall be applied in conjunction with Section 10.4B to avoid the double allocation of gain under such sections when Operating Expense Loans are repaid.

E. Notwithstanding the foregoing provisions of Sections 10.3.A and 10.3.B, in no event shall any losses be allocated to a Limited Partner if and to the extent that such allocation would cause, as of the end of the Partnership taxable year, the negative balance in such Limited Partner's Capital Account to exceed such Limited Partner's share of Partnership Minimum Gain plus such Limited Partner's share of Partner Nonrecourse Debt Minimum Gain. Any losses which are not allocated to the Limited Partners by virtue of the application of this Section 10.3E shall be allocated as required under Treasury Regulation Section 1.704-1(b). For purposes of this Section 10.3E, a Partner's Capital Account shall be treated as reduced by Qualified Income Offset Items.

F. The terms "profits" and "losses" used in this Agreement shall mean income and losses, and each item of income, gain, loss, deduction or credit entering into the computation thereof, as determined in accordance with the accounting methods followed by the Partnership and computed in a manner consistent with Treasury Regulation Section 1.704-1(b)(2)(iv). Profits and losses for federal income tax purposes shall be allocated in the same manner as profits and losses under Section 10.3 except as provided in Section 10.5B.

G. Tax credits under Section 42 of the Code shall be allocated among the Partners in the same manner as the deductions attributable to the expenditures creating the tax credit are allocated among the Partners in accordance with Treasury Regulation Section 1.704-1(b)(4)(ii).

### Section 10.4    Minimum Gain Chargebacks and Qualified Income Offset

A. If there is a net decrease in Partnership Minimum Gain during a Partnership taxable year, each Partner will be allocated items of income and gain for such year (and, if necessary, subsequent years) in the proportion to, and to the extent of, an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain during the year. A Partner is not subject to this Partnership Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(f)(2)-(5) apply. Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(f) under Section 704 of the Code.

B. If there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a Partnership taxable year, then each Partner with a share of the minimum gain attributable to such debt at the beginning of such year will be allocated items of income and gain for such year

(and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain during the year. A Partner is not subject to this Partner Nonrecourse Debt Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(i)(4) applied consistently with Treasury Regulation Section 1.704-2(f)(2)-(5) apply. Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(i)(4) under Section 704 of the Code.

C. If a Limited Partner unexpectedly receives (1) an allocation of loss or deduction or expenditures described in Section 705(a)(2)(B) of the Code made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Partnership, (b) pursuant to Section 706(d) of the Code as the result of a change in any Partner's interest in the Partnership, or (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as a result of a distribution by the Partnership of unrealized receivables or inventory items or (2) a distribution, and such allocation and/or distribution would cause the negative balance in such Partner's Capital Account to exceed (i) such Partner's share of Partnership Minimum Gain plus (ii) such Partner's share of Partner Nonrecourse Debt Minimum Gain and (iii) the amount of such Partner's obligation, if any, to restore a deficit balance in its Capital Account, then such Partner shall be allocated items of income and gain in an amount and manner sufficient to eliminate such negative balance as quickly as possible. For purposes of this Section 10.4C, a Partner's Capital Account shall be treated as reduced by Qualified Income Offset Items.

### Section 10.5   Special Provisions

A. Except as otherwise provided in this Agreement, all profits, losses, credits and distributions shared by the respective classes composed of the Special Limited Partner and the General Partners shall be allocated among the members of such class in accordance with the percentages set forth opposite their respective names in the Schedule. Subject to the provisions of Section 13.8, the Investor Limited Partner and Special Limited Partner each shall be deemed to have been admitted to the Partnership as of the first day of the month during which its actual admission occurs for purposes of allocating profits and losses.

B. Income, gain, loss and deduction with respect to property which has a variation between its basis computed in accordance with Treasury Regulation Section 1.704-1(b) and its basis computed for federal income tax purposes shall be shared among the Partners for tax purposes so as to take account of such variation in a manner consistent with the principles of Section 704(c) of the Code and Treasury Regulation Sections 1.704-1(b)(2)(iv)(g) and 1.704-3.

C. If the Partnership shall receive any purchase money indebtedness in partial payment of the purchase price of the Project and such indebtedness is distributed to the Partners pursuant to the provisions of Section 10.1B or Section 10.2, the distributions of the cash portion of such purchase price and the principal amount of such purchase money indebtedness hereunder shall be allocated among the Partners in the following manner: On the basis of the sum of the principal amount of the purchase money indebtedness and cash payments received on the sale (net of amounts required to pay Partnership obligations and fund reasonable reserves), there shall be calculated the percentage of the total net proceeds distributable to each class of Partners based on Section 10.1B or Section 10.2, as applicable, treating cash payments and purchase

money indebtedness principal interchangeably for this purpose, and the respective classes shall receive such respective percentages of the net cash purchase price and purchase money principal. Payments on such purchase money indebtedness retained by the Partnership shall be distributed in accordance with the respective portions of principal allocated to the respective classes of Partners in accordance with the preceding sentence, and if any such purchase money indebtedness shall be sold, the sale proceeds shall be allocated in the same proportion.

D.  In the event that any fee payable to any General Partner or any Affiliate shall instead be determined to be a non-deductible, non-capitalizable distribution from the Partnership to a Partner for federal income tax purposes, then there shall be allocated to such General Partner an amount of gross income equal to the amount of such distribution.

E.  Notwithstanding any provision to the contrary in this Article X, funds of the Partnership constituting Designated Proceeds shall be applied to pay Development Costs and the Development Amount in accordance with the provisions of this Agreement, the Development Agreement and the Project Documents.

F.  In applying the provisions of this Article X with respect to distributions and allocations, the following ordering of priorities shall apply:

(1)  Capital Accounts shall be deemed to be reduced by Qualified Income Offset Items.

(2)  Capital Accounts shall be reduced by distributions of Cash Flow under Section 10.1A.

(3)  Capital Accounts shall be reduced by distributions from Capital Transactions under Section 10.1B.

(4)  Capital Accounts shall be increased by any minimum gain chargeback under Section 10.4A or 10.4B.

(5)  Capital Accounts shall be increased by any qualified income offset under Section 10.4C.

(6)  Capital Accounts shall be increased by allocations of profits under Section 10.3A.

(7)  Capital Accounts shall be reduced by allocations of losses under Section 10.3A.

(8)  Capital Accounts shall be reduced by allocations of losses under Section 10.3B.

(9)  Capital Accounts shall be increased by allocations of profits under Section 10.3B.

G.  For purposes of determining each Partner's proportionate share of excess Partnership Nonrecourse Liabilities pursuant to Treasury Regulation Section 1.752-3(a)(3), the Investor Limited Partner shall be deemed to have a 99.98% interest in profits of the Partnership and the General Partners shall be deemed to have a 0.02% interest in profits of the Partnership.

H.  To the maximum extent permitted under the Code, allocations of profits and losses shall be modified so that the Partners' Capital Accounts reflect the amount they would have reflected if adjustments required by Section 10.4 had not occurred.  Furthermore, if for any Fiscal Year the application of the provisions of Section 10.4 would cause a distortion in the economic sharing arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partners may request a waiver from the Service of the application in whole or in part of Section 10.4 in accordance with Treasury Regulation Section 1.704-2(f)(4).

I.  To the extent that interest on obligations to any General Partner or its Affiliates is determined to be deductible by the Partnership in excess of the stated amount of interest payable thereunder, the corresponding additional interest deduction shall be allocated solely to such General Partner.

J.  Any interest income earned by the Partnership on any and all reserve, escrow or other accounts prior to the Completion Date shall be specially allocated to the General Partners.

## ARTICLE XI

## MANAGEMENT AGENT

### Section 11.1   Management Agent

The General Partners shall have responsibility for obtaining a Management Agent acceptable to the Investor Limited Partner and each Lender and Governmental Agency to manage the Project in accordance with the requirements of each Lender and Governmental Agency.  The General Partners shall cause the Partnership to enter into the Management Agreement with the Management Agent, which may be an Affiliate of a General Partner.  The initial Management Agent shall be Intermark Management Company.   Subject to the Regulations, the Management Agent shall be entitled to receive a reasonable and competitive Management Fee (determined by reference to arm's-length property management arrangements for comparable properties in force in the general locality of the Project) not to exceed the lesser of **[5%]** of gross rental income or the maximum amount permitted by any relevant Governmental Agency or Lender.

If at any time after the Completion Date:

(i)      the Project shall be subject to any substantial building code violation which shall not have been cured within ninety (90) days after notice from the applicable Governmental Agency or department or unless such violation is being validly contested by the General Partners by proceedings which operate to prevent any fines or criminal penalties from being levied against the Partnership or unless, in the case of any such violation not susceptible of cure

within such ninety (90)-day period, the General Partners are diligently making reasonable efforts to cure the same,

(ii)     operating revenues of the Project in respect of any period of twenty-four (24) consecutive calendar months after the Completion Date shall be insufficient to permit the Partnership to pay when due on a current basis all Partnership obligations in respect of such twenty-four (24)-month period,

(iii)     the Project ceases to qualify as a "qualified low-income housing project" under Section 42(g) of the Code or any Low Income Unit in the Project ceases to qualify as a "low income unit" under Section 42(i)(3) of the Code,

(iv)     a Recapture Event shall have occurred,

(v)     the Management Agent or its agents or employees have demonstrated incompetence or malfeasance in the management of the Project, or

(vi)     the Special Limited Partner has elected to remove a General Partner that is an Affiliate of the Management Agent pursuant to the provisions of Section 7.7,

then the General Partners shall forthwith give to the Special Limited Partner notice of such event (a "Management Default Notice"), and thereafter the Partnership shall, subject to any Requisite Approvals, forthwith terminate its management agreement with the Management Agent, unless the approval of the Special Limited Partner is obtained to the retention of the Management Agent.  Upon any termination, the General Partners shall immediately proceed to select a qualified Person as the new Management Agent (which, in the event the terminated Management Agent was an Affiliate of a General Partner, shall be unaffiliated with any General Partner) as the new Management Agent for the Property, which selection shall be subject to any Requisite Approvals; and, after such selection, no Management Fee shall be payable to any Person which is an Affiliate of a General Partner unless the management contract with any such Person shall provide for the right of the Partnership to terminate the same upon the occurrence of the circumstance described in this Article XI.  By its execution hereof, the Management Agent agrees that the provisions of this Section which limit the amount of the Management Fee and provide for the termination of the Management Agent under the circumstances herein described are hereby incorporated into any present or future Management Agreement (which shall be deemed amended hereby to the extent necessary to give effect to such provisions).

**Section 11.2   <u>Special Power of Attorney</u>**

If an event described in clauses (i) through (vi) of Section 11.1 above occurs and the General Partner fails to send a Management Default Notice to the Special Limited Partner within the ten (10) days of the date the General Partner became aware of such event, the Special Limited Partner hereby is granted an irrevocable power of attorney, coupled with an interest, to take such action, and to execute and deliver such documents on behalf of the Partners and the Partnership, as shall be legally necessary and sufficient to effect the provisions of this Article XI.

## ARTICLE XII

## BOOKS AND REPORTING, ACCOUNTING, TAX ELECTION, ETC

### Section 12.1   Books, Records and Reporting

A.  The General Partners shall keep or cause to be kept a complete and accurate set of books and supporting documentation with respect to the Partnership's business.  The books of the Partnership shall be kept on the accrual basis.  The books and records of the Partnership (including all records required to be maintained under the Uniform Act) shall at all times be maintained at the principal office of the Partnership.  Each Partner, its duly authorized representatives and any regulatory authority which regulates such Partner shall have the right to examine the books of the Partnership and all other records and information concerning the Partnership and the Project at reasonable times.  The books and records of the Partnership shall include, without limitation, copies of the following: (i) the Partnership's federal, state and local income tax or information returns and reports, if any, and all related back-up documentation for ten (10) years from the date of production and (ii) financial statements of the Partnership for ten (10) years from the date of production.

B.  The books of the Partnership shall be examined by the Accountants in accordance with generally accepted auditing standards annually as of the end of each Fiscal Year of the Partnership.  The General Partners shall prepare a balance sheet as of the end of each such year and statements of income, partners' equity and cash flows for such year.  Said balance sheet and statements shall be accompanied by the opinion of the Accountants that said balance sheet and statements have been prepared in accordance with generally accepted accounting principles applied consistently with prior periods identifying any matters to which the Accountants take exception and stating, to the extent practicable, the effect of each such exception on such financial statements.  As a note to such financial statements, the General Partners shall prepare a schedule of all loans to the Partnership (to be reviewed by the Accountants), setting forth the purpose of such loan and Section of this Agreement or the Development Agreement under which such loan was obtained.  Such schedule shall demonstrate that loans have been made, used, carried on the books of the Partnership (and repaid, if applicable) in accordance with the provisions of this Agreement and the Development Agreement.  In addition, after the first year in which the Accountants examine the financial statements of the Partnership after completion of the Project, the depreciation schedule for that year and all future years, along with the depreciation worksheet, shall be prepared by the General Partners, reviewed by the Accountants and furnished to the Investor Limited Partner. The General Partners shall, promptly upon receipt of such balance sheet and statements and in any event within sixty (60) days after the end of each Fiscal Year, transmit to the Investor Limited Partner a copy thereof.  The Accountants shall also review and sign the federal and state income tax returns of the Partnership.  In connection with the preparation of such tax returns, the General Partners shall seek and obtain the advice of the Special Limited Partner with respect to material allocations of assets for cost recovery purposes.  The General Partners shall complete the books of the Partnership in such time as will allow the Accountants to complete such tax returns within forty-five (45) days after the end of such Fiscal Year.  The General Partners shall cause such tax returns to be filed within such time periods and shall immediately upon the filing thereof transmit to the Investor Limited Partner a copy of Schedule K-1.  If the General Partners fail to complete such tax returns and to

transmit such Schedule K-1 to the Investor Limited Partner within such time periods, shall fail to transmit the annual balance sheet and financial statements to the Investor Limited Partner within the time period set forth above or shall fail to deliver any of the information required by Section 12.1E within twenty (20) days after the end of any applicable quarter of the Partnership's Fiscal Year, the General Partners shall pay as damages the sum of $500 per day (plus interest at the Designated Prime Rate plus 3% per annum) to the Investor Limited Partner until such Schedule K-1, balance sheet and financial statements and information required pursuant to Section 12.1E are received by the Investor Limited Partner. Such damages shall be paid forthwith by the General Partners and failure to so pay shall constitute a default of the General Partners under Section 6.3C. In addition, if the General Partners fail to so pay, the Investor Limited Partner may deduct any unpaid damages from any portion of its Capital Contribution not yet paid, or if such Capital Contribution has been fully paid then the General Partners and their Affiliates shall forthwith cease to be entitled to any Cash Flow or to the payment of any fees which are payable from Cash Flow as provided in Section 10.1A ("Cash Flow Fees"). Such payments of Cash Flow and Cash Flow Fees shall only be restored upon the payment of such damages in full and any amount of such damages not so paid shall be deducted against payments of Cash Flow and Cash Flow Fees otherwise due to the General Partners or their Affiliates.

Such reports and estimates shall clearly indicate the methods under which they were prepared and shall be made at the expense of the Partnership.

C. If the General Partners fail to complete such tax returns and submit such Schedules K-1 on a timely basis, the Investor Limited Partner may select a firm of accountants who shall prepare such returns and Forms K-1. The General Partners shall immediately furnish all necessary documentation and other information to prepare such tax returns and such Schedules K-1 to such accountants.

D. Every Limited Partner shall at all times have access to the records of the Partnership and may inspect and copy any of them. A list of the names and addresses of all of the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request. A reasonable charge for copy work may be charged by the Partnership. Within a reasonable time following receipt of a written direction from the Investor Limited Partner, the General Partners shall furnish copies of information or reports required to be maintained or prepared pursuant to this Article XII to members or limited partners of the Investor Limited Partner. Any such direction shall specifically identify the information or reports requested and the name and address of each member or limited partner of the Investor Limited Partner to receive the same.

E. Within fifteen (15) days following the end of each of the first three (3) quarters of each Fiscal Year (and, if and to the extent specifically requested in writing by the Investor Limited Partner, within twenty (20) days following the end of such Fiscal Year), the Managing General Partner shall send to each Person who was a Limited Partner at any time during such quarter one or more reports which, taken together, provide the following information (which need not be audited): (i) a balance sheet as at the end of such quarter; (ii) a statement of income for such quarter on the cash as well as accrual bases; (iii) a statement of cash available for distribution and reserves for such quarter; (iv) a statement describing (a) any new agreement,

contract or arrangement between the Partnership and a General Partner or an Affiliate of a General Partner, (b) the amount of all fees and other compensation and distributions and reimbursed expenses paid by the Partnership for the quarter to any General Partner or Affiliate of a General Partner, and (c) the amount of all distributions of Cash Flow and Capital Transaction proceeds made to Partners; and (v) a report of the significant activities of the Partnership during the fiscal quarter. Each quarterly report shall also contain a certification by the General Partners that neither the Partnership nor any General Partner has received any notice or has been cited by or otherwise warned in writing of any "Violation" (as hereinafter defined) by any Governmental Agency, which Violation could have a materially adverse impact on any of them. For purposes of this certification, a Violation shall mean any act or omission complained of which, if uncured, would be in violation of (a) any applicable statute, code, ordinance, rule or regulation, (b) any agreement or instrument to which the Governmental Agency and the Partnership or a General Partner is a party or to which the Project is subject, (c) any license or permit, or (d) any judgment, decree or order of a court. Any exceptions to the foregoing shall be described in such certification. In addition, if requested by the Investor Limited Partner in writing, within a reasonable time after receipt of such a request, each General Partner shall send to the Investor Limited Partner such recent financial statements (including a balance sheet and statement of income) as shall have been so requested.

F. The General Partners shall provide the Investor Limited Partner with (i) a copy of each draw request for construction or development costs as such requests are made to the Lender; (ii) a copy of each inspection report, evaluation or similar report issued to the Partnership by any Governmental Agency or Lender promptly upon receipt thereof; (iii) a copy of each low-income housing tax credit compliance report delivered to or prepared by the applicable tax credit monitoring agency or agencies with respect to the Project; (iv) prompt notice of any casualty or other significant adverse event relating to the Partnership; (v) evidence of insurance, (vi) at least annually, a schedule setting forth the adjustments necessary, if any, to state the income of the Partnership using the longer depreciable lives available under generally accepted accounting principles (rather than the depreciable lives used for federal income tax purposes), and (vii) such other information as the Investor Limited Partner may specifically request from time to time with regard to the business or operations of the Partnership.

G. By the fifteenth (15th) day of each month prior to the Development Obligation Date, the General Partners shall provide the Investor Limited Partner with a brief written summary of the status of the construction, development, lease-up and operations of the Project during the prior month.

H. An annual pro forma operating budget for the succeeding calendar year shall be prepared by the General Partners and furnished to the Investor Limited Partner by November 30 of each year. In addition, the General Partners shall prepare and furnish to the Investor Limited Partner an estimate of the profits and losses of the Partnership for federal income tax purposes for the current Fiscal Year not later than September 30 of each year.

I. Within thirty (30) days following the close of the first year of the Credit Period with respect to the Project, the General Partners shall provide the Investor Limited Partner with a copy (in electronic form, if feasible) of all records establishing the qualification of tenants under Section 42 of the Code.

J.   The General Partners shall furnish to the Investor Limited Partner a radon gas test measurement report and conclusion (a "Radon Report") for each Building upon completion of construction or rehabilitation thereof, unless the Project is located in a county in the lowest risk EPA radon map Zone 3. The Radon Report must come from a radon service professional who (i) meets state-specific requirements, if any, for providing such Radon Reports, and (ii) has a proficiency listing, accreditation or certification in radon test measurement from either (a) The National Environmental Health Association ("NEHA") National Radon Proficiency Program or (b) The National Radon Safety Board ("NRSB"). Alternatively, a Radon Report from an environmental professional who lacks such a proficiency listing, accreditation or certification from NEHA or NRSB may be acceptable if it follows state-specific requirements and EPA recommendations and protocols set forth in the following EPA publications: *Protocols for Radon and Radon Decay Product Measurements in Homes* (EPA 402-R-93-003, August, 1993) and the *Indoor Radon and Radon Decay Product Measurement Device Protocols* (EPA 402-R-92-004, July, 1992), which protocols are summarized at www.airchek.com. If the Radon Report demonstrates that the radon gas level for a Building exceeds the EPA standard for radon action or remediation then in effect, the General Partners shall install a radon mitigation system or take other recommended mitigation measures and shall provide a follow-up Radon Report to confirm effectiveness.

### Section 12.2   Bank Accounts

Subject to any Requisite Approvals, the bank accounts of the Partnership shall be maintained in such banking institutions as the General Partners shall determine and withdrawals shall be made only in the regular course of Partnership business on the signature of the Managing General Partner. All deposits and other funds not needed in the operation of the business shall be deposited, to the extent permitted by the Lender and the Governmental Agency, in interest-bearing accounts or invested in short-term United States Government obligations maturing within one (1) year.

### Section 12.3   Elections

Unless the Investor Limited Partner shall specify a different permissible treatment in writing, and except to the extent otherwise required by Section 168(g)(1)(B) of the Code, the Partnership shall depreciate its residential rental property, site improvements and personal property costs, respectively, over twenty-seven and a half (27.5) years, fifteen (15) years and five (5) years for federal income tax purposes and over forty (40) years, twenty (20) years and ten (10) years for financial accounting purposes. Subject to the provisions of Section 12.4, all other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partners, after consultation with the Investor Limited Partner, in such manner as shall be most advantageous to the Limited Partners.

### Section 12.4   Special Adjustments

In the event of (i) a transfer of all or any part of any Interest or (ii) an election pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) is made by the Investor Limited Partner, the Partnership shall elect, if requested by the transferee or by the Investor Limited Partner (as the case may be), pursuant to Section 754 of the Code (or corresponding

provisions of succeeding law) to adjust the basis of Partnership assets.  Notwithstanding anything to the contrary contained in Article X, any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner.  Each Partner will furnish the Partnership with all information necessary to give effect to such election.

### Section 12.5   Fiscal Year

The Fiscal Year of the Partnership shall be the calendar year unless a different year is required by the Code.

### ARTICLE XIII

### GENERAL PROVISIONS

### Section 13.1   Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) deposited with Federal Express or similar overnight delivery service, (iii) transmitted by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

If to the Partnership, at the principal office of the Partnership set forth in Section 2.2, and if to a Partner, at its address set forth in the Schedule, with copies to MMA Financial TC Corp., 101 Arch Street, Boston, Massachusetts 02110, Attention: Asset Management Department; Scott M. Nemeroff, Esq., Nixon Peabody LLP, Suite 900, 401 9th Street, N.W., Washington, D.C. 20004-2128; and Partnership Counsel.

### Section 13.2   Word Meanings

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  Any references to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless reference is expressly made to a different document.

### Section 13.3   Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assignees of the respective parties hereto, except in each case as expressly provided to the contrary in this Agreement.

### Section 13.4   Applicable Law

This Agreement shall be construed and enforced in accordance with the internal laws of the State.

### Section 13.5   Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

### Section 13.6   Paragraph Titles

Paragraph titles and any table of contents herein are for descriptive purposes only, and shall not affect the meaning of this Agreement as set forth in the text.

### Section 13.7   Separability of Provisions; Rights and Remedies

A.  Each provision of this Agreement shall be considered separable and (i) if for any reason any provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provisions herein would cause the Limited Partners to be bound by the obligations of the Partnership under the laws of the State as the same may now or hereafter exist, such provisions shall be deemed void and of no effect.

B.  Each of the parties hereto irrevocably waives during the term of the Partnership (including any periods during which the business of the Partnership is required to be continued under Article VII) any right (i) that such party may have to maintain any action for partition with respect to the property of the Partnership, and (ii) to commence an action seeking dissolution of the Partnership (unless the Consent of the Investor Limited Partner has been obtained).

C.  The rights and remedies of any of the parties hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof.  Each of the parties confirms that damages at law may be an inadequate remedy for breach or threat of breach of any provisions hereof.  The respective rights and obligations hereunder shall be enforceable by specific performance, injunction, or other equitable remedy, but nothing herein contained is intended to limit or affect any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threat of breach of any provision hereof, it being the intention that the respective rights and obligations of the Partners shall be enforceable in equity as well as at law or otherwise.

D.  Each Partner and each Guarantor irrevocably:

(i)     agrees that any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby shall be brought in the courts of record of Suffolk

County of the Commonwealth of Massachusetts or the courts of the United States located in Boston, Massachusetts;

(ii)     consents to the jurisdiction of each such court in any such suit, action or proceeding;

(iii)     waives any objection which he may have to the laying of venue of any such suit, action or proceeding in any of such courts; and

(iv)     waives its right to a jury trial with respect to any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby.

## Section 13.8     Effective Date of Admission

Any Partner admitted to the Partnership during any calendar month shall be deemed to have been admitted as of the first day of such calendar month for all purposes of this Agreement including the allocation of profits, losses and credits under Article X; *provided*, *however*, that if regulations are issued by the Service or an amendment to the Code is adopted which would require, in the opinion of the Accountants, that a Partner be deemed admitted on a date other than as of the first day of such month, then the General Partners shall select a permitted admission date which is most favorable to the Partner.

## Section 13.9     Delivery of Certificate

Promptly upon the filing of the Certificate and each amendment thereto in the appropriate filing office, the General Partners shall deliver or mail a copy thereof to each Limited Partner.

## Section 13.10   Additional Information

At the request of the Investor Limited Partner, the General Partners shall furnish to the Investor Limited Partner: (i) plans and specifications for the Project; (ii) manuals, booklets and other documents describing the location and operation of all systems within the Project, including without limitation heating, air conditioning, elevator, electrical and plumbing systems; (iii) a list and copies of all agreements concerning the maintenance, operation and management of the Project; and (iv) such other information regarding the Partnership, the Project or the Related Agreements as the Investor Limited Partner may reasonably request.

## Section 13.11  Further Documents and Actions

The Partners agree that they shall, from time to time, execute and deliver such further documents and do such further actions and things as may be reasonably requested by any other such party in order to effect fully the purposes of this Agreement and each other agreement or instrument identified on the Document Schedule.

**Section 13.12  Brokers or Finders**

The parties hereto agree that no broker or finder has any claim for commissions or fees in connection with the transaction embodied herein.   The General Partners shall jointly and severally indemnify the Limited Partners against any brokers' or finders' fees or commissions claimed through the General Partners or their Affiliates in connection with the transactions contemplated hereby, including without limitation fees or commissions claimed by any syndicator or consultant engaged by the General Partners or any of their Affiliates.  Fees payable to MMA Financial are not covered hereby.

**Section 13.13  Amendment**

This Agreement may only be amended in writing signed by the General Partner, the Investor Limited Partner and the Special Limited Partner.   All parties agree that no oral agreements or course of conduct of the parties shall be deemed to be an amendment to this Agreement unless in writing signed as described above.   So long as the Fleet Pledge is outstanding, any amendment of those provisions herein of which Fleet, as Agent, is a third party beneficiary, or any other amendment to any other provision herein which would materially affect Fleet's rights and priorities as Agent under the Fleet Pledge, shall require the prior written consent of Fleet.  Fleet, as Agent, is an intended third party beneficiary of this section.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed under seal as of the day and year first above written.

GENERAL PARTNERS:
    DOUGLAS COMPANY, LLC,
A South Carolina limited liability company

By: _____

Name:
Managing Member

BLUE CROW DEVELOPMENT, LLC,
a South Carolina limited liability company

By: _____

Name:
Managing Member

INVESTOR LIMITED PARTNER:
    MMA SHELL POINTE, LLC a Delaware limited liability company, by its authorized member, West Cedar Managers, Inc.

By: _____

_____, Vice-President

SPECIAL LIMITED PARTNER:
    MMA SPECIAL LIMITED PARTNER, INC., a Florida corporation

By: _____

Vice-President

ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:
    DAVID D. DOUGLAS

By: _____

MANAGEMENT AGENT:
(Pursuant to Section 11.1)
    INTERMARK MANAGEMENT CORP.

By: _____

Name:
Title:

W318390.1  031249.3038

70

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed under seal as of the day and year first above written.

GENERAL PARTNERS:

DOUGLAS COMPANY, LLC,
A South Carolina limited liability company

By: _____
Name:
Managing Member

BLUE CROW DEVELOPMENT, LLC,
a South Carolina limited liability company

By: _____
Name:
Managing Member

INVESTOR LIMITED PARTNER:

MMA SHELL POINTE, LLC a Delaware limited liability company, by its authorized member, West Cedar Managers, Inc.

By: _____
William J. Tomashewski, Vice-President
AUTHORIZED REP.

SPECIAL LIMITED PARTNER:

MMA SPECIAL LIMITED PARTNER, INC., a Florida corporation

By: _____
William J. Tomashewski, Vice-President
AUTHORIZED REP.

ORIGINAL (AND WITHDRAWING)
LIMITED PARTNER:

DAVID D. DOUGLAS

By: _____

MANAGEMENT AGENT:
(Pursuant to Section 11.1)

INTERMARK MANAGEMENT CORP.

By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed under seal as of the day and year first above written.

GENERAL PARTNERS:

DOUGLAS COMPANY, LLC,
A South Carolina limited liability company

By: _____
Name:
Managing Member

BLUE CROW DEVELOPMENT, LLC,
a South Carolina limited liability company

By: _____
Name:
Managing Member

INVESTOR LIMITED PARTNER:

MMA SHELL POINTE, LLC a Delaware limited liability company, by its authorized member, West Cedar Managers, Inc.

By: _____
_____, Vice-President

SPECIAL LIMITED PARTNER:

MMA SPECIAL LIMITED PARTNER, INC., a Florida corporation

By: _____
_____, Vice-President

ORIGINAL (AND WITHDRAWING) LIMITED PARTNER:

DAVID D. DOUGLAS

By: _____

MANAGEMENT AGENT:
(Pursuant to Section 11.1)

INTERMARK MANAGEMENT CORP.

By: _____
Name: Mark T. Stuckey
Title: President

Exhibit A

**SHELL POINTE, LP**

SCHEDULE OF PARTNERS

As of August 1, 2004

| **Name and Business Address** | **Capital Contributions** | **Percentage of Partnership Interests for Class** |
|---|---|---|
| **GENERAL PARTNERS:** | | |
| Douglas Company, LLC<br>607 8th Avenue<br>Aynor, SC  29511<br>843 358-1052 (Telephone No.)<br>843 358-1069 (Fax No.) | $100 | 50% |
| Blue Crow Development LLC<br>607 8th Avenue<br>Aynor, SC  29511<br>843 358-1052 (Telephone No.)<br>843 358-1069 (Fax No.) | $100 | 50% |
| **SPECIAL LIMITED PARTNER:** | | |
| MMA Special Limited Partner, Inc.<br>c/o MMA Financial TC Corp.<br>101 Arch Street<br>Boston, MA 02110<br>(617) 439-3911 (Telephone No.)<br>(617) 439-9978 (Fax No.) | $10.00 | 100% |
| **INVESTOR LIMITED PARTNER:** | | |
| MMA Shell Pointe, LLC<br>c/o MMA Financial TC Corp.<br>101 Arch Street<br>Boston, MA 02110<br>(617) 439-3911 (Telephone No.)<br>(617) 439-9978 (Fax No.) | $3,769,000* | 100% |

---

*Payable in accordance with Article V.

W318390.1  031249.3038

71

<u>Exhibit B</u>

DOCUMENT SCHEDULE FOR SHELL POINTE, LP

List of Related Agreements:

1.      Partnership Agreement

2.      Development Agreement

3.      Investment Assumptions

4.      Guaranty Agreement

5.      Closing Certificate

6.      Initial Transfer Agreement

7.      Opinion of Local Counsel

8.      ALTA Owner's Policy of Title Insurance (dated within ten (10) days of closing or date of Construction Loan closing, if later) in amount of $_____ with Special Endorsements

9.      Tax Credit Carryover Allocation Approval

10.     Balance Sheet of Partnership (unaudited, dated as of closing date)

11.     Financial Statements of General Partner (audited or AICPA-reviewed, dated not earlier than three (3) months prior to the date of this Agreement)

12.     Financial Statements of Guarantor (audited or AICPA-reviewed, dated not earlier than three (3) months prior to the date of this Agreement)

13.     Insurance Certificates (satisfying requirements of Section 6.4A and Exhibit C of Partnership Agreement)

14.     Evidence of Lender/Governmental Agency required consents satisfactory to the Investor Limited Partner.

15.     Environmental Site Assessment satisfactory to the Investor Limited Partner.

16.     Engineering Report satisfactory to the Investor Limited Partner.

17.     Market Study satisfactory to the Investor Limited Partner.

**Exhibit C**

**Insurance Requirements**

## I. General Insurance Requirements

The following are construction period and permanent insurance requirements. This outline describes the minimum types and amounts of insurance that are satisfactory to the Special Limited Partner:

    i.    Partnership's Commercial General Liability Insurance (Bodily Injury and Property Damage);

    ii.    During the construction period, a special form, Builder's Risk policy (written on a completed value form with an agreed value endorsement) and, thereafter, Partnership's Property Insurance;

    iii.    Partnership's Automobiles/Hired and Non-Owned Liability Insurance;

    iv.    Insurance for boiler and machinery (if applicable), in the amount of full replacement cost. To be written on a comprehensive form, and to include loss of rents with a maximum of "24 hour" deductible with a mechanical breakdown endorsement.

    v.    Insurance for flood if project is located within a 100-year flood plain (FEMA Flood Zone "A" – or any sub-designation of Zone "A"). Policies must be obtained through the National Flood Insurance Plan (NFIP) in the amount equal to the lesser of the full insurable value or $250,000 per building with a deductible not to exceed $5,000 per building. An excess Flood or Difference in Conditions (DIC) policy should provide for the difference, if any, between the maximum limit provided by NFIP policies and the full insurable value. Flood policies must be in full effect for both the construction and permanent phases.

    vi.    If the project is located in Seismic Zones 3 or 4, a Seismic Report must be completed to determine Probable Maximum Loss (PML). If the PML is shown to have an expected seismic damage ratio of less than 20%, then earthquake coverage may be waived. If earthquake coverage is required, it must be in full effect for both construction and permanent phases in the amount not less than full insurable value.

    vii.    Windstorm is a generally accepted exclusion from "All-Risk" insurance policies, provided that a separate policy is obtained for that exclusion. The wind policy must include business income/rents loss coverage for a minimum of 12 months.

viii.   Fidelity Bond in an amount not less than six (6) months of project's gross rental receipts. Fidelity Bond coverage must be in full effect for both the construction and permanent phases.

ix.   Management agent's Workers' Compensation and Employer's Liability Insurance in the statutory amount.

x.   During the construction period, General Contractor's Commercial General Liability and Property Damage Insurance; Automobile/Hired and Non-Owned Liability; and Workers' Compensation and Employer's Liability Insurance; and

xi.   During the construction period, Architect's Errors and Omissions (Professional Liability) Insurance is required.

xii.   Ordinance and Law Coverage must be obtained when the project represents a non-conforming use under current building, zoning or land use laws or ordinances.  Amount to cover loss of undamaged portion of the building at replacement cost, demolition cost (10% of replacement cost) and increased cost of construction (10% of the replacement cost).

xiii.   Terrorism coverage is required for all projects equal to or greater than $20 million.  For projects under $20 million, terrorism coverage is an acceptable exclusion, but remains strongly encouraged.

W318390.1

74

**Additional Insurance Items**

- No commercial general liability insurance policy may contain an exclusion for loss or damage caused by mold, fungus, moisture, microbial contamination or pathogenic organisms, and no property insurance policy may contain an exclusion for loss or damage caused by mold, fungus, moisture, microbial contamination or pathogenic organisms in connection with another covered peril (e.g. mold in connection with water damage caused by storm or fire) unless the Special Limited Partner determines that the potential risk for material loss or damage as a result of such exclusions is minimal or that such insurance without those exclusions is unavailable or available only at a price that is not commercially reasonable, or it is not customary practice in the geographic region in which the Property is located to obtain such coverage for the type of construction involved.

- All carriers must be A- or better rated according to A.M. Best & Company, with a Financial Size Category rating by A.M. Best of VIII or higher.

- All insurance binders, certificates, and policies for the Partnership's insurance must name the Partnership as the named insured. All Partnership's insurance must name the Investor Limited Partner and Special Limited Partner as an additional insured or loss payee as expressly indicated, under a customary form of lender's or mortgagee's clause, with a minimum of 30 days notice of cancellation. All architect's and General Contractor's insurance must name the Partnership as additional insured or loss payee as indicated.

- All policies shall provide for a minimum of 30 days prior written notice to the Special Limited Partner of cancellation, termination, or reduction of coverage except for non-payment of premium where ten (10) days notice shall be given.

- Please reference the name of the Property or the Partnership, including address, in the "description section" of the insurance certificate.

- Each Certificate/Binder must include a broker or agent contact name along with their phone and fax number.

- Special Limited Partner reserves the right to modify the insurance requirements as conditions warrant.

W318390.1

## II.   DURING THE CONSTRUCTION PERIOD

### A.   Partnership's Policies

1. All Risk Builder's Risk

| | |
|---|---|
| Form: | Completed Value (Non-Reporting Form) |
| Perils: | Special form "All-Risk" policy, subject to the policy terms, conditions and exclusions, but excluding Flood and Earthquake (unless in a flood plain or quake zone) |
| Valuation: | Replacement Cost including the existing structure, if applicable. |
| Deductible: | Not to exceed $10,000 per occurrence |
| Endorsements / Extensions: | Permission to Occupy Endorsement<br>Renovations Coverage Endorsement<br>Loss of Rents (12 months)<br>Soft Costs<br>Ordinance and Law Coverage<br>Waiver of Coinsurance |
| Loss Payee: | Investor Limited Partner |

2. Commercial General Liability

| | |
|---|---|
| Form: | ISO, Occurrence Form |

Minimum Limits:

| | |
|---|---|
| $2,000,000 | Aggregate Limit |
| $1,000,000 | Products/completed Operations aggregate |
| $1,000,000 | Personal & Advertising Injury |
| $1,000,000 | Each Occurrence |
| $50,000 | Fire Damage |
| $5,000 | Medical Expense |

Aggregate Limits must be written on a per property basis

3. Umbrella Liability

| | |
|---|---|
| Minimum Limit: | $3,000,000 |
| Additional Insured: | Partnership, Investor Limited Partner and Special Limited Partner |

W318390.1

76

4.. <u>Automobile/Hired & Non-Owned Liability   (If Rehab)</u>

      Limit:                              $1,000,000  per  accident  Combined  Single Limit ("CSL")

5. <u>Boiler and Machinery</u>          (If Rehab)

      Form:                              Comprehensive Form

      Limit:                              Total Building Value Limit

      Valuation:                    Repair and/or Replacement

      Extensions:                 Loss  of  Rents  with  Mechanical  Breakdown Endorsement

6. <u>Workers' Compensation and</u>     (If Rehab)
   <u>Employer's Liability</u>

      Limits:
               Workers Compensations     Statutory

               Employer's Liability        $1,000,000 Each Accident
                                          $1,000,000 Disease – Policy Limit
                                          $1,000,000 Disease – Each Employee

*If the Partnership has no employee(s), please provide evidence of item 5 for the General Partner or, if applicable, parent of the General Partner.

**B.**    **<u>General Contractor's Policies</u>**

1. <u>Commercial General Liability</u>

      Form:                                ISO Occurrence Form

      Minimum Limit:              $2,000,000   Aggregate Limit
                                $1,000,000   Products/completed operations Aggregate
                                $1,000,000   Personal & Advertising Injury
                                $1,000,000   Each Occurrence
                                $50,000      Fire Damage
                                  $5,000       Medical Expense

                                Aggregate  Limits  must  be  written  on  a  per property basis

|  | |
|---|---|
| Additional Insured: | Partnership, Investor Limited Partner and Special Limited Partner |

2. Umbrella Liability

|  | |
|---|---|
| Minimum Limit: | $3,000,000 |
| Additional Insured: | Partnership, Investor Limited Partner and Special Limited Partner |

3. Workers' Compensation and
   Employer's Liability

|  | |
|---|---|
| Certificate Holder | Investor Limited Partner |
| Limits: Workers' Compensation | Statutory |
| Employer's Liability | $1,000,000 Each Accident<br>$1,000,000 Disease – Policy Limit<br>$1,000,000 Disease – Each Employee |

4. Automobile/Hired & Non-Owned Liability

|  | |
|---|---|
| Limit | $1,000,000 per accident Combined Single Limit ("CSL") |

C.   **Architect's Policies**

1. E&O Professional Liability Insurance

|  | |
|---|---|
| Minimum Limit: | $250,000 or 10% of Construction Contract (whichever is greater) |
| Certificate Holder: | Investor Limited Partner |
| Additional Insured: | Partnership |

### III.   PERMANENT INSURANCE

A.   <u>Property Insurance</u>

| | |
|---|---|
| Form: | ISO Special Form (please supply Evidence of Property Insurance, ACORD form 27, 28 or other "Special" or "All Risk" form) |

Limits:

| | |
|---|---|
| Building (Real Property) | 100% of insurable Value (Replacement Cost) |
| Contents (Personal Property) | Replacement Cost Coverage |
| Business Interruption (Rents) | 12 months' gross rental income |

| | |
|---|---|
| Valuation: | Full   Replacement   Cost/Agreed   Amount Endorsement |
| Maximum Deductible: | $25,000 per occurrence |
| Extensions: | • Vacancy/Unoccupancy up to 60 days<br>• Ordinance and Law<br>• Waiver of Coinsurance |
| Loss Payee: | Investor Limited Partner |

B.   **Commercial General Liability**

| | |
|---|---|
| **Form:** | ISO Occurrence Form |

| | |
|---|---|
| **Limit:** | $2,000,000   Aggregate Limit |
| | $1,000,000   Products/Completed Operations Aggregate |
| | $1,000,000   Personal & Advert. Injury |
| | $1,000,000   Each Occurrence |
| | $50,000   Fire Damage |
| | $5,000   Medical Expenses |

W318390.1  031249.3038

Aggregate Limits must be written on a "per property basis"

**Deductible or Retention:**     None

**Additional Insured:**     Partnership (if policy through Management Agent), Investor Limited Partner and Special Limited Partner

C.   **Umbrella Liability**

**Minimum Limit:**     $3,000,000

**Additional Insured:**     Partnership (if policy through Management Agent), Investor Limited Partner and Special Limited Partner

D.   **Worker's Compensation**

**Certificate Holder**     Investor Limited Partner

**Limits:**     $1,000,000 Each Accident

$1,000,000 Disease – Policy Limit

$1,000,000 – Each Employee

E.   **Auto Liability**

**Limit**     $1,000,000 per accident combined single limit

W318390.1  031249.3038

80

**F.**     **Boiler and Machinery**

| | |
|---|---|
| Form: | Comprehensive Form |
| Limit: | Total Building Value Limit |
| Valuation: | Repair and/or Replacement |
| Extensions: | Loss of Rents with Mechanical Breakdown Endorsement |

Exhibit D

SHELL POINTE, LP

CERTIFICATE OF ACHIEVEMENT OF DEVELOPMENT OBLIGATION DATE

The undersigned, constituting the general partners (the "General Partners") of Shell Pointe, LP, a South Carolina limited partnership (the "Partnership"), does hereby certify to MMA Shell Pointe, LLC, a Delaware limited liability company and its successors and assigns (the "Investor Limited Partner"), pursuant to the Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of August 1, 2004 (the "Partnership Agreement"), that:

1.      The first anniversary of the Completion Date occurred on _____.

2.      Breakeven occurred on _____, as evidenced by the determination letter attached hereto as Attachment A.

3.      Final Closing occurred on _____.

4.      The Development Obligation Date occurred on _____.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this ___ day of _____, 20__.

DOUGLAS COMPANY, LLC

By: _____

BLUE CROW DEVELOPMENT, LLS

By: _____

**[Letterhead of Partnership Accountants]**

Attachment A

<u>DETERMINATION OF BREAKEVEN REQUIREMENT FOR DEVELOPMENT
OBLIGATION DATE</u>

_____, 20__

MMA Shell Pointe, LLC
c/o MMA Financial TC Corp.
101 Arch Street, 13th Floor
Boston, MA 02110

Attention:  Asset Management

     RE:    Shell Pointe, LP, a South Carolina limited partnership (the "<u>Partnership</u>")

Gentlemen:

     We have reviewed the pertinent portions of the  Amended and Restated Agreement of Limited Partnership of the Partnership dated as of August 1, 2004 (the "<u>Partnership Agreement</u>").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Partnership Agreement.

     Using information provided to us by the Partnership concerning 64 Apartments an apartment complex located in Greenville, South Carolina (referred to herein as the "<u>Project</u>"), we have performed the following procedures:

     We have compiled a statement of income and expenses for the three months ended _____, 20__.

     We have obtained an annual budget prepared by the Project's management agent for the year ended December 31, 20__.

     We have adjusted the statement to annualize all expenditures, including those of a seasonal or irregular nature which might reasonably be expected to be incurred on an unequal basis during a full annual period of operations.  (Examples of such expenditures include debt service, reserve funding, maintenance, utilities, snow removal and real estate taxes.)

     We have compared the budget for such period to the statement of actual results, and have made all inquiries we considered necessary with respect to any material variances.

     We have performed such other procedures as we considered necessary to evaluate both the assumptions used and the information provided to us by the Partnership and the management agent.

W318390.1                                          83

We have determined that the Project, for each of three calendar months commencing on or after Final Closing, has achieved Breakeven, as that term is defined in the Partnership Agreement.

Copies of the calculations and adjustments we have made in reaching the determination above and of financial statements and budgets upon which such calculations are based are attached hereto.

[Partnership Accountants]

_____

Exhibit E

SHELL POINTE, LP

<u>SECOND INSTALLMENT PAYMENT CERTIFICATE</u>

The undersigned, constituting the general partners (the "<u>General Partners</u>") of Shell Pointe, LP, a South Carolina limited partnership (the "<u>Partnership</u>"), do hereby certify to MMA Shell Pointe, LLC, a Delaware limited liability company and its successors and assigns (the "<u>Investor Limited Partner</u>"), pursuant to Section 5.1B(i) of the  Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of August 1, 2004 (the "<u>Partnership Agreement</u>"), that:

5.      All preconditions, representations, warranties and agreements set forth in the Partnership Agreement and applicable to the Third Installment have been satisfied.

6.      As set forth in Section 5.1A of the Partnership Agreement, the amount of the Second Installment is $753,800, there being no reduction in the amount thereof pursuant to Section 5.2 **[or Section 5.5]** of the Partnership Agreement.  **[Modify as appropriate if any adjustment shall have occurred and attach supporting calculations and documentation.]**

7.      The Completion Date occurred on _____.

8.      The Accountants have determined the amount of the Tax Credits as evidenced by the determination letter attached hereto as <u>Attachment A</u>.

9.      Each of the representations and warranties set forth in Section 6.5 of the Partnership Agreement is true and correct in all material respects.

10.      No event has occurred which would permit the Investor Limited Partner to give an Election Notice under Section 5.3 of the Partnership Agreement.

11.      No Event of Bankruptcy as to any General Partner, Developer or Guarantor shall have occurred unless such Event of Bankruptcy shall have been cured in a manner approved in writing by the Investor Limited Partner.

12.      No event has occurred which suspends or terminates the obligations of the Investor Limited Partner to pay Installments under the Partnership Agreement which has not been cured as therein provided.

13.      Attached hereto is a true copy of an as-built survey for the Project, together with the Title Policy, including all endorsements thereto, evidencing the accuracy of the representation contained in Section 6.5(viii) of the Partnership Agreement.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this ___ day of _____, 20__.

**[GENERAL PARTNER[S]**

By: _____

**[Letterhead of Partnership Accountants]**

Attachment A

<u>DETERMINATION OF TAX CREDIT</u>

_____, 20__

MMA Shell Pointe, LLC
c/o MMA Financial TC Corp.
101 Arch Street, 13th Floor
Boston, MA 02110

Attention: Asset Management

     RE:    Shell Pointe, LP, a South Carolina limited partnership (the "<u>Partnership</u>")

Gentlemen:

     We have reviewed the pertinent portions of the Amended and Restated Agreement of Limited Partnership of the Partnership dated as of August 1, 2004 (the "<u>Partnership Agreement</u>").  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Partnership Agreement.

     Based upon information provided to us by the Partnership concerning Gardens of Montague Apartments (an apartment complex located in Greenville, South Carolina, referred to herein as the "<u>Project</u>"), we have performed the following procedures.

     We have compiled a statement of the development costs through _____, 20__ and the expected classification of each cost for tax purposes.

     We have obtained a budget for the development costs from the Partnership.

     We have compared the budget for such costs to the actual results, and have made all inquiries we considered necessary with respect to any material variances.

     We have performed such other procedures as we considered necessary to evaluate both the assumptions used and the information provided to us by the Partnership.

     We have determined that the Adjusted Aggregate Federal Credit Amount properly allocable to the Investor Limited Partner will be $_____.

     Furthermore, nothing has come to our attention to suggest that the data or assumptions on which the above determinations are based are incorrect or inappropriate.

In making these determinations, we have assumed that _____% of the apartment units in the Project will be "low-income units" as such term is defined in Section 42(i)(3) of the Internal Revenue Code of 1986, as amended, and have no reason to believe that such assumption is unwarranted.

Copies of the calculations we have made in reaching the determinations above and of the financial statements and budgets upon which such calculations are based are attached hereto.

**[Partnership Accountants]**

_____

W318390.1  031249.3038                                    88

Exhibit F

SHELL POINTE, LP

THIRD INSTALLMENT PAYMENT CERTIFICATE

The undersigned, constituting the general partners (the "General Partners") of Shell Pointe, LP, a South Carolina limited partnership (the "Partnership"), does hereby certify to MMA Shell Pointe, LLC, a Delaware limited liability company and its successors and assigns (the "Investor Limited Partner"), pursuant to Section 5.1B(i) of the Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of August 1, 2004 (the "Partnership Agreement"), that:

14.     All preconditions, representations, warranties and agreements set forth in the Partnership Agreement and applicable to the Fourth Installment have been satisfied.

15.     As set forth in Section 5.1A of the Partnership Agreement, the amount of the Third Installment is $565,350, there being no reduction in the amount thereof pursuant to Section 5.2 **[or Section 5.5]** of the Partnership Agreement.  **[Modify as appropriate if any adjustment shall have occurred and attach supporting calculations and documentation.]**

16.     Final Closing occurred on _____.

17.     Each of the representations and warranties set forth in Section 6.5 of the Partnership Agreement is true and correct in all material respects.

18.     No event has occurred which would permit the Investor Limited Partner to give an Election Notice under Section 5.3 of the Partnership Agreement.

19.     No Event of Bankruptcy as to any General Partner, Developer or Guarantor shall have occurred unless such Event of Bankruptcy shall have been cured in a manner approved in writing by the Investor Limited Partner.

20.     No event has occurred which suspends or terminates the obligations of the Investor Limited Partner to pay Installments under the Partnership Agreement which has not been cured as therein provided.

21.     Attached hereto is a true copy of the Title Policy, including all endorsements thereto, evidencing the accuracy of the representation contained in Section 6.5(viii) of the Partnership Agreement.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this ___ day of _____, 20__.

**[GENERAL PARTNER[S]**

By: _____